# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

TODD WOLF,

        Plaintiff,

v.                                                                    Case No. 23-cv-149

**JURY TRIAL DEMANDED**

CITY OF SHEBOYGAN, MAYOR RYAN
SORENSON in his individual and official capacity,
CITY ATTORNEY CHARLES ADAMS in his
individual and official capacity, ALDERWOMAN
BARBARA FELDE, in her individual and official
capacity, ALDERWOMAN ROBERTA FILICKY-
PENESKI, in her individual and official capacity,
ALDERWOMAN AMANDA SALAZAR, in her
individual and official capacity,  ALDERWOMAN
ANGELA RAMEY, in her individual and official
capacity, ALDERWOMAN BETTY ACKLEY, in her
individual and official capacity, ALDERMAN
ZACHARY RUST, in his individual and official
capacity, ALDERMAN DEAN DEKKER, in his
individual and official capacity, ALDERWOMAN
GRAZIA PERRELLA, in her individual and official
capacity, PRESIDENT SHEBOYGAN AREA SCHOOL
DISTRICT MARY LYNNE DONOHUE, in her
individual capacity; MAYA HILTY; and JILL HALL,


        Defendants.

---

# COMPLAINT
---

Plaintiff Todd Wolf, by his undersigned counsel, Jennifer DeMaster, hereby alleges as follows:

# INTRODUCTION

1.     Plaintiff Todd Wolf ("Mr. Wolf") was one of the most successful and well-liked businessmen and public servants that the City of Sheboygan has ever known known until he refused to play by the rules of the Sheboygan DEIB collective and their extremist political backers. When Mr. Wolf, a lean six-sigma black belt, walked away from the private sector to become Sheboygan's City Administrator, he aimed to ensure the citizens and the City's hardworking employees knew they had a transparent government that acted in their interest. Despite Mr. Wolf's qualifications and successes, his integrity made him a target within his first year. In 2021, the Sheboygan DEIB "collective" installed certain individuals into trusted positions on the Common Council, the Mayoral seat, and one reporter at a local newspaper. The Sheboygan DEIB and installed officials wanted to strip Mr. Wolf's powers after he denied their demands but were unsuccessful. However, when Mr. Wolf started defending employees and hiring real diversity experts, he became their main target. The goal to fire Mr. Wolf and damage his reputation hit a tipping point when Mr. Wolf finally spoke out to oppose harassment and threats for public funds and policy control.

2.     Sheboygan's Mayor and most of the Common Council publicly launched a vague "sham" investigation into Mr. Wolf's "conduct" without any legitimate justification to make sure that his stature in the community was destroyed with the help from their "friendly reporter," Maya Hilty. The defendants (and others) involved in this effort against Mr. Wolf did not actually care about diversity, equality, or inclusion. Indeed, Mr. Wolf brought on many "diversity initiatives" through qualified professionals; but not them. Mr. Wolf even offered to have them volunteer to train citizens and staff for City "Community Meetings," but they wanted money. Their concern was not about "diversity," but about money, influence, and power over the City to impose their ideologies on the employees and the citizens. Whomever stood in the way of *their* so-called

"equity" initiatives—especially Todd Wolf, whom they called a "white man of privilege"—would would face severe retaliation if he disobeyed or refused them. This was a concerted effort between DEIB-affiliated elected officials, including a "news" reporter, all working in conjunction to destroy Mr. Wolf's reputation with fabricated allegations and remove him as City Administrator without any chance for due process. This Complaint seeks to vindicate the egregious constitutional deprivations that Mr. Wolf suffered at defendants' hands simply because he chose to play by the rule of law rather than the "rule of DEIB" in Sheboygan.

## PARTIES

3.      Plaintiff, Todd Wolf, was the City Administrator for the City of Sheboygan from July 7, 2020, to January 9, 2023.  At all times material to the facts alleged in the foregoing complaint, Todd Wolf was a citizen of the United States and resident of the State of Wisconsin.

4.      Defendant City of Sheboygan ("City") is a municipality, organized pursuant to a body politic, organized under the laws of the State of Wisconsin, whose address is 828 Center Avenue, Room 103, Sheboygan, Wisconsin.

5.      Defendant Ryan Sorenson is the Mayor for the City of Sheboygan and at all times material hereto.  Sorenson was elected Mayor of Sheboygan on April 6, 2021, through the campaign leadership and advising of Defendant Mary Lynne Donohue.  He is sued in his individual and official capacities.

6.      Defendant Charles Adams is the City Attorney for the City of Sheboygan and at all times material hereto.  Adams has been the City Attorney in Sheboygan for nearly two decades and spent many years working other positions in the Sheboygan City Attorney's office prior to being named City Attorney. He is sued in his individual and official capacities.

7.     Defendant Barbara Felde is an Alderwoman and President of Sheboygan's Common Council and has been at all times material hereto.  Along with Filicky-Peneski, Feldi is considered "council leadership." She is sued in her individual and official capacities.

8.     Defendant Roberta Filicky-Peneski is an Alderwoman and Vice President of Sheboygan's Common Council and has been at all times material hereto. Along with Feldi, Feldi is considered "council leadership." She is sued in her individual and official capacities.

9.     Defendant Amanda Salazar is an Alderwoman on Sheboygan's Common Council and has been at all times material hereto. She is sued in her individual and official capacities.

10.     Defendant Angela Ramey is an Alderwoman on Sheboygan's Common Council and has been at all times material hereto. She is sued in her individual and official capacities.

11.     Defendant Dean Dekker is an Alderman on Sheboygan's Common Council and has been at all times hereto.  He is sued in his individual and official capacities.

12.     Defendant Betty Ackley is an Alderwoman on Sheboygan's Common Council and has been at all times material hereto.  She is sued in her individual and official capacities.

13.     Defendant Zach Rust is an Alderman on Sheboygan's Common Council and has been at all times material hereto.  He is sued in his individual and official capacities.

14.     Defendant Grazia Perrella is an Alderwoman on Sheboygan's Common Council and has been at all times material hereto.  She is sued in her individual and official capacities.

15.     Defendant Mary Lynne Donohue is a highly influential political power player in Sheboygan.  She currently serves as the President of the Sheboygan Area School District Board of Education and has served as Chairman of the Board for Planned Parenthood of Wisconsin.[1]  Prior

---

[1] *Planned Parenthood of Wisconsin Announces Opening of New Health Center in Milwaukee*, (Oct. 6, 2017), https://www.plannedparenthood.org/planned-parenthood-wisconsin/inc/newsroom/press-releases/planned-parenthood-of-wisconsin-announces-opening-of-new-health-center-in-milwaukee-3.

to the School District Board, Donohue served as an Alderwoman on Sheboygan's Common Council for several years.  In addition to her many listed and other political and/or activist roles, Donohue is the Founder of the "Sheboygan Justice Equity" group under the "umbrella" of the Sheboygan DEIB. *See infra* ¶ 99.

16.     Defendant Maya Hilty ("Hilty") is a reporter for Gannett Inc.'s "Sheboygan Press" and resides in Sheboygan, Wisconsin at all times material hereto.  Hilty graduated college in 2021 and moved to Sheboygan.[2]  Between October 2022 – January 2023, Hilty authored *six* articles targeting Mr. Wolf.  As set for in the following paragraphs, all of Hilty's articles targeting Mr. Wolf since October 2022 have been used in some form to remove Todd Wolf from his position as City Administrator. *See infra* Conspiracy to Violate Mr. Wolf's Fourteenth Amendment Due Process Right. She is sued in her individual capacity.

17.     Defendant Jill Pedigo Hall ("Hall") is an attorney with "VonBrieson and Roper[3] Hall has known Defendant Donohue for over thirty (30) years. Hall was contracted by Adams and Sheboygan's Common Council to investigate Plaintiff Todd Wolf.  On information and belief, Hall was selected based on her association with Donohue to retain attorney-client privilege of the City's purported "investigation" into Plaintiff Todd Wolf aid in his removal by the Common Council. Hall is sued in her individual capacity.

## VENUE & JURISDICTION

18.     This case arises under the Constitution and laws of the United States, and subject matter jurisdiction is therefore proper under 28 U.S.C. §§ 1331 and 1343.  This Court has authority to grant the requested declaratory relief pursuant to 28 U.S.C. §§2201 and 2202, and Fed. R. Civ.

---

[2] *Maya Hilty*, Sheboygan Press, Biography Page, https://www.sheboyganpress.com/staff/7964665002/maya-hilty/.
[3] *Jill Pedigo Hall*,, vonBrieson & Roper, https://www.vonbriesen.com/people/jill-pedigo-hall.

P. 57. This Court has authority to award damages and to issue injunctive relief pursuant to 42 U.S.C. § 1983. This Court has authority to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

19. The events or omissions giving rise to this cause of action occurred in Sheboygan County, Wisconsin, which is within the Eastern District of Wisconsin, Milwaukee Division. Venue is therefore proper under 18 U.S.C. § 1391(b)(1) and (2).

## RELEVANT FACTUAL BACKGROUND

### Sheboygan's City Administrator Todd Wolf

20. Todd Wolf ("Mr. Wolf") was born in Ventura, California to an impoverished family and has spent the last forty years of his life living in Sheboygan, Wisconsin.

21. Forced to be "on his own" at the age of seventeen, Mr. Wolf worked multiple jobs from a young age, eventually rising through the ranks to management because of his integrity, honesty, skill, and work ethic in the private sector. A true and accurate copy of some of Mr. Wolf's Letters of Recommendation are attached to this complaint as Exhibit A.

22. Mr. Wolf put himself through college and obtained his master's degree while continuing to work full-time and being a devoted husband and father as a City of Sheboygan ("city") resident.

23. Beginning in 2011, Mr. Wolf agreed to serve on various city committees and commissions because he wanted to improve his home in Sheboygan and desired to eventually shift to full-time public sector employment.

24. Mr. Wolf was elected as an Alderman on the Sheboygan Common Council in 2015.

25. As an Alderman and committee volunteer, Mr. Wolf studied the challenges, makeup, and inner workings of Sheboygan between 2011 – 2020 to ensure that he was well-equipped to someday become an effective public servant for the City of Sheboygan.

26. Mr. Wolf served as the Vice President of the Common Council for one year (under Donohue as President) and then as President for four years, with Donohue serving as his Vice President of the Council.

27. During the years Mr. Wolf served as an Alderman and on various Sheboygan committees, Mr. Wolf's integrity, honesty, character, and beliefs were never attacked nor questioned.

28. Defendant Mary Lynne Donohue ("Donohue") supported Mr. Wolf's appointment as City Administrator in 2020.

29. Mr. Wolf walked away from his successful private sector career when he accepted the role of Sheboygan's City Administrator in June 2020—at the height of the COVID 19 pandemic. A true and accurate copy of a Press Release Naming Mr. Wolf as City Administrator from 6-23-2020 is attached to this complaint as Exhibit B.

30. Within both the public and private sector, Mr. Wolf was considered a widely respected and well-liked leader, manager, and public servant in Sheboygan. True and accurate screen shots from *several city employees* is attached to this complaint as Exhibit C. (The messages are redacted to protect the various employees from retaliation). *See also* Ex. A.

31. As City Administrator from 2020-2023, Mr. Wolf was highly admired, respected, and well-liked by nearly every employee and department head who worked with him. *Id.*

32.     Both of Mr. Wolf's performance reviews by the Council were "outstanding" with a score of 3.96 in 2020 and 3.5 for 2021.  A true and accurate copy of Mr. Wolf's performance reviews from the City is attached to this complaint as Exhibit D.

33.     Mr. Wolf achieved outstanding success in the short time as Sheboygan's City Administrator, including *first-ever* internal audits, wage studies and increases, cutting large amounts of wasteful spending, and implementing long overdue processes into Sheboygan's City government.  A true and accurate copy of Mr. Wolf's accomplishments as City Administrator in Sheboygan is attached to this complaint as Exhibit E.

34.     In 2021, Mr. Wolf was nominated for Sheboygan County Chamber's MVP of the Team Award."[4]

35.     On August 7, 2022, Employ Humanity announced Mr. Wolf was awarded as and "Inspirational Leader" based on Mr. Wolf's "extraordinary ability to lead, serve and inspire." A true and accurate copy of an email naming Mr. Wolf for this award is attached to this complaint as Exhibit F.

**Mr. Wolf's Duties and the City Administrator Laws**

36.     Sheboygan's Common Council ("the council") created the City Administrator position in 2011 by General Ordinance and amended that Ordinance in 2014 ("City Administrator Ordinance").   A true and accurate copy of the 2014 City Administrator Ordinance in effect when Mr. Wolf was hired in June 2020 is attached to this complaint as Exhibit G – 2014 ORDINANCE.

37.     The Ordinance stated in 2020 that the City Administrator can only be removed for "cause" by a vote of three-fourths of the Common Council. *Id.*

---

[4] The details of this award nomination are in Mr. Wolf's prior office at the City, and Mr. Wolf has not been permitted to access his office since he was placed on leave and ultimately removed from his position.

38.     Mr. Wolf also signed an employment agreement ("Agreement") in June 2020 that served as "additional" benefits and assurances. A true and accurate copy of Mr. Wolf's employment agreement is attached to this Complaint as Exhibit H.

39.     The "City Administrator Ordinance" was slightly amended in 2021 to officially change the name from "Chief Administrative Officer" to "City Administrator" and edit the "council vote" for "cause" number from "three-fourths" to "four-fifths." A true and accurate copy of the 2021 amendment to the City Administrator Ordinance is attached to this complaint as Exhibit I.

40.     In his Agreement, the City agreed to provide Mr. Wolf with payment of his Wisconsin City/County Manager Association ("WCMA") fees. Ex. H ⁋ 5.

41.     The Agreement also specified that the City encouraged professional development and would provide for professional development expenses incurred to achieve these educational objectives within the State of Wisconsin. *Id.* at ⁋ 6.

42.     Pursuant to this provision, and with the agreement of Common Council ("council") leadership within the city's budget for the 2021, 2022 and 2023 years, Mr. Wolf enrolled in and began classes for his Certificate in Public Management ("CPM") at the University of Wisconsin ("UW") Madison and his master's degree in public administration ("MPA") at UW Milwaukee.

43.     Mr. Wolf has not yet completed either educational degree or certification.

44.     Mr. Wolf's Agreement imposed an automatic "severance" payment to Mr. Wolf if the City took *any action* that the Agreement defined as a "termination" including a "reduction in pay" or modification of his Mr. Wolf's job duties as City Administrator, as well as a termination without cause. *Id.* at pp. 2-4.

45. The Agreement expressly states that "[n]othing in this agreement shall contravene the [City Administrator] ordinance" pertaining to a removal of the City Administrator for cause. *Id.* ₱ 16.

46. The Agreement does *not* contain a single line nor provision that a "termination without cause" is valid, lawful, or effective. *Id.*

47. Under the current City Administrator Ordinance, the City Administrator's duties are only outlined as the "authority and powers prescribed by the common council." Ex. I.

48. The City Administrator in Sheboygan is considered an "administrative arm" of the "legislature." A true and accurate copy of a Memo on the Powers of the Mayor and City Administrator from City Attorney Charles Adams to Mr. Wolf on 1-21-2021 is attached to this complaint as Exhibit J.

49. The City Administrator in Sheboygan is not an "executive" position that ensures compliance with the laws. *Id.* at p. 7.

50. As part of his duties prescribed by the Common Council, Mr. Wolf introduced an annual budget to the Common Council for the *next* year by October of the previous year for the Council's adoption and implementation. *Id.* at pp. 7-11.

51. By August of the previous year, department heads would present their budget requests to Mr. Wolf, and between September and October, Mr. Wolf would accept or reject the department budget requests and determine the final numbers based on each department's needs.

52. Mr. Wolf's budget for 2023 was approved by the Council in October 2022.

53. The City Administrator is authorized, when necessary, to suggest that the Council put out a Request for Proposal ("RFP") when necessary for specific department or City needs within the purview of the annual budget each year.

54. An RFP is a resolution memorandum sent out to the public asking for proposals to be submitted to the City to assume specific roles, jobs, or contracted assignments based on City needs as specific in the RFP.

55. The City's Employee Handbook outlines the Grievance Procedure for employees, with most grievances being handled by the City Administrator. A true and accurate copy of the City of Sheboygan's Employee Handbook is attached to this complaint as Exhibit K.

56. The City has no grievance procedure via Ordinance or Handbook for the City Administrator. *Id.*

### Other Relevant Roles and Positions in the City of Sheboygan Government

57. Sheboygan has a "Mayor-Council" form of government under Wis. Stat. § 62.09.

58. As Mayor of Sheboygan, Sorenson's duties include ensuring "the city ordinances" are followed and upheld. *See* Ex. J.

59. The Mayor is the "presiding officer" of the Common Council and the head over the Sheboygan Police and Fire Departments. *Id.*; Wis. Stat. § 62.09(8)(d).

60. In the event of any dispute regarding whether a duty falls to the Mayor or the City Administrator, the Mayor is considered the "executive branch" and the Administrator is the "legislative branch." Ex. J at p. 7.

61. The Mayor is considered the Chief Executive Officer over the City's day-to-day operations and makes sure that City ordinances are upheld. *Id.* at p. 4.

62. The Mayor has not held power or authority over the City budget since 2011, when the City Administrator position was created.[5]

---

[5] *Sheboygan Officials wants to take power from Mayor,* Pioneer Press (Sept. 7, 2011), https://www.twincities.com/2011/09/07/sheboygan-officials-want-to-take-power-from-mayor/.

63.     On or around mid-2022, Sorenson asked a citizen affiliated with the Sheboygan DEIB to draft a "city grant proposal" for a large government grant that would directly benefit the citizen's business.

64.     When Mr. Wolf discovered this effort by Sorenson, he told Sorenson that asking a citizen to draft a public grant proposal that will directly benefit *that* citizen is not legal; and Sorenson appeared upset.

65.     Sheboygan's City Clerk is Meredith DeBruin ("Ms. DeBruin").

66.     Ms. DeBruin is the main contact for public records requests under Wisconsin Open Records Laws and all officials have named DeBruin as custodian, but Ms. DeBruin does not authorize nor disclose any records without the express authorization of the City Attorney. *See* Wis. Stats. § 62.09(11); Sheb. Muni Code 2-838(d).

67.     Ms. DeBruin takes the official "minutes" for all Common Council closed sessions.

68.     In the 8+ years Mr. Wolf served as an Alderman and City Administrator, Ms. DeBruin has always taken "handwritten" minutes in council's closed sessions and stored those minutes in her files.

69.     The City Attorney has repeatedly advised all City officials to not "re-type" any handwritten minutes because both documents (the handwritten notes and typed notes) would be subject to public records requests.

70.     Defendant City Attorney Charles Adams ("Adams") is elected, but his annual budget is determined by the City Administrator, who, until recently, was Mr. Wolf.

71.     Adams helped draft the City Administrator ordinance stating Mr. Wolf could only be removed for "cause," as well as Mr. Wolf's employment agreement, that expressly states it does not "contravene" the City Administrator Ordinance. *See* Ex. H ¶ 16.

72.     On multiple occasions, Mr. Wolf approached Adams and asked that he provide legal advising for the City department heads to help them and the employees, but Adams responded, "I only advise the Mayor and Common Council."

73.     Adams told Mr. Wolf that department heads and City employees needed to retain their own legal counsel if they had questions or legal concerns.

74.     The City Attorney's office under Adams has one full time Assistant City Attorney ("ACA"), one part time ACA, and two employees classified as professional full-time paralegals or legal assistants solely for Adams' "advising the Mayor," Council, ordinance enforcements, and reviewing contracts.

75.     On at least two occasions, Adams declined to provide any legal representation or advise City departments in need of legal counsel when Mr. Wolf requested his assistance and Adams felt that Mr. Wolf was "questioning" his capabilities.

76.     Adams asked Mr. Wolf for additional attorneys and a larger budget for the City Attorney's office, but Mr. Wolf declined Adams' requests given Adams' refusal to advise or represent City department heads on legal matters and the City's consistent need to retain outside counsel despite Adams' high salary and tenure with the City.

77.     The Director of Sheboygan's Department of Planning and Development is Chad Pelishek—a nearly sixteen-year veteran city employee.

78.     Mr. Pelishek's main duty is to approve how and to whom the City will spend all Community Development Block Grant (CDBG) money that it obtains from the state and federal government pursuant to various regulations.

79.     Another area under Mr. Pelishek's purview is Sheboygan's "Community Meetings" where each Sheboygan community neighborhood arranges a monthly meeting to discuss neighborhood issues, concerns, events, or ideas together ("Community Meeting").

80.     To support these Community Meetings, one City employee acts as a "liaison" for the citizens who lead the meetings to help them find speakers, guests, attendees, or venues for their monthly meetings ("city liaison").

81.     This City liaison works under Mr. Pelishek and is part of the Planning and Development Department.

### Mr. Wolf Turns Down Requests by Donohue and the Sheboygan DEIB

82.     On information and belief, Donohue believed Mr. Wolf would do whatever she asked after she supported his appointment as City Administrator.

83.     Within days of Mr. Wolf being named City Administrator in 2020, Donohue told Mr. Wolf to fire Chad Pelishek, who oversees government grant funding, saying, "you gotta get rid of that Chad guy."

84.     Mr. Wolf declined this request, and then Donohue asked Mr. Wolf to introduce for Council passage a new RFP for the City to hire a DEIB "diversity consultant" referencing the "Sheboygan DEIB" umbrella and Donohue's "Sheboygan Justice Equity" group.  A true and accurate copy of Donohue's drafted RFP that was emailed in October 2022 to Council is attached to this complaint as Exhibit L.

85.     Mr. Wolf refused to introduce Donohue's RFP request on at least two occasions in 2020 and 2021.  *Id.*

86.     After Mr. Wolf refused Donohue's RFP requests, Donohue helped run Sorenson's Mayoral campaign to help him get elected in 2021.

87.     On information and belief, Donohue told Sorenson that she intended to help him get elected as Mayor to help him "take back power" from the "City Administrator" (Mr. Wolf).

88.     Sorenson has repeatedly referred to Donohue as his "mentor."

89.     On information and belief, the day after Sorenson was elected Mayor, the City's (then) Human Resources Director, Vicky Schneider ("Ms. Schneider"), exclaimed that the "power" was finally "going to go back to Ryan" and would be taken away "from Todd [Wolf]."

90.     During training for the new incoming Alderpersons in 2021, Defendant Amanda Salazar also stated that the powers needed to go back to the Mayor (away from the City Administrator).

91.     In October and November 2021, Sorenson told Ms. Schneider on multiple occasions that Mr. Wolf "had a target on her back," and that Mr. Wolf sent people to "spy on her."

92.     In January 2022, Ms. Schneider filed a complaint with the Wisconsin Department of Workforce Development ("DWD") naming Mr. Wolf as "discriminating" and "retaliating" against her relying almost entirely on Sorenson's statements to her about Mr. Wolf.  A true and accurate copy of Schneider's Rebuttal to the City's Response to her complaint is attached as Exhibit M.

93.     Listed in Schneider's complaint *against the City of Sheboygan* as "corroborating witnesses" are Defendants Adams and Sorenson—the current City Attorney and Mayor of Sheboygan. *Id.* at p. 9.

94.     The City retained attorney James Macy ("Attorney Macy") to defend against Ms. Schneider's DWD complaint, and Macy agreed to conduct a full investigation into her factual allegations.

95.     On information and belief, in the summer of 2022, Attorney Macy reported to Sorenson, Adams, and the Council that Mr. Wolf did nothing wrong, and Ms. Schneider's factual allegations against Mr. Wolf were inaccurate following his internal investigation.

96.     The DWD dismissed all but one of Schneider's claims on November 10, 2022, with the remaining claim resting almost exclusively on Sorenson's comments and comments from Adams' employee.  A true and accurate copy of the DWD's Initial Determination is attached to this complaint as Exhibit N.

97.     Following Attorney Macy's investigation report and Mr. Wolf's "Employ Humanity" award nomination, Director of Senior Services Emily Rendall-Araujo (Ms. Rendall-Araujo) and Sorenson became very "close" and left City Hall almost daily to take "walks" and would constantly text one another on their cell phones or using the app "Signal" during business hours.

98.     On information and belief, Defendant Mayor Ryan Sorenson prohibited the City from publishing Mr. Wolf's "Employ Humanity" award nomination in August 2022 on any public website or City platform.  *See* Ex. F.

99.     On August 17, Donohue emailed the Council members to express her displeasure against Mr. Wolf's denying wage increases for the part-time library "Pages" based on a City-wide wage study Mr. Wolf authorized by the firm Carlson Dettmann, calling Mr. Wolf's decision "nasty."  A true and accurate copy of Donohue's email to the Council is attached as Exhibit O.

100.    On August 16, at the City's "Community Meeting," an unknown man entered the meeting and used a derogatory racial slur.  *Supra* ⁋ 79.

101.    The incident with the unknown man was reported by the City liaison to her supervisor, Chad Pelishek ("Mr. Pelishek").

102. Sorenson refused to respond to Mr. Pelishek's requests for guidance or assistance, so Mr. Pelishek raised his concerns about the incident at the City's department head meeting on August 22, to obtain guidance and help from other department heads on how to address racism at the City's Community Meetings.

103. Mr. Wolf retained an HR expert consultant to be present at the department head meetings to advise on any HR-related concerns.

104. Present at the August 22 meeting were all 15 City department heads, the HR consultant, Mr. Wolf, and one other City employee.

105. At the meeting, Mr. Pelishek told the attendees about the August 16 "slur" incident stating *only* that the unknown man used "a derogatory racial slur" and Mr. Pelishek wanted help on how to address racist behaviors by citizens during the City's Community Meetings.

106. Ms. Rendell-Araujo asked Mr. Pelishek to tell her what the derogatory phrase was, and Mr. Pelishek said, "what he said was…." in response to Rendell-Araujo's request to hear the racial slur that was used.

107. The official "minutes" of the August 22, 2022, meeting did not disclose any information or details about the "slur exchange," nor did it describe the August 16 incident that Mr. Pelishek had raised. A true and accurate copy of the official August 22 department head meeting "minutes" is attached to this complaint as Exhibit P.

108. Several hours after the meeting, Sorenson told Mr. Wolf that Rendall-Araujo disclosed the August 22 exchange to the public, and Sorenson asked if Mr. Wolf was going to "talk to" Rendall-Araujo about her disclosures, and Rendall-Araujo admitted to Mr. Wolf that she disclosed the "slur exchange" to the public.

109.    Following Sorenson's statements, Mr. Wolf called an "emergency meeting" on August 26 to be led by a qualified HR diversity advisor to address what occurred and the disclosures of the meeting.

110.    At the August 26 meeting, Sorenson and Adams joined all 15 department heads and Mr. Wolf in training on maintaining a "safe space" for employees like Mr. Pelishek to report concerns about racism.

## The Final Steps to Remove Todd Wolf as City Administrator

111.    On information and belief, Donohue, Sorenson, and Adams agreed in September 2022 to use Rendall-Araujo's public disclosures to have Sheboygan Press's Maya Hilty make it appear as though Mr. Wolf had "leaked" the confidential meeting information to the public to generate enough public outcry that would lead to Council finally removing him with "cause."

112.    On information and belief, Hilty became personally involved with Donohue's associates and leaders affiliated with the Sheboygan DEIB collective in 2022.

113.    Hilty has used her platform as a reporter for the Sheboygan Press to advocate for DEIB ideologies and promote BLM and other social justice initiatives. A true and accurate copy of an article about DEIB initiatives in Sheboygan is attached to this complaint as Exhibit SS.

114.    Hilty has used Sheboygan DEIB individuals in her articles on several occasions between January 2022 – October 2022. See e.g. *id.*

115.    Hilty knew the "slur exchange" was confidential information that was disclosed without authorization or via a lawful public records request. Ex. P.

116.    Hilty emailed *only* Mr. Wolf on September 12, 2022, to request an "interview" with him about Mr. Pelishek using a racial slur. A true and accurate copy of Hilty's email requesting comment from Mr. Wolf is attached to this complaint as Exhibit Q.

117.    Mr. Wolf blind-copied Adams on his response to Hilty because Mr. Wolf knew that Adams' job was to assess authorizations about confidential information that Hilty had been provided.  *Id.*

118.    Mr. Wolf stated that he *and* Sorenson would meet with her together based on a directive from Council President and Vice President Felde and Filicky-Peneski that the Mayor and City Administrator should be present together for Hilty's interview.

119.    Mr. Wolf arranged the interview with Hilty, himself, and Sorenson to be on September 20, which Hilty claimed was her article deadline.

120.    Without his knowledge, Mr. Wolf discovered that Sorenson separately arranged a *private* meeting with Hilty outside of City Hall on September 16, when Mr. Wolf would be out of the office.  A true and accurate copy of emails between Hilty and Mr. Wolf about her separate meeting with Sorenson is attached as Exhibit R.

121.    On September 16 when Mr. Wolf was out of the office, Sorenson obtained several confidential City documents related to diversity initiatives *that Mr. Wolf had implemented* and left City Hall.

122.    On information and belief, Sorenson took these confidential documents to his private meeting with Hilty.

123.    Mr. Wolf asked Hilty for her questions in advance, and she provided 5 questions that would pertain to the job duties of both Sorenson and Mr. Wolf.

124.    Prior to the September 20 interview, Mr. Wolf sought legal counsel from Adams, Felde and Filicky-Peneski about Hilty's email regarding Mr. Pelishek and what he should say to Hilty in the interview.

125.     Neither Felde, Filicky-Peneski, nor Adams told Mr. Wolf not to comment on, nor confirm Hilty's information; and Adams only response was, "less is more."

126.     At the September 20 interview with Sorenson and Hilty, Hilty asked several additional questions that she had not previously disclosed to Mr. Wolf, and the vast majority of her questions were specifically targeted at Mr. Wolf.

127.     Mr. Wolf pled with Hilty not to publish the information about the August 22 "slur exchange" to harm "the director" (Pelishek) because he was concerned that the information was leaked to harass Mr. Pelishek and stated to Hilty that people should feel "safe" to report racism instead of scared that they will be retaliated against and harassed as "racist."

128.     Mr. Wolf never once mentioned a single employee name to Hilty on September 20, and Hilty followed up on September 26 asking Mr. Wolf to "be specific."

129.     By October 5, Mr. Wolf thought that Hilty had decided not to publish her article after pleading with her to refrain from harassing Mr. Pelishek for reporting racism.

130.     Mr. Wolf remained concerned about Pelishek and other employees who had tried to report racism and discrimination but were all ignored by Adams, Sorenson, and Felde.

131.     Following the pressure from Sorenson, Felde, Donohue and others to do more with the Sheboygan DEIB, Mr. Wolf had a City employee, Abby Block, arrange a meeting with them because he knew Ms. Block had their contact information.

132.     Mr. Wolf had been told by two other DEI professionals that the Sheboygan DEIB had a "list of approved experts" in "DEIB" matters that they would be able to share with the City to help in the community meetings.

133. Ms. Block arranged a lunch on October 5, outside of City Hall for Mr. Wolf, Chad Pelishek, and Ms. Block to meet with two Sheboygan DEIB representatives, Ale Guevara ("Guevara") and Jamie Haack ("Haack"), at Sheboygan's "Black Pig" restaurant on 8th Street.

134. Ms. Block warned Mr. Wolf and Mr. Pelishek that Guevara and Haack would likely "ask for money" prior to the lunch meeting.

135. Present at the October 5 lunch meeting was Mr. Wolf, Chad Pelishek, Abby Block, and the Sheboygan DEIB's Guevara and Haack.

136. At the lunch, Mr. Wolf asked if the women would provide their "list of approved experts" to help the citizens address racism issues at the "Community Meetings," and the women said they did not have a list and would need to be paid to create their "list."

137. One of the women asked Mr. Wolf what the budget was for "DEI" funding, and Mr. Wolf declined to provide that information.

138. They said their budget to do "DEI" work for the City was $70,000.00 and then told Mr. Wolf that "their time was valuable," and they "have to get paid."

139. Neither Guevara nor Haack provided Mr. Wolf with any proposals, paperwork, nor information related to how their operation would work with the City budget they were looking for.

140. Mr. Wolf told them that he would not pay them City money, and Guevara responded that if he didn't pay the Sheboygan DEIB, they would "oppose" him, his policies, and anyone he used for diversity that was not with them.

141. Hilty decided to publish her article five days after the October 5 lunch with the title, "City Leader Uses Racial Slur," with several quotes and comments from Guevara. A true and accurate copy of Hilty's 10-10-2022 article about Mr. Wolf is attached as Exhibit S.

142.     In Hilty's article, Guevara stated that community members had "already been concerned about equity and inclusion issues in [Sheboygan's] government" and called on "city leaders" to "do something" about it. *Id*.

143.     Hilty characterized Mr. Wolf as caring more about the unauthorized disclosure than "a white department head repeat[ing] the racist term." *Id.*

144.     In the article, Hilty implied that Sorenson was responsible for the diversity training that Mr. Wolf had implemented, the details of which were contained in the confidential documents that Sorenson took on September 16 prior to his meeting with Hilty. *Id.* at p. 6. *Supra* ¶ 140.

145.     Immediately following Hilty's article, Sorenson told the public to email the Common Council about Mr. Wolf's position as City Administrator in response to Hilty's article. A true and accurate photograph of a copy from an email affirming Sorenson's request is attached to this complaint as Exhibit T.

146.     Following Hilty's article, Defendants Felde, Filicky-Peneski, and Sorenson ordered Mr. Wolf "not to speak to the media" about anything.

147.     In addition to Sorenson asking the public to send emails to the Council members about Mr. Wolf, Sorenson also encouraged the public to show up to speak at the Council's Public Meeting about Mr. Wolf and Hilty's article on October 17, 2022.

148.     Hilty, Jamie Haack, Vicky Schneider, and many other people affiliated with Donohue and the Sheboygan DEIB were present at the October 17 Council meeting.

149.     Prior to the meeting, Sorenson ordered Mr. Wolf to sit directly in front of Schneider and had Adams sit in Mr. Wolf's seat at the Council table.

150. Jamie Haack from the October 5 Black Pig lunch gave a public speech at open session asking Council to "re-evaluate" Mr. Wolf's position in "response" to Hilty's article.[6]

151. Donohue's associate on the SASD Board, Sarah Ruiz-Harrison, also gave a public speech asking Council to terminate Mr. Wolf in response to Hilty's article.[7]

152. During the closed session on October 17, 2022, Haack spoke for several minutes with Defendant Alderwoman Angela Ramey.

153. On October 17, the Council met in closed session to discuss action against Mr. Wolf and Mr. Pelishek. A copy of the 10-17 closed minutes that Defendant Adams authorized for release is attached as Exhibit U.

154. On October 24, the Council met again in closed session to discuss action against Mr. Wolf related to Hilty's articles. A copy of the 10-24 closed minutes that Defendant Adams authorized for release is attached as Exhibit V.

155. On October 26, 2022, Hilty published a *second* article about the "outrage" against Mr. Wolf and Pelishek because of the "racism" in City Hall. A true and accurate copy of Hilty's 10-26-2022 article about Mr. Wolf is attached as Exhibit W.

156. In her October 26 article, Hilty admitted that her articles alone were generating the public outcry to remove Mr. Wolf. *Id.*

157. On October 27, Hilty published a *third* article about Mr. Wolf describing Schneider's DWD complaint from January 2022. A true and accurate copy of Hilty's 10-27-2022 article about Mr. Wolf is attached to this Complaint as Exhibit X.

158. On October 28, Donohue sent all the Council members her RFP that Mr. Wolf had rejected to consider requesting funding and policy initiatives from the Sheboygan DEIB. A true

---

[6] https://youtu.be/3T9nkJknLCI .
[7] *Id.*

and accurate copy of Donohue's email to the Council about her RFP is attached as Exhibit Y. *See also* Ex. L for the attachment to Donohue's email.

159.    On November 1, Defendant Filicky-Peneski told Mr. Wolf, at that time, there were only five Council members in favor of removing Mr. Wolf because of twelve (12) emails from the "public" that Sorenson had requested.

160.    Filicky-Peneski told Mr. Wolf that Sorenson was "hanging his hat" on the Sheboygan DEIB and that they were gaining a lot of "power" in the City.

161.    Between October 17 and November 1, Defendants Felde and Filicky-Peneski told Mr. Wolf that the pressure to act against him and Mr. Pelishek was ***not*** in any way "about his performance" but purely because of Hilty's articles.

162.    On November 1, Sorenson met with Guevara and another Sheboygan DEIB representative in his office.

163.    On information and belief, Adams stated during this time that he "would do anything to get rid of Todd [ Wolf]."

## The City Publicly Announces an Investigation into Mr. Wolf's "Conduct" on November 7

164.    Mr. Wolf began to suffer severe emotional and physical distress in October and early November due to the harassment of Mr. Pelishek and the trauma that other City employees were experiencing after witnessing the retaliatory efforts against Mr. Pelishek for reporting racism.

165.    Mr. Wolf wanted City officials to be aware that their actions against Mr. Pelishek (and himself for defending Pelishek) would lead to employees never reporting racism incidents or other inappropriate behaviors for fear of that being leaked or them being harassed and targeted the way Mr. Pelishek was.

166.    In wanting to address these concerns, Mr. Wolf sent all ten Alderpersons on the Council a confidential email and letter on November 7, 2022, at approximately 3:00 PM ("confidential council letter").  A true and accurate copy only of Mr. Wolf's *email only* is attached to this complaint as Exhibit Z.

167.    Mr. Wolf marked his email and the attached letter as "confidential" to ensure that information about specific employees or individuals' names would be protected. *Id.*

168.    The "confidential council letter" stated that Haack and Guevara had requested money from the City, and Mr. Wolf expressed his suspicions that Hilty may have been told by the Sheboygan DEIB to publish her article about the August 22 "slur exchange" *after* the Black Pig meeting to see whether he might finally pay them.

169.    Mr. Wolf's "confidential council letter" was to express his concern that Guevara and Haack had been so involved in the "public efforts" to remove him given Guevara's quotes in Hilty's article and Haack's public speech and communications with Alderwoman Ramey *and Hilty* during closed session at the October 17 Council meeting.

170.    Mr. Wolf did not receive any response or communication from the Common Council following his email.

171.    At 6:00 pm on November 7, 2022, the Council held their next public meeting and went into closed session for approximately two hours. A true and accurate copy of the Agenda from the November 7 Council meeting is attached as Exhibit RR.

172.    At approximately 9:00 pm, Council returned from closed session, and in open session via livestream, Defendant Barbara Felde publicly read the following motion:

> "I am making a motion to place Administrator [Todd] Wolf on paid administrative leave effective immediately, for the purpose of investigating allegations and concerns regarding his conduct with

direction to authorize the city attorney to hire outside counsel to conduct the investigation."[8]

173.     The vote succeeded with Alderpersons Felde, Filicky-Peneski, Salazar, Ramey, Perrella, Rust, Ackley, and Dekker voting in favor, and Sorenson voted to adjourn the meeting.[9]

174.     Mr. Wolf was given no prior notice of the "allegations" related to his "conduct" prior to the Council's public announcement on November 7, 2022.

175.     Immediately following the meeting, Adams approached Mr. Wolf, asked him to turn over his City laptop, and personally escorted Mr. Wolf out of City Hall without giving him an opportunity to gather any of his personal belongings in his office.

176.     Adams did not give Mr. Wolf any other information about Council's public motion, the "allegations" against him, or what alleged "conduct" he was being investigated for while Adams' escorted Mr. Wolf from City Hall.

177.     No Council member present at the November 7 meeting gave Mr. Wolf any details about the alleged "conduct" that he was to be investigated for.

**Mr. Wolf's Recorded Statement for a Sheboygan Radio Station**

178.     Mr. Wolf arrived at his home at approximately 9:30 pm on November 7, 2022, and was contacted by a local Sheboygan radio station, WHBL, to see if he wanted to respond or make a statement in response to the Council's public announcement investigating his conduct following the meeting.

179.     Mr. Wolf recorded a short statement at approximately 10:00 pm from his private home on November 7 that would air on November 8, during their morning radio news show.

---

[8] Sheboygan Common Council Public Meeting, WCSC YouTube, November 7, 2022, *available at* https://youtu.be/RniRbk67aG0.
[9] *Id.*

180.    Mr. Wolf stated that he "denied a request for $70,000 of taxpayer money to members of the Sheboygan DEIB group" who stated they would "oppose" him if he didn't give them money and that these individuals went to the Common Council and "they listened."

181.    Mr. Wolf stated that that he was "blindsided" to learn of his suspension "without any notice, details, allegations or cause against [himself]" and "escorted out of the City like a criminal."

182.    Mr. Wolf also expressed concern about the way this was handled so surprisingly without any notice "in the dark of the night."

183.    At the time Mr. Wolf recorded his statements, not a single City ordinance nor anything in the employee handbook referenced an "administrative leave" as distinguished from a "suspension."

184.    In November, the "Sheboygan DEIB" was not a registered entity in any form under the Wisconsin Department of Financial Instruction.

185.    Mr. Wolf did not state Guevara or Haack's name in any public statement nor to any private individual third party while he was City Administrator.

186.    Mr. Wolf's statement was questioning whether the City was effectively being "run" by members and affiliates of the Sheboygan DEIB.

### The City's "November Directives" on Mr. Wolf & the Republican Event

187.    At approximately 11:30 pm on November 7, 2022, Adams' ordered a Sheboygan police officer to serve a letter ("November 7 directive") on Mr. Wolf at his private home in front of his family.

188.    The November 7 directive ordered Mr. Wolf to "not speak with any city employees or individuals."   A true and accurate copy of the November 7 Directive letter to Mr. Wolf is attached as Exhibit AA.

189.    The letter did not state which "individuals" Mr. Wolf was not to speak with nor did the letter state any exception for the City's police and fire department employees in case of an emergency during his "leave."

190.    The November 7 letter from Adams to Mr. Wolf stated in relevant part:

> "Henceforth, you are not authorized to speak with any city employees or individuals conducting city business. This prohibition applied to all means of communications. You are not authorized to speak to the media about City matters.  You are not allowed within all City facilities except upon invitation by council leadership, Mayor Sorenson or the City Attorney.  You may not access City emails or computer systems.  Failure to abide these restrictions will be deemed insubordination and may subject you to discipline.  If you would like to retrieve any of your belongings, please contact Attorney Adams to coordinate that.  Mayor Sorenson, council leadership or the City Attorney's office may contact you in the near future regarding the investigation and related issues. Please make yourself available for those discussions."  *Id.*

191.    Mr. Wolf was not given this letter during the Council meeting on November 7.

192.    The letter was served at 11:30 pm the night before the Wisconsin November midterm elections.

193.    Mr. Wolf's voting precinct is in the City of Sheboygan and every poll worker on November 8 is considered a "City employee or individual."

194.    The letter did not provide any exception for Mr. Wolf to "speak" to poll workers at his voting precinct during the November 8 midterm elections.

195.    The November 7 letter from Adams did not specify which "City" properties he was not to "step foot on."

196. Both the Sheboygan Police Department and the Sheboygan Fire Department are considered City properties.

197. On or around November 23, the Chairman of the Sheboygan County Republican Party reached out to Mr. Wolf and asked if he would speak at their annual caucus meeting on November 28.

198. Mr. Wolf agreed to provide a short speech addressing general concerns about "DEIB" efforts within City governments several days prior to the November 28 Republican annual caucus meeting.

199. By November 28, 2022, Mr. Wolf had not received a single letter, record, or document from the City giving him details about the investigation into his "conduct."

200. Indeed, almost one month after he was placed on leave, Mr. Wolf was not given a single ounce of information about the investigation or the "allegations" that Council publicly referenced into his "conduct."

201. On November 28, at 12:00 pm, the Chairman of the Sheboygan County Republican Party sent out a Press Release announcing that Mr. Wolf would be speaking at the annual caucus at 6:45 pm that evening. A true and accurate copy of the email from the Sheboygan County GOP announcing Mr. Wolf as a speaker at the event is attached as Exhibit BB.

202. At approximately 4:45 pm on November 28, 2022, Mr. Wolf was, again, personally served at his home, in front of his family and neighbors, by the City of Sheboygan Police Department with another letter from Adams telling Mr. Wolf that "Council" was informed of his intention to speak at the Sheboygan County Republican event ("November 28 Directive"). A true and accurate copy of the "November 28 Directive" served on Mr. Wolf is attached to this complaint as Exhibit CC.

203.    The November 28 Directive on Mr. Wolf further ordered that he was also not allowed to speak "at any event" about "City matters." *Id.*

204.    The "November 28 Directive" did not define what constituted "City matters."

205.    Mr. Wolf feared the Council's threat of "discipline" based on the content of what he spoke about at the Republican event, so Mr. Wolf declined giving the public address that he had prepared within one hour of the meeting.

206.    Mr. Wolf attended the November 28 Republican caucus meeting and spoke to various people in the back of the room but did not provide any public address based on the City's "directive" threatening him with discipline.

207.    At the caucus meeting, a woman named Lauren Hofland, wife of the former City Administrator, attended and recorded the event and Mr. Wolf.

208.    Hofland left the Republican event early and, on information and belief, Hofland provided the details of the Mr. Wolf's speaking to persons at the Republican event to one or more of the Defendants.

209.    On information and belief, shortly after the Republican event, a post was published on the "Progressive Women of Sheboygan" Facebook page calling for immediate "retaliation" against Mr. Wolf and the Sheboygan Republican Party of Mr. Wolf's attendance.

210.    The Facebook post was deleted after several minutes.

## The "Investigation" Into Mr. Wolf

211.    Within 24 hours of Mr. Wolf being placed on leave, Sorenson met with Wisconsin Watch reporters in his office. True and accurate photographs from City Hall security camera footage on November 8 along with the resultant photograph from the Wisconsin Watch website of Sorenson is attached to this complaint as Exhibit DD.

212.     Mr. Wolf later discovered that Sorenson disclosed confidential City information to Wisconsin Watch and painted Mr. Wolf in a false light with that information.

213.     On November 9, 2022, Sorenson and Adams authorized the disclosure of Mr. Wolf's *entire* "confidential council letter" to Maya Hilty.   A copy of the disclosure that Hilty shared with Mr. Wolf's attorney on December 2, 2022, and a screen shot showing the attachment of Mr. Wolf's "confidential council letter," is attached to this complaint as Exhibit EE.

214.     On November 10, without any knowledge that the City had already released his "confidential council letter" to Hilty, Mr. Wolf signed an authorization allowing the City to release his "confidential council letter" *only to his attorney* in its entirety for the limited purpose of representing him during the "investigation."  A true and accurate copy of Mr. Wolf's authorization and release only for his attorney from November 10, 2022, is attached as Exhibit FF.

215.     The City stopped reimbursing and paying for some of Mr. Wolf's benefits in November 2022 including his WCMA fees and his mileage reimbursements for his college courses.

216.     In November, Mr. Wolf requested, through his attorney, just a few of Mr. Wolf's personal documents and contemporaneous handwritten notes from his office, but Adams stated that neither Mr. Wolf nor his attorney were allowed to enter Mr. Wolf's office.

217.     Adams said that he would gather any documents that Mr. Wolf wanted, but Mr. Wolf felt uncomfortable about that and decided that he would wait until he was allowed to enter his office again.

218.     To date, Adams has never allowed Mr. Wolf any access to his office, work files, or personal belongings since he was placed on leave.

219. Adams did not allow Mr. Wolf to obtain a single work or City related document from his office even for the purposes of preparing for the "investigation."

220. Prior to the City authorizing the release of Mr. Wolf's "confidential council letter" to his attorney for the purposes of his investigation, Hilty sent Mr. Wolf a single-spaced, nearly two page, "interrogation" disguised as a "request for comment" that contained lots of confidential information contained within Mr. Wolf's "confidential council letter" on November 7.

221. Hilty's demanded that Mr. Wolf tell her why he was lying and "what evidence he had" against the defendants and the Sheboygan DEIB.

222. Mr. Wolf declined to comment on any of Hilty's questions.

223. On November 30, 2022, Mr. Wolf's attorney sent public records request pursuant to Wis. Stat. 19.356 to the city for all records, communications, emails, and information about the investigation into Mr. Wolf including details relating to the allegations against him and any other information. A true and accurate copy of an email request for investigation information is attached to this complaint as Exhibit GG.

224. The City never provided a single responsive document to this request during the investigation into Mr. Wolf but Hilty was given the exact date that the City retained the investigator, Jill Hall, based on Hilty's December 16 article that further attacked Mr. Wolf's credibility. A true and accurate copy of Hilty's 12-16-2022 article about Mr. Wolf is attached to this complaint as Exhibit HH.

225. The only information Mr. Wolf received about the "investigation" was on December 6, 2022, when Adams orally stated that Defendant Attorney Jill Pedigo Hall ("Hall") was conducting the "investigation," and it related to emails that Mr. Wolf sent to Hilty.

226.    In following up on Adams' statement that the "allegations" about Mr. Wolf's "conduct" related to an email Mr. Wolf sent to Hilty, Adams provided Mr. Wolf's attorney with the email exchanges between Mr. Wolf and Hilty in September 2022 when they were arranging the interview.   A true and accurate copy the email from Adams is attached to this Complaint as Exhibit II.

227.    On information and belief, Sorenson met with a Sheboygan *County* employee at Paradigm Coffee shop on December 9, 2022, on 8th Street in Sheboygan to discuss ways to "remove" Chad Pelishek by public petition now that Mr. Wolf was "out of the way."

228.    Hall arranged for an interview with Mr. Wolf to be held via Zoom on December 20 at 10:00 AM.

229.    Hall stated to Mr. Wolf's attorney on December 16 that her interview would only include Mr. Wolf and herself without his attorney present.  A true and accurate copy of the email from Hall is attached as Exhibit JJ.

230.    At the time, Mr. Wolf thought the investigation was only about the emails between himself and Hilty from September, as stated in the December 7 email from Adams so he agreed to abide by the investigators orders and did not demand his attorney be present.  *Id.*

231.    On December 20, 2022, at 8:43 a.m.—*less than 90 minutes* before his scheduled interview with Hall—Adams sent Mr. Wolf a letter with instructions about the investigation and what he was ordered to do. A true and accurate copy of Adams' 12-20-2022 email and attached letter to Mr. Wolf is attached to this complaint as Exhibit KK.

232.    The December 20 letter was the first, and only, document the City ever provided to Mr. Wolf related to the "investigation" and the "allegations" into his "conduct."

233. Neither Mr. Wolf nor his attorney saw the email prior to Mr. Wolf's interview with Hall at 10:00 AM on December 20.

234. Adams intended to send the letter the *day of* Mr. Wolf's interview, but Adams backdated the letter to December 19, 2022. Ex. KK at p. 2.

235. Adams' letter on December 20 stated, for the first time, that Mr. Wolf was being investigated for his alleged "communications, conduct and leadership and certain allegations of inappropriate and illegal conduct made by you."

236. Mr. Wolf has never, to date, received any further details about these "allegations."

237. Adams' letter to Mr. Wolf did not advise Mr. Wolf that he had the right to have his attorney present during the interview.

238. Adams' letter demanded Mr. Wolf cooperate with Hall's request for City "records," stating that Mr. Wolf was not to "modify, alter, delete, or destroy any records" related to his "employment, [or] any official … City business" even though Adams knew Mr. Wolf had been denied all access to his employment records and all City properties since November 7 with no opportunity to gather even his personal belongings and possessions.

239. Hall's interview with Mr. Wolf lasted approximately five (5) hours, and Hall never once told Mr. Wolf exactly what the "allegations" were that she was investigating.

240. At several points during Hall's interview with Mr. Wolf, where she had denied his attorney be present with him, Hall appeared to be cross-examining Mr. Wolf to try and elicit specific responses to see whether he had "ever" committed any wrongdoing at all, including accusing Mr. Wolf of violations based on statements that *others* made in his defense after Council publicly placed him under "investigation" for his "conduct."

241.    Hall implied to Mr. Wolf that Council wanted her report to be in "oral form" rather than "written form."

242.    Hall told Mr. Wolf that she had "known [Defendant Mary Lynne Donohue] for over thirty years" during the interview.

243.    Mr. Wolf never received any other information about the "investigation" nor communications from the City about the "investigation" following his interview with Hall.

244.    On information and belief, Hall was made aware of exonerating evidence that favored Mr. Wolf during her "investigation."

245.    On information and belief, Hall never disclosed any favorable or exonerating evidence to the Council.

### The Oral "Investigation Synopsis" and Mr. Wolf's Removal

246.    On January 3, 2023, the Common Council posted a "special meeting" Agenda for a closed session on January 4 to discuss the investigation by Hall into Mr. Wolf. A true and accurate copy of the Agenda for the January 4, 2023, Council meeting is attached as Exhibit LL.

247.    On information and belief, Hall appeared via Zoom video during the January 4 closed session.

248.    During the January 4 closed session, Hall provided only a vague oral investigation conclusion ("investigation synopsis") in which Hall stated that there was "evidence to suggest" Mr. Wolf violated the City's Directives and laws. A copy of the January 4 Minutes that Adams released to the public is attached to this complaint as Exhibit MM.

249.    On information and belief, Hall did not discuss what "evidence" she had found, what laws Mr. Wolf is alleged to have violated, nor whether there was any exonerating information that favored Mr. Wolf.

250. Following Hall's "investigation synopsis," the Council held a vote to decide whether to allow Mr. Wolf a hearing or deny him a hearing by terminating him "without cause." Ex. MM.

251. Council members were informed Mr. Wolf would have the option of requesting the hearing be conducted publicly if they voted to allow him a hearing. *Id.*

252. During the January 4 closed session, the Council also discussed an alleged "cease and desist" letter from Guevara and Haack against the City even though Mr. Wolf never disclosed their names publicly. *Id.*; *see also* Exs. EE & MM.

253. At the end of the closed session, Defendant Alderpersons Felde, Filicky-Peneski, Salazar, Ramey, Perrella, Ackley, Rust, and Dekker voted to deny Mr. Wolf any hearing and to remove him "without cause." *Id.*

254. Mr. Wolf was not allowed to attend the closed session where the investigator provided her "synopsis" on January 4.

255. On January 6, the Council posted an Agenda that they would be voting to remove Mr. Wolf without cause at the Council meeting on January 9. A true and accurate copy of the Agenda for the January 9, 2023, Council meeting is attached as Exhibit NN.

256. On information and belief, on January 7, Defendant Felde stated to a member of the public that Mr. Wolf had "no chance of defending the allegations against him." A true and accurate copy of a contemporaneous text message about a conversation with Felde is attached as Exhibit OO (REDACTED).

257. During the January 9 open session, Alderman Dean Dekker made the following statement in open session:

> "After concerns were brought forward…the majority of the council decided to hire an independent investigator. That investigation has

concluded. ...[A]fter hearing [Hall's Jan. 4 investigation] synopsis, [I] have come to the conclusion that this is in the best interests of our employees...one employee doesn't stand over the rest of our employees. To put our employees through something like this is not right. So that is why I support [terminating Mr. Wolf without a hearing]."[10]

258.    On January 9, 2023, Alderpersons Felde, Filicky-Peneski, Salazar, Ackley, Ramey, Parella, Rust, and Dekker voted to remove Mr. Wolf as City Administrator with no opportunity for a pre termination or post termination hearing.

259.    Defendant Dekker publicly stated in open session on January 9 that his decision to remove Mr. Wolf was based on Hall's oral "investigation synopsis" from January 4.

260.    Immediately following the Council's vote to remove Mr. Wolf as City Administrator, Sorenson made several public comments to the media suggesting Mr. Wolf was permanently removed based on the investigation determined he lied and violated laws and directives.[11] A true and accurate copy of the Sheboygan Press article on 1-10-2023 about Mr. Wolf's Removal is attached to this complaint as Exhibit PP.

261.    On January 9, 2023, Sorenson stated to the media that Mr. Wolf had "interfered in [the] investigation by leaking details of the investigation" which Sorenson knew was not true because Mr. Wolf has never received a single requested record or communication related to the details or even knowledge of the specific charges against him. *Id.*

262.    Sorenson told the media that Mr. Wolf was fired in part because the "investigation" found that Mr. Wolf was dishonest and kept "doubling down on" lies that Mr. Wolf "knew [weren't] true" noting that Mr. Wolf's previous statements "could be proven false with other documentation." *Id.*

---

[10] Sheboygan City Council Meeting, WCSC YouTube, January 9, 2023, *available at* https://youtu.be/8bFMX8xqeuU.
[11] WHBL ARTICLE FROM JAN 10 WOLF FIRED URL (they won't delete theirs..)

263.    Sorenson told the Sheboygan Press that Mr. Wolf was warned about his dishonesty many times, even though Sorenson knew that Mr. Wolf had never been accused of dishonesty nor told that he was being investigated for "dishonesty." *Id.*

264.    At no point during Mr. Wolf's tenure as City Administrator, Alderman, nor in the private sector, has anyone ever accused Mr. Wolf of "dishonesty."

265.    Sorenson also told the Sheboygan Press that Mr. Wolf's termination resulted in part because Mr. Wolf was unlawfully retaliating against employees by stating, "people should feel safe to come to work…[and not] have to be fearful of retaliation," even though Sorenson knew that Schneider's complaint was based mainly on *Sorenson's* statements to her. *Id.*

266.    Sorenson intended for his public statements to be exclusively connected to Mr. Wolf's removal as City Administrator on January 9, 2023 stating he hopes the "investigation" report against Mr. Wolf would "come[] sooner than later," despite Mr. Wolf never being provided the "investigation synopsis," report, evidence, or details about the "allegations" against him. *Id.*

267.    Mr. Wolf was informed by at least one municipal recruiter that based on the many articles and new claims about the investigation from Sorenson's statements and Hilty's articles, it would be impossible to secure Mr. Wolf any municipal position for a long time.

268.    Following his firing and removal as City Administrator, the City has refused to respond to Mr. Wolf or allow access to his previous office to collect his personal belongings.

269.    On January 13, 2023, without any response allowing Mr. Wolf to gather his personal belongings from his office, Adams emailed Mr. Wolf's attorney that he was authorizing the "public release" of the closed session minutes from the Council meetings related to Mr. Wolf from October 17, October 24, November 7, and January 4. A true and accurate copy of Adams' email is attached to this complaint as Exhibit QQ.

270. Despite the City Clerk always handwriting her closed session minutes, the Minutes that Adams decided to release to the public were *typed*. *See* Exs. U, V, MM, all obtained from Adams' release authorization following Mr. Wolf's removal.

271. On information and belief, Adams edited, altered, or removed information from the Ms. DeBruin's original closed session minutes in their handwritten form.

272. To date, Mr. Wolf has never been told what "laws" he is alleged to have violated nor what the "allegations" against him were.

273. To date, Mr. Wolf has never been told what "evidence" was used in Hall's determining his "guilt" and "violations" of law during her January 4 "investigation synopsis."

274. To date, Mr. Wolf has not been subpoenaed by the District Attorney, questioned in relation to any alleged criminal wrongdoings, or otherwise under criminal investigation.

## CAUSES OF ACTION

### CLAIM ONE: 42 U.S.C. § 1983
### VIOLATION OF MR. WOLF'S FIRST AMENDMENT RIGHTS
### FREEDOM OF SPEECH & RETALIATION
*BY CITY OF SHEBOYGAN, SORENSON, ADAMS, FELDE, FILICKY-PENESKI, SALAZAR, ACKLEY, RAMEY, DEKKER, RUST, PERRELLA*

275. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

276. The First Amendment of the United States Constitution protects Mr. Wolf's ability to speak on his own time as a private citizen on matters of public concern.

277. Mr. Wolf did not forfeit his Constitutional right to speak on matters of public concern on his own time solely because he was employed by the City of Sheboygan.

278.    The First Amendment of the United States Constitution prohibits the government from retaliating against a public employee who speaks on matters of public concern as a private citizen.

279.    Mr. Wolf's administrative duties did not involve expressing concerns about lawful compliance of private activist groups and their influence over City officials.

280.    Mr. Wolf's statements were made in his capacity as a private citizen within his private home, while on "administrative leave," and outside of work hours.

281.    Mr. Wolf's statements aired on November 8, 2022, related to a matter of political and social concern that the Sheboygan DEIB group had been targeting him publicly throughout October after he refused to fire Chad Pelishek for reporting racism and after he denied their request for taxpayer money.

282.    Mr. Wolf believed that an objective and fair investigation would easily prove his innocence; and his statement was a furtherance of his concerns about the harassment from Sheboygan DEIB group for City money.

283.    At the time of his statements, Mr. Wolf believed the only way that he could be forced out of his office temporarily was with a suspension since there was no directive in any City handbook or ordinance distinguishing a "leave" from a "suspension."

284.    Mr. Wolf's November 8 statements addressed a matter of public concern.

285.    Indeed, few things are less concerning to the public than government funding of private activists that have control over elected officials.

286.    Mr. Wolf's conversations at the Sheboygan County GOP event on November 28 involved general concerns about the Sheboygan DEIB collective and the reach they had over businesses and City officials.

287.     Mr. Wolf did not discuss with any event attendees any confidential city information nor information about the investigation because, on November 28, 2022, the city had refused to provide Mr. Wolf any details about the "investigation," what the exact "allegations" against him were, nor whether the city had even retained an investigator.

288.     The defendants waived their right to oversee Mr. Wolf's statements pertaining to his leave and his confusion about what the "allegations" were when *the Council* publicly announced an "investigation" into Mr. Wolf's alleged "conduct" and placed him on leave during a live and public Council meeting on November 7, 2022.

289.     Mr. Wolf's interest in addressing the Sheboygan DEIB targeting City employees who denied their money requests far outweighed the City's interest in managing an efficient workplace and/or promoting effective and efficient public service.

290.     Mr. Wolf's interest in responding to the City's public announcement of his involuntary leave for "an investigation" based on alleged "allegations" into his "conduct" far outweighed the City's interest in maintaining effective services or promoting effective and efficient public service since it was the City's decision to make the surprise public announcement without any prior notice to Mr. Wolf nor City employees that reported to him.

291.     The Council's "November 7 directive" to Mr. Wolf that he was not allowed "to step foot on city properties" the *day before the November 2022 midterm election* amounted to a severe Constitutional deprivation policy of his First Amendment rights because the defendants knew Mr. Wolf was a resident of the City of Sheboygan.

292.     The City knew Mr. Wolf's voting precinct was located in the City of Sheboygan.

293.     The "November 7 directive" on Mr. Wolf that he was "not allowed to talk to employees or individuals" without any further details on the nature or subject of his speech was a

clear violation of Mr. Wolf's First Amendment rights even while he was on leave or under "investigation."

294.     The "November 28 directive" to Mr. Wolf to "not speak about City matters" at "any event where the media might be present" under threat of "discipline" was a unreasonably vague and was a clear infringement on Mr. Wolf's First Amendment rights that resulted in Mr. Wolf declining his public address at the Republican event.

295.     The "November 28 directive" restricting speech about "City matters" was unlawfully vague because the directive did not define what constituted a "City matter" since so many "City matters" had already been made public by other City officials starting in August 2022.

296.     Mr. Wolf was fired as City Administrator on January 9 based on the January 4 "synopsis" that suggested Mr. Wolf had violated the City's "directives," which included the order that Mr. Wolf not "speak to employees or individuals."

297.     Mr. Wolf's speech as a private citizen on November 8 and 28 on matters of public concern was, at least in part, a direct motivating factor in his being fired as City Administrator.

298.     In both "November directives" to Mr. Wolf, Adams stated that he was instructed to draft and serve the letters at the instruction of the "[common] Council."

299.     The Common Council in Sheboygan consists of ten alderpersons and Mayor Ryan Sorenson as presiding officer.

300.     The Common Council has final decision-making power to enact administrative policies over employees, and the Mayor is considered the "presiding officer" over the Common Council.

301. Adams ratified the "November Directives" to Mr. Wolf when he authored both "directive" letters and ordered the Sheboygan Police Department to serve them on Mr. Wolf at his home as a show of public force.

302. On information and belief, Filicky-Peneski has admitted to at least one person that she knows the "November 7 Directive" to Mr. Wolf was unlawful.

303. On information and belief, the City has also imposed "gag order directives" on all City employees that testified to Mr. Wolf's innocence during the "investigation."

304. As City Attorney, Adams' failure to properly advise the Common Council (including the Mayor) has directly resulted in policy and practice of the City's constitutional violations against Mr. Wolf and other City employees.

305. The City's "November 7 directive" banning Mr. Wolf, a City resident, from setting foot on all "City properties" and to not speak to "City employees or individuals" the day before the November midterm elections showed a deliberate indifference to Mr. Wolf's Constitutional rights.

306. The City's November directives ordering Mr. Wolf to not speak "to employees or individuals" without narrowing instructions, while he was on leave during the holiday season and unable to communicate with the City's Police or Fire Departments in case of emergency, amounted to a deliberate indifference to his Constitutional rights.

307. The City's November "directive" ordering Mr. Wolf not to speak about "City matters" at any public "event where the media might be present" while he was on leave was unlawfully vague and amounted to a deliberate indifference to his Constitutional rights.

308. The "November Directives" on Mr. Wolf were the moving force behind his being fired and removed as City Administrator on January 9 based on the "investigation synopsis" that

stated, in part, Mr. Wolf violated the "directives" and according to statements from Dekker and Sorenson related to Mr. Wolf being fired because of the "investigation."

309.     The defendants took an adverse action by ceasing all reimbursement benefit payments for his education expenses and cancelling Mr. Wolf's WCMA membership fees payments in November 2022.

310.     The Defendants took an adverse employment action and retaliated by firing and removing Mr. Wolf as City Administrator on January 9 based, at least in part, on Mr. Wolf's statements on November 8 and 28 that, according to the City, was a "violation" of their "directives."

311.     Adams knew that the November 7 and 28 letters were violations of Mr. Wolf's Constitutional rights, but Adams facilitated, directed and participated by drafting the letters and supporting Council's vote to remove Mr. Wolf.

312.      Adams acted willfully and maliciously because he wanted to "get rid of [Mr.] Wolf."

313.     Sorenson knew the Council's vote to remove Mr. Wolf, in part, based on Mr. Wolf's purported "violations" of the unconstitutional November directives was a Constitutional violation, but Sorenson facilitated and approved Council's vote based on his statements to the media supporting Mr. Wolf's removal based on those "violations."

314.     Sorenson acted intentionally and maliciously based on his multi-year effort to slander Mr. Wolf and ensure his removal based on his friendship with the Sheboygan DEIB individuals and Donohue.

315.     As members of the Common Council, Alderpersons Felde, Filicky-Peneski, Salazar, Ramey, Ackley, Dekker, Rust, and Perrella directly participated in the deprivation of Mr.

Wolf's rights by "instructing" Adams to send the November Directives and then directly participating in the vote to remove Mr. Wolf based, in part, on Hall's "synopsis" that Mr. Wolf violated the November Directive letters.

316.    All Defendant Alderpersons acted intentionally and willfully in directing and causing the deprivation of Mr. Wolf's clearly established rights.

317.    Mr. Wolf has suffered severe financial and emotional damage and injuries as well as the deprivation of his job, title, reputation, and position.

<u>CLAIM TWO: 42 U.S.C. § 1983</u>
**VIOLATION OF MR. WOLF'S FOURTEENTH AMENDMENT
DUE PROCESS RIGHTS (PROPERTY)**
*BY SORENSON, ADAMS, FELDE, FILICKY-PENESKI, SALAZAR, PERRELLA, RAMEY,
RUST, ACKLEY, DEKKER*

318.    Plaintiff realleges and incorporates each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

319.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits government actors from "depriv[ing] any person of life, liberty, or property, without due process of law."

320.    The Due Process Clause generally requires notice and a hearing before, or reasonably promptly after, a deprivation of an individual's property rights.

321.    Wisconsin state law allows a municipality to create property interests in specific jobs by city ordinance.  Wis. Stat. 17.12(1)(c)(2)(b).

322.    Sheboygan's General Ordinance 41-20-21 controls the City Administrator position ("City Administrator Ordinance") and includes a provision that states a City Administrator can only be removed for "cause."  *See* Sheb. Mun. Code Sec. 2-341.

323.    The City Administrator Ordinance "cause" provision was in effect when Mr. Wolf signed his Employment Agreement in June 2020.  Ex. G.

324.    Mr. Wolf's Employment Agreement Section 16 expressly states, "nothing in the agreement shall contravene the [City Administrator] ordinance." Ex. H, p. 4 ₱ 16 & Ex. G.

325.    The Agreement does not state that Mr. Wolf's removal without cause would be considered valid, effective, or lawful nor that Mr. Wolf agrees to any waiver in exchange for the automatic "severance" payment from the City.

326.    Mr. Wolf had a protected property interest in his position under state law.

327.    Defendants acted in violation of the due process rights inferred upon Mr. Wolf by Wis. Stats. § 17.16(3), and both State and Federal Constitutions.

328.    This is no statutory mechanism for Mr. Wolf to address or appeal the City's violation of his due process rights to notice and a hearing; indeed, defendants have failed to ever provide written charges.

329.    The City had no legitimate reason to deny Mr. Wolf a hearing based on Sorenson's statement that a *Loudermill* hearing would cost the City money in legal fees since the vote to deny Mr. Wolf a hearing included an agreement to pay Mr. Wolf benefits and severance under the terms of the Agreement.

330.    Defendant Alderpersons Felde, Filicky-Peneski, Salazar, Ramey, Rust, Perrella, Ackley, and Dekker acted knowingly and consented by voting to deny Mr. Wolf a hearing on January 4.

331.    On information and belief, Adams and Sorenson advised and directed the Council to deny Mr. Wolf any hearing.

332.     As Presiding Officer over the Common Council, Sorenson facilitated and approved Adams' advising and the Alderpersons voting to deny Mr. Wolf due process.

333.     Sorenson facilitated, approved, and turned a blind eye towards the Council's unconstitutional vote to deny Mr. Wolf any hearing or notice of the charges against him when they removed him as City Administrator.

334.     Sorenson acted with malice and intent in advising the Council to deny Mr. Wolf's Constitutional rights to conceal evidence of his own involvement and protect Hilty, Donohue, and the Sheboygan DEIB.

335.     Adams allowed the City to engage in a pattern or practice of violating the Constitutionally protected rights to Due Process as afforded by both State and Federal Constitutions.

336.     Adams knew a vote denying any hearing before or after his removal would violate Mr. Wolf's due process rights, and he facilitated, approved, and condoned the violation of Mr. Wolf's Constitutional rights to any hearing.

337.     Adams acted willfully and with malice and intent because he hated Mr. Wolf, and he knew the Agreement did not "contravene" the "cause" provision in the City Administrator Ordinance.

338.     Felde and Filicky-Peneski acted with malice and intent by voting to deny Mr. Wolf a hearing and removing him as City Administrator because they knew Mr. Wolf was innocent of any "allegations" and they wanted to conceal from the public all exonerating information.

339.     Alderpersons Salazar and Ramey acted with malice and intent because of their personal ties and connections with Sorenson and the Sheboygan DEIB.

340. Alderpersons Dekker, Ackley, and Rust acted willfully and intentionally by voting to remove Mr. Wolf from his position without any hearing.

341. In efforts to protect Mr. Wolf's right to any hearing, only two Aldermen, Trey Mitchell and Joe Heidemann, voted in favor of a hearing on January 4.

342. Defendant Alderpersons Felde, Filicky-Peneski, Salazar, Ramey, Ackley, Perrella, Rust, and Dekker directly caused the deprivation of Mr. Wolf's due process rights by voting against a hearing for Mr. Wolf on January 4.

343. The direct and intentional actions by Sorenson, Adams, Felde, Filicky-Peneski, Salazar, Ramey, Perrella, Rust, Ackley, and Dekker resulted in the deprivation of Mr. Wolf's clearly established rights.

344. Mr. Wolf has suffered severe emotional and mental distress over the previous three months directly because of the intentional acts and omissions by the Defendants herein.

345. Mr. Wolf has suffered severe financial injuries, including having to cover the full cost of his *two* college certifications related to his position as City Administrator.

### CLAIM THREE: 42 U.S.C. § 1983
### VIOLATION OF MR. WOLF'S FOURTEENTH AMENDMENT
### DUE PROCESS RIGHTS (LIBERTY)
*BY CITY OF SHEBOYGAN, ADAMS, SORENSON*

346. Plaintiff realleges and incorporates each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

347. The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits government actors from "depriv[ing] any person of life, liberty, or property, without due process of law."

348. The government is prohibited from stigmatizing a public employee that has been removed from a protected position without due process.

349. Mr. Wolf's position was guaranteed under state law and pursuant to the City Administrator Ordinance ("Ordinance") in Sheboygan that stated he could only be removed for "cause."

350. Mr. Wolf's employment Agreement did not "contravene" the Ordinance.

351. Mr. Wolf had a property interest in his position as City Administrator.

352. Mr. Wolf had a liberty interest in his excellent reputation, honesty, and integrity throughout the Sheboygan public and private sector from his years serving as an Alderman and on various City Commissions.

353. Mr. Wolf had a liberty interest in his reputation as an award-winning Manager, City Administrator, and "Inspirational Leader" in the City of Sheboygan. *See* Exs. A & F.

354. Mr. Wolf was entitled to notice and an opportunity to be heard about any "allegations" that the city publicly lodged against him on November 7 and January 9, when he was removed from his position following the public announcement of an "investigation" into his "conduct."

355. Mr. Wolf's position was permanently extinguished when the Council voted to remove him without any hearing on January 9.

356. Mr. Wolf's firing and removal on January 9 was a direct result of the public "investigation" into his alleged "conduct" that the City announced on November 7 based on Sorenson and Dekker's public statements on January 9.

357. Mr. Wolf suffered a deprivation of his Constitutional rights when Felde, as President of Council, read the motion on November 7 calling for an investigation into "allegations" and "concerns" about Mr. Wolf's "conduct" without previously giving Mr. Wolf any notice of the allegations or opportunity to be heard by the Council.

358.    Felde's public announcement was made within the context of Mr. Wolf's firing because the "investigation" that was announced directly led to Mr. Wolf's removal on January 9.

359.    Mr. Wolf suffered a deprivation of his Constitutional rights when Alderman Dekker stigmatized him at public session on January 9 stating that his decision to remove Mr. Wolf was based on the oral "investigation synopsis" related to Mr. Wolf's "conduct" and Mr. Wolf remaining was not safe for employees without affording Mr. Wolf any opportunity for a hearing to clear his name.

360.    Sorenson's public statements to the Sheboygan Press that Mr. Wolf had "leaked confidential" information related to the investigation was intentionally defamatory because Mr. Wolf never spoke about any investigation details because he was given no details and not even provided written notice about the investigation until December 20 from Adams' letter two hours before his interview.

361.    Sorenson knew that Mr. Wolf never spoke about the investigation details in public outside of what the Council had already publicly announced, and he intentionally aimed to stigmatized and defame Mr. Wolf by stating that he unlawfully leaked confidential information.

362.    Sorenson destroyed Mr. Wolf's reputation by stating to the media on January 9 that Mr. Wolf was "warned" many times about dishonesty and still continued to lie, which Sorenson knew was not true as Mr. Wolf had only been reprimanded for his honesty in defending Pelishek for reporting racism and reporting his concerns about the Sheboygan DEIB collective funding.

363.    Sorenson defamed Mr. Wolf when he suggested Mr. Wolf was fired so employees could be safe from "retaliation," even though Sorenson knew that Mr. Wolf never unlawfully retaliated against any employee.

364. Sorenson is aware that no employee was disciplined other than Mr. Wolf based on the inaccurate articles written by Maya Hilty.

365. All of Sorenson's public statements on January 9 were made in connection to Mr. Wolf's removal as City Administrator.

366. Mr. Wolf's suffered multiple and egregious deprivations of his liberty rights within the context of the "investigation" and his ultimate removal as City Administrator without any opportunity to be heard between November 7 and January 9.

367. The City's custom and policy of depriving Mr. Wolf's of his Constitutional rights was established in their "November Directives" that prohibited him from speaking to the media, "individuals," or at any event "where the media might be present," even though the City intended to defame and destroy Mr. Wolf at his removal on January 9.

368. The City also approved the policy to deny Mr. Wolf any opportunity to be heard when they voted *against* a hearing on January 4 immediately prior to their removal of him as City Administrator violating his Constitutional rights protected by both State and Federal Constitutions.

369. Sorenson had final decision-making power in determining statements published to the media about internal personnel matters within the city on January 9 following Mr. Wolf's removal.

370. Sorenson ratified the public defamation and stigmatization of Mr. Wolf's character on January 9 in connection with his termination as City Administrator without any opportunity for Mr. Wolf to clear his name publicly or even know the details of the charges against him.

371. Sorenson, as Mayor, and Felde, as Council President, both had final decision-making power over whether Council would read the November 7 motion related to the "allegations" and "investigation" into Mr. Wolf.

372.     Adams' poor legal advising to Council led to Felde publicly reading the November 7 motion about the investigation into Mr. Wolf's "conduct" despite the Wisconsin Open Meetings Laws that provide a clear exception allowing Council to vote in closed session for personnel matters or internal investigations.

373.     The City's policy denying Mr. Wolf a public name-clearing hearing or know the actual "charges" against him in order to conceal their own involvement and fabricated evidence amounted to a deliberate indifference to Mr. Wolf's Constitutional liberty rights.

374.     The City's policy of denying Mr. Wolf a public name clearing hearing prior to his removal directly caused Constitutional deprivation when Sorenson expressly inferred that Mr. Wolf was fired because of his continued dishonesty and unlawfully leaking information .

375.     As Mayor who oversees compliance with City Ordinances, Sorenson knew or should have known, that Mr. Wolf could only be fired for "cause" with a name-clearing hearing.

376.     Sorenson knew about and facilitated the violation of Mr. Wolf's liberty rights and then directly engaged in the public defamatory statements in connection with Mr. Wolf's removal after advising the Council to deny Mr. Wolf a hearing.

377.     Sorenson's public statements on November 8 that Mr. Wolf was dishonest, and his many statements on January 9 were intentional efforts to defame and destroy Mr. Wolf's reputation in connection with his removal as City Administrator.

378.     Sorenson acted with malice and intent to defend and protect his own involvement and the Sheboygan DEIB he affiliates with and whom had demanded taxpayer monies.

379.     As City Attorney, Adams knew that Mr. Wolf could only be removed for cause and was entitled to a hearing, but Adams intentionally advised the Council to publicize the

investigation on November 7 and then to vote to deny Mr. Wolf a name-clearing hearing on January 4.

380.    Adams knew or should have known that Sorenson and Dekker's public statements on January 9 about Mr. Wolf's conduct, honesty, and integrity were unlawful without affording Mr. Wolf an opportunity to be heard, and he facilitated, condoned, and turned a blind eye to Sorenson's and Dekker's statements.

381.    Adams' authorized the public release of the January 4 "oral investigation synopsis" minutes that stated "evidence suggested Mr. Wolf violated the law without ever affording Mr. Wolf an opportunity before the investigation synopsis to publicly clear his name.

382.    Adams' authorization of the records release with a Wisconsin records notice allowing Mr. Wolf to file an appeal was meant to further stigmatize Mr. Wolf as "trying to hide the investigation report" in furtherance of Adams' facilitating the deprivation of Mr. Wolf's Constitutional rights.

383.    Adams and Sorenson acted with malice and intent.

384.    The defamatory statements by the defendants have made it nearly impossible for Mr. Wolf to find another job in his chosen profession.

385.    Mr. Wolf has suffered extreme and severe emotional distress because of the defendant's defamation of his character to the public within the context of the "investigation" into his "conduct" that led to his removal and firing.

386.    Mr. Wolf has suffered severe financial damages and has almost no chance of obtaining gainful employment in any municipality or as a public servant (and even the private sector) based on the defendants' public statements about him without a chance to clear his name.

387.    The defendants conspired to violate Mr. Wolf's clearly established liberty rights.

**CLAIM FOUR: 42 U.S.C. § 1983**
**CONSPIRACY TO VIOLATE MR. WOLF'S FOURTEENTH**
**AMENDMENT DUE PROCESS RIGHTS (LIBERTY)**
*BY DONOHUE, HILTY, HALL, SORENSON, ADAMS*

1.      Plaintiff realleges and incorporates each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

2.      The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits the government from "depriv[ing] any person of life, liberty, or property, without due process of law."

3.      The Fourteenth Amendment prohibits government officials from working in conjunction with private individuals to deprive another of their constitutional liberty and property interests without due process of law.

4.      Mr. Wolf's position as City Administrator was established under State law and pursuant to Sheboygan's City Administrator Ordinance that stated Mr. Wolf could only be removed for "cause."

5.      Mr. Wolf had a Constitutional right to not be deprived of his position without a single hearing or opportunity for a hearing following his removal.

6.      Mr. Wolf had a Constitutional right to not be publicly stigmatized within the context of his removal as City Administrator on January 9, 2023, without an opportunity to view the evidence against him or clear his name in a public hearing.

7.      Mr. Wolf was deprived of his right to his position and reputation by being subjected to a "sham" investigation through fabricated evidence, and then being slandered and stigmatized when he was permanently removed as City Administrator on January 9.

8.      Donohue, Sorenson, Adams, and Hilty devised a single agreement in September 2022 to frame Mr. Wolf for leaking confidential information and inciting a "public outcry" and fabricating false "cause" to remove him as City Administrator with eight Council votes.

9.      On information and belief, Hall agreed to assist this plan in mid-November 2022 to manipulate Mr. Wolf into finding *any* wrongdoing on his part and then report falsely to Council that Mr. Wolf had violated laws to ensure his removal.

10.     This plan was devised to remove Mr. Wolf as City Administrator to ensure funding and implementation of Sheboygan DEIB affiliated persons that Mr. Wolf had not supported by destroying his credibility and reputation in creating "cause" to fire him.

11.     The plan also aimed to destroy Mr. Wolf's respected standing and influence throughout the Sheboygan government and private businesses that he had built over the previous twenty years so that Mr. Wolf could not undermine the efforts of the Sheboygan DEIB to obtain funding and influence throughout the public and private sectors in Sheboygan.

12.     On information and belief, Sorenson has admitted that Mr. Wolf was targeted for removal because of Sorenson's connection to the Sheboygan DEIB individuals.

13.     On information and belief, Adams admitted in December 2022 to being "on the mayor [Sorenson]'s team" in "doing anything in his power" to get rid of Mr. Wolf because he believed Mr. Wolf questioned Adams' capabilities and budget requests.

14.     In furtherance of this plan, Hilty intentionally wrote articles to generate "public outcry" against Mr. Wolf so that he would be removed, which she took credit for in her October 26 and December 16 articles.  *See* Exs. S, W, X, & HH.

15.     Hilty harassed Mr. Wolf and Chad Pelishek by printing intentionally misleading articles from unlawfully leaked information to make it appear as though Mr. Wolf had leaked the August 22 meeting details by omitting the true source of her articles.

16.     In furtherance of the plan, Hilty wrote false and misleading articles targeting Mr. Wolf and anyone who defended Mr. Wolf to fabricate "evidence" that Mr. Wolf had leaked information and committed wrongdoing to ensure his removal.

17.     In furtherance of the plan, Sorenson or Adams authorized the City Clerk to release Mr. Wolf's entire "confidential council letter" to Hilty on November 9 to publish the letter as if Mr. Wolf disclosed the confidential matter to claim that Mr. Wolf was unlawfully disclosing confidential information.

18.     In furtherance of the plan, Sorenson asked "people in the public" affiliated with the Sheboygan DEIB to write outraged emails to the council members demanding Mr. Wolf be terminated after Hilty's October 10 article, which led to Council meetings in closed session starting on October 17 to determine how to remove Mr. Wolf.

19.     On information and belief, Sorenson destroyed and ordered the destruction of public records after Mr. Wolf's attorney requested them for the "investigation," to conceal the defendants' involvement in the plan.

20.     In furtherance of this plan, Adams refused Mr. Wolf access to his office to gather his personal notes and belongings during the investigation to allow him and Sorenson to fabricate or destroy evidence during the "investigation."

21.     In furtherance of the plan, Adams and Hall ensured a "sham investigation" by refusing to (1) allow Mr. Wolf his attorney during the interview, (2) provide details of the

allegations against Mr. Wolf, (3) advising Council to remove Mr. Wolf without cause to conceal their false evidence and deny Mr. Wolf a chance to be heard.

22.     On information and belief, Adams edited the City Clerk's handwritten minutes of the January 4 closed session to fabricate the appearance that Hall's synopsis showed Mr. Wolf's dishonesty and "violations" of "law."

23.     In furtherance of the plan, Donohue ensured that her associate of "more than thirty years," Jill Hall would conduct the "investigation" to solidify Mr. Wolf's removal and funding for her Sheboygan DEIB RFP, that she sent to Council after Hilty's October articles.  Exs. Y & L.

24.     On information and belief, Sorenson, Adams and Donohue advised that protection from public open records may be obtained through attorney-client privilege and an attorney-investigator (Hall) who would provide an oral opinion could accomplish this objective.

25.     In furtherance of the plan, Donohue and Sorenson arranged for Guevara and Haack to issue a "cease and desist" letter against the "City" based on Mr. Wolf's "confidential council letter" to fabricate evidence that Mr. Wolf was a "legal liability" for the City as Sorenson stated to the Sheboygan Press.

26.     Adams intentionally authorized the public release of Guevara and Haack's names to the public so that Hilty could publish those names on December 16 from Mr. Wolf's confidential email and imply that Mr. Wolf was a legal liability for the City based on Hilty's publication.

27.     On information and belief, one or more defendants arranged for Lauren Hofland to spy on the Republican event on November 28 and report back to them that Mr. Wolf had violated the November directive.

28.     On information and belief, Hall used her "employee interviews" to determine and report to the defendants which employees' testimonies would exonerate Mr. Wolf so that Adams could assess whether to allow Mr. Wolf a hearing.

29.     In furtherance of the plan, Hall intentionally concealed evidence that exonerated Mr. Wolf when she gave her "oral investigation synopsis" to the Council on January 4 on orders from Adams or Sorenson.

30.     As a direct result of the willful and intentional acts by the named defendants, Mr. Wolf was deprived of his Constitutional property rights without due process of law.

31.     As a direct result of the willful and intentional acts by the named defendants, Mr. Wolf was deprived of his Constitutional liberty rights without due process of law.

32.     Donohue, Hilty and Hall acted as private citizens in conjunction with the City official defendants to deprive Mr. Wolf of his clearly established due process rights to liberty and property.

33.     Donohue, Hilty, Hall, Sorenson, and Adams willfully participated in carrying out a single agreement to stigmatize Mr. Wolf as a liar and criminal within the context of his removal as City Administrator by Council.

34.     Donohue, Hilty, Sorenson, and Adams acted maliciously and intentionally in carrying out the plan to remove Mr. Wolf without due process and destroying his reputation based on Hilty's many articles, regular weekly private meetings with Sorenson, and their overall hatred of Mr. Wolf.

35.     Hall intentionally facilitated and turned a blind eye by knowing the plan to deprive Mr. Wolf of his constitutional rights and denying Mr. Wolf legal counsel while concealing

exonerating information to create the appearance of his alleged "guilt" that would convince eight alderpersons to vote for his removal without a hearing.

36.     The defendants plan to conjure false allegations against Mr. Wolf to convince eight Council members to remove him and publicly stigmatize his reputation, and their many combined acts in furtherance of that plan, directly resulted in the deprivation of Mr. Wolf's clearly established due process rights.

37.     Based on the defendants' many overt acts, Mr. Wolf has suffered severe emotional, mental, and financial injuries including the loss of his position, severe damage to his reputation, and no ability to provide financially for himself or his family.

### CLAIM FIVE: STATE LAW CLAIM: WIS. STAT. § 895.446
### UNLAWFUL CONVERSION OF MR. WOLF'S PERSONAL PROPERTY BY
### THE CITY OF SHEBOYGAN

38.     Plaintiff realleges and incorporates each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

39.     Wisconsin state law holds that it is unlawful to refuse to turn over control of property that was previously lawfully in ones possession without the owner's consent.

40.     The City of Sheboygan had temporary control over Mr. Wolf's personal property, notes, records, photographs, artwork and other valuable personal items that Mr. Wolf stored in his City Administrator office in City Hall during his tenure.

41.     When the Council placed Mr. Wolf on involuntary administrative leave, Mr. Wolf was entitled to sufficient time to collect any personal belongings if he chose during his leave.

42.     Adams' deprived Mr. Wolf of access to his personal property by refusing to allow Mr. Wolf an opportunity to collect his personal belongings on November 7 based on the City's November 7 Directive letter that Adams' would provide Mr. Wolf his personal belongings.

43.     When Mr. Wolf asked that his legal representative be granted access to gather some of his personal and private notes and records in November 2022, Adams stated that neither Mr. Wolf nor his legal representative were allowed in his office.

44.     During Mr. Wolf's involuntary leave, he was under investigation for vague "charges" and ordered by the City Attorney (Adams) to "furnish all records" requested by the investigator related to his position despite knowing that Mr. Wolf had been prohibited by the City from accessing his office, any City electronic devices and/or technology(ies), contemporaneous handwritten notes, or other valuable personal belongings.

45.     The city's refusal to allow Mr. Wolf access to his personal belongings as well as his own personal contemporaneous handwritten notes caused Mr. Wolf to be unprepared for the investigation interview that led to his removal and firing.

46.     Mr. Wolf was removed as City Administrator on January 9, 2023.

47.     On January 10, Mr. Wolf, through his legal representative, emailed Adams and the City's outside legal counsel requesting that they grant immediate access to Mr. Wolf's City Administrator office to gather his personal belongings.

48.     To date, neither Adams nor any representative from the City has ever responded to Mr. Wolf's requests to obtain his personal belongings, and Mr. Wolf's deprivation of these items had led to severe loss, time, deprivation of resources, and ultimately his position because he could not access nor remember some of his personal detailed notes and information.

49.     On information and belief, Adams and Sorenson trespassed into Mr. Wolf's office and removed, altered, destroyed, or fabricated information to harm Mr. Wolf during the investigation and their actions have harmed, damaged, and injured Mr. Wolf's personal property and belongings within his previous office.

50.     The city of Sheboygan unlawfully converted Mr. Wolf's personal property and belongings and caused him injury by depriving him of his personal property.

## REQUEST FOR RELIEF

Plaintiff Todd Wolf therefore requests the following relief:

1.     A declaration that the City of Sheboygan violated Mr. Wolf's First Amendment rights;

2.     A declaration that Defendants Sorenson, Adams, Felde, Filicky-Peneski, Salazar, Ramey, Ackley, Dekker, Rust, and/or Perrella violated Mr. Wolf's First Amendment rights;

3.     A declaration that Defendants Sorenson, Adams, Felde, Filicky-Peneski, Salazar, Ramey, Ackley, Dekker, Rust, and/or Perrella violated Mr. Wolf's Fourteenth Amendment Due Process property rights;

4.     A declaration that the City of Sheboygan violated Mr. Wolf's Fourteenth Amendment due process liberty rights;

5.     A declaration that Defendants Sorenson and Adams violated Mr. Wolf's Fourteenth Amendment due process liberty rights;

6.     A declaration that Defendants Sorenson, Donohue, Adams, Hilty, and/or Hall conspired to violate Mr. Wolf's Fourteenth Amendment due process rights;

7.     A declaration that the City of Sheboygan unlawfully converted Mr. Wolf's personal property and belongings by refusing to allow him to access, acquire, or possess his personal belongings during his leave and following his termination;

8.     An immediate preliminary injunction requiring Defendants to retain, preserve, and keep all emails, text messages, documents, calendars, handwritten notes, and other records including all electronica and/or other media, in whatever native formats related to Mr. Wolf's and

the Defendants' plans, investigation, and termination of Mr. Wolf while he was employed by the City, including, but not limited to, all such records and documents that were requested by Mr. Wolf's legal counsel through Wisconsin public records laws between November 7 – January 6, 2023 and all original handwritten notes from City Clerk DeBruin related to the closed sessions from October 17, October 24, November 7, and January 4 for the purposes of discovery in this civil action;

9.     An injunction requiring Defendants to allow Mr. Wolf to enter his former City office to gather his personal belongings and photographs in his office to assess the extent of any further conversion of his personal belongings, including but not limited to, his artwork, decorations, personal items, personal and sensitive notes, and other such personal property;

10.     An injunction prohibiting Defendants from making further false, misleading and otherwise unlawful public disclosures related to Mr. Wolf's termination and the defendants' "investigation";

11.     Compensatory damages, including, but not limited to, damages for lost income and benefits, severe mental and emotional distress, loss of reputation, humiliation and inconvenience;

12.     Punitive damages against Defendants Sorenson, Adams, Donohue, Hilty, Felde, Filicky-Peneski, Salazar, Ramey, Dekker, Rust, Perrella, Ackley, and/or Hall;

13.     Nominal damages;

14.     Costs and attorneys' fees under 42 U.S.C. § 1988; and

15.     Any other relief that the Court deems appropriate.

16.     Plaintiff requests a trial by jury.

Dated: February 6, 2023

Respectfully Submitted,

<u>*/s/ Jennifer DeMaster*</u>
Jennifer DeMaster
Wis. Bar No. 1124201
attorney@jenniferdemaster.com

DEMASTER LAW LLC
361 Falls Rd # 610
Grafton, WI 53024
Phone: (414) 235-7488
Fax: (262) 536-0515

*Attorney for Plaintiff*