

# Fox&Fox
S.C.
ATTORNEYS at LAW

**Madison**
124 W Broadway
Monona, WI 53716
p: 608.258.9588
f: 608.258.9105

**Milwaukee**
111 E Wisconsin Ave
Suite 1925
Milwaukee, WI 53202
p: 414.326.3260
f: 414.224.1411

**Chicago**
111 E Wacker Dr.
Suite 2600
Chicago, IL 60601
p: 312.526.3220

info@fox-law.com
www.fox-law.com
toll free: 800.416.5368

Writer's E-mail
pfox@foxquick.com

April 8, 2022

Rupneet Sidhu
Equal Rights Officer
Equal Rights Division
819 North 6th Street, Rm. 723
Milwaukee, WI 53203-1687
E: Rupneet.Sidhu@dwd.wisconsin.gov

      RE:    *Schneider v. City of Sheboygan*
              ERD Case No. CR202200171
              EEOC Case No. 26G202200443C

Dear Ms. Sidhu,

    This letter responds to your correspondence of March 14, 2022 and offers rebuttal to the Respondent's March 11, 2022 position statement in this matter.

## I.    Introduction & General Rebuttal

    The City of Sheboygan's response ignores the bulk of Ms. Schneider's allegations other than to assert that the City does not discriminate or retaliate and to suggest that she was an inexperienced and disgruntled employee who was upset that the City hired a third party to investigate a female police officer's claim of sexual harassment. While this defense may be enough at a merits hearing where the credibility of competing testimony can be measured, it is not enough at the probable cause stage for an employer to ask the Division to simply take it at its word, especially in the face of competing and unchallenged allegations from the complainant.

    In her complaint, Ms. Schneider made the following assertions that went unaddressed in the respondent's position statement:

**EXHIBIT M**

**Attorneys at Law**

Michael R. Fox    Mary E. Kennelly    Richard F. Rice    Randall B. Gold*    Peter J. Fox
mfox@foxquick.com    mkennelly@foxquick.com    rrice@foxquick.com    rgoldlaw@aol.com    pfox@foxquick.com

*Also Admitted in Illinois

- "I expressed serious concerns regarding…the sufficiency of the respondent's remedial efforts to address the sexual harassment;"
- "I expressed serious concerns regarding…the sufficiency of the respondent's remedial efforts to address…other inappropriate sexual behavior involving City employees;"
- "I…openly questioned the sufficiency of the respondent's remedial efforts to address the sexual harassment;"
- "I … openly questioned … the sufficiency of the respondent's remedial efforts to address…other inappropriate sexual behavior involving City employees;"
- "(T)he City Administrator admonished me to not let this situation 'taint' me;"
- "I have seen my role marginalized and have been steadily ostracized by the City Administrator;"
- (The City Administrator) has instructed members of my own staff to spy on me and report anything that could advance his obvious plan to set me up for failure;"
- "I have been told by the Mayor that I have a 'target' on my back, from the City Administrator, and that my job is in jeopardy;"
- "The City Administrator has orchestrated this hostility against me in order to undermine my authority, in retaliation for my opposition to the sexual harassment of female City employees by their male co-workers and the City's inadequate response to the situation."

The City's reply is instead a series of inaccurate and irrelevant allegations that do nothing to refute her claims. Indeed, the respondent's principal defenses – that the City Administrator had consistent concerns about Ms. Schneider's skill level and that she was upset with the hiring of an outside investigator – have nothing whatsoever to do with her claims and are demonstrably false.

Until Ms. Schneider expressed concerns and openly questioned the City's handling of the sexual harassment complaints involving the police department, the City Administrator fully supported her and her work. In fact, he expressed his full support for her publicly and on record at numerous Common Council meetings throughout 2020 and 2021. The televised and recorded Common Council and Committee meetings leave no doubt of this fact or the fact that she received commendations from the Council throughout 2021. In addition, text conversations between the City Administrator and Ms. Schneider show just how disingenuous his newly alleged concerns are; they include "You are great for this position." (7/14/21), and "Thanks for all you do." (7/15/21). Exhibit 1. It was not infrequent that Ms. Schneider and the City Administrator would also have

lunch together during the business day. But these lunches and applauding texts stopped after she criticized the City's and the City Administrator's handling of the sexual harassment complaints.

Contrary to the narrative the City now wants the Division to believe, Ms. Schneider embraced the involvement of an outside investigator. In fact, prior to the external investigation, Ms. Schneider was not involved in the investigation; it had theretofore been handled internally by the police department itself. (In other words, she was not given the "responsibility to continue the internal investigation" as the respondent suggests. The police department did the internal investigation and on its own determined the discipline for the officers involved. Ms. Schneider had nothing to do with that part of the investigation. In fact, in June, 2021, the President of the Police and Fire Commission expressed his concern that Human Resources **had not** been included in the investigation). It was only through the involvement of an outside firm that Ms. Schneider learned of the full scope of the allegations, which included several female officers allegations against a number of male officers and was far more serious than she had been led to believe. This gave her great concern that the female officer's complaints were not being taken seriously and a cover up was under foot and she expressed those concerns to the City Administrator.

The City would also have the Division believe that Ms. Schneider was advised "not to interfere with the investigation," but that is also completely untrue. In fact, she was assigned by the City Administrator as the City's contact to work with the external investigator on July 8, 2021. Her responsibility was to assist and facilitate meetings, conference calls and communications between and with the attorney investigator, the City's insurer, the City Administrator, Mayor Sorenson and City Attorney Adams related to the matter. She abided by these instructions and was never once told not to interfere.

As it turned out, the police department was not forthcoming about the scope of the allegations. Until the outside investigation occurred, all Ms. Schneider knew was what she had been told by the police department – that the situation involved primarily one female officer and the alleged sharing of nude photos. However, when the complaining female officer learned of the result of the investigation – short suspensions for the male officers involved – she resigned and in the process of her scheduling an exit interview with the City (including Ms. Schneider), Ms. Schneider learned of the full scope of the allegations. This occurred on July 7, 2021. By July 8, 2021, the process of submitting the claim to the City's insurer and having an external investigation had begun. Ms. Schneider was in full agreement with this plan.

It was during this time period where things began to change for Ms. Schneider. As a conscientious and female human resources professional, she was dutiful and adamant about following appropriate protocol in investigating what was obviously a problem within the City's police department. The allegations were serious and far more involved than the sharing of nude photos as had been described to her. She recognized the problem and expressed her concern that the male officers were essentially getting off easy for behaviors that were far worse than the discipline being meted out would suggest. In response, she was told by the City Administrator to stay in her lane and that he did not want this situation – one involving serious allegations of sexual misconduct by male police officers towards female co-officers – to "taint" her and the work she was doing. He also instructed her to not inform the Common Council about the complaint or its allegations and otherwise downplayed its significance and her concerns about the behavior involved.

That he would now suggest that the real issue was that he had problems with her experience and skill set as a human resources professional is laughable and completely dishonest.

The reality of the situation is that the allegations consisted of more than the sharing of nude photos. The allegations revealed a pattern of abuse and harassment from a number of male officers towards female officers. Four female officers resigned during this time period. During a meeting on September 14, 2021, which included the City Administrator, the Mayor, and the City Attorney, Ms. Schneider expressed her concerns about the breadth of the allegations and the pattern of discrimination and sexual mistreatment occurring within the City's police department. Among the topics she questioned during the meeting included:

- That her review of the documents she received indicated a pattern of severe sexual harassment;
- That there was non-consensual sharing of nude photos of female officers during work;
- That the discipline was meager in scope (only a few officers were disciplined) and duration (only brief suspensions);
- That four female officers had resigned entirely from the police profession as a result of what occurred;
- That there is a profound lack of curiosity from the City and the police department about what happened to a former female police officer who woke up naked in a hotel room after blacking out during a police department sponsored training and a male police officer witnessed

       another male officer taking her pants off the night before while she was incapacitated.

It should be noted that Ms. Schneider was the only female involved in the investigation. She expressed to the City Administrator and others within City leadership that the discipline of the male officers was inadequate and sent a message that female employees had no legitimate protection against this kind of behavior from their male co-workers. Her concerns were not taken seriously by the City Administrator, who instead sought to discredit the female officers involved and instructed Ms. Schneider to stay out of the investigation. Indeed, it was the very next day that he threatened her by stating that he did not want the investigation to "taint" her.

    From that point forward, she has been ostracized by the City Administrator. In addition to the previously described decline in communication, the litany of retaliatory actions by him include at least the following:

- Reduction of staff from three HR generalists to two;
- Relocation of the HR department to the second floor storage room at City Hall without input from or notice to Ms. Schneider; "this is what you are getting" is all he told her;
- An Assistant City Attorney warned Ms. Schneider that the City Administrator was actively marginalizing her;
- Consistent interference, criticism, and shaming of Ms. Schneider and the Human Resources department by the City Administrator's assistant, as instructed by the City Administrator and despite Ms. Schneider's complaints to the City Administrator about her behavior;
- Disparaging her to other City officials, including telling an Alderperson that Ms. Schneider was "obsessing" about the sexual harassment case, but that the City would be "closing the book on the case soon;"
- On October 4, 2021, the Mayor warned Ms. Schneider that the City Administrator had her "under the microscope" because of her concerns about the sexual harassment case and that the City Administrator was using other Human Resources employees to spy on her;
- On October 6, 2021, the Mayor confessed to Ms. Schneider that the City Administrator has been "gaslighting" and "gatekeeping" her, that he has kept her out of meetings and communications, and that he disparaged her to council leadership that she was obsessive about the sexual harassment complaint;

- The Mayor also expressed to Ms. Schneider that she was being treated with abuse by the City Administrator and that based on his experience working in a women's domestic abuse shelter, she was responding to the City Administrator's treatment "exactly" as someone who is being abused;
- In early October, a newly hired HR Generalist (Nicole Geschke) confided to Ms. Schneider that another HR Generalist (Jennifer Wray) had been directed by the City Administrator to spy on Ms. Schneider and report back to him;
- The Mayor confirmed that at least two employees (Ms. Wray in HR and Sandy Halvorsen in Finance) – subordinates to Ms. Schneider - had been solicited by the City Administrator to monitor and report to him about her;
- In early November, Ms. Schneider learned from the Mayor that Ms. Schneider was accusing her of conspiring with an alderperson to undermine him;
- During this meeting on November 8, 2021, the Mayor told Ms. Schneider that the City Administrator had placed a target on her back and that he had her staff involved and against her and that she should "probably never meet with him alone anymore;"
- On November 11, 2021, Ms. Schneider met with the City Administrator, who admitted that he was using her staff to actively marginalize and work against her, at one point suggesting that the deterioration of their relationship was because of the "police thing."

At this point, Ms. Schneider's health was suffering and she was left with no reasonable alternative other than to request leave under the Family Medical Leave Act in order to recuperate. She notified the City of her need for leave on November 22, 2021 for leave to begin on November 29, 2021. Interestingly, the respondent takes umbrage with the fact that Ms. Schneider requested FMLA leave, suggesting that she did so on "little notice." There is nothing unlawful or inappropriate about the timing of Ms. Schneider's FMLA leave request. She needed FMLA; she requested it; she was approved. Why the respondent felt the need to question the timing of her request says far more about the veracity of the respondent's position in this case than it does to disparage Ms. Schneider's contentions.

II. **Miscellaneous Rebuttal**

Although not directly relevant to Ms. Schneider's claims, the respondent makes a number of representations that are untrue and merit response.

1.    It is not true that the City re-evaluated "whether or not there was a need for a director for the Senior Center" in early 2020. The implication that Ms. Schneider was going to be let go from the Senior Center because the City planned to close it is a complete fabrication. This fact is confirmed by the former City Administrator, Darrell Hofland. (See Exhibit 2). The only thing that closed in March 2020 was the actual building due to concerns of COVID-19, but programming and staffing of the Senior Center continued and continues through to the present time at various locations.

In fact, Director Schneider held BOTH positions of Director of Human Resources and Labor Relations AND Director of Senior Services until the hiring of Emily Rendall-Araujo in December 2020. This can be verified through meeting minutes of the Senior Activity Center Commission and board of directors' minutes of the Friends of the Senior Activity Center of Sheboygan throughout 2019 and 2020.

2.    It is also not true that Vicky Schneider "*did not have any appreciable prior experience working in a human resources department or holding a position of Human Resources Director in the past.*" Indeed, Ms. Schneider's work experiences include the following:

- Director of Human Resources/Compliance Officer for Villa St. Francis which is an assisted living facility on Milwaukee's south side. This was and is a highly regulated facility with many federal and state compliance expectations;
- Executive Director for McKinley Place in Cedarburg, a highly regulated facility with responsibilities that were highly involved with Human Resources;
- Human Resources Manager for Covey (formerly known as Cerebral Palsy of Mideast Wisconsin) in Oshkosh;
- Executive Director of Generations Intergenerational Center which included all responsibilities of Human Resources.

Ms. Schneider also holds a Master's degree in Management and Organizational Behavior with an emphasis in Human Resources. For reference, Ms. Schneider's c.v. is attached as Exhibit 3.

3.    The respondent's description of Ms. Schneider's hiring process is also inaccurate. On approximately March 10, 2020, Mr. Hofland appointed her as the interim Director of Human Resources and Labor Relations. She thereafter applied for the permanent position of Director of Human Resources. During the application process, she participated in three rounds of interviews by a panel

which consisted of City Administrator Darrell Hofland, Chief of Police Chris Domagalski, Rae Anne Beaudry (City of Sheboygan's Insurance broker), and a member of the Sheboygan Area School District's Human Resources department. Ultimately, Ms. Schneider was selected through a competitive process, a fact that Mr. Hofland has previously and no doubt will again confirm. On May 18, 2020, her hire was presented to and approved by the Common Council. Attached as Exhibit 4 are the Common Council meeting minutes from that date.

Coincidentally, the current City Administrator was then the Common Council president and made the motion to approve her hire.

4. While it is true that Ms. Schneider's 2020 performance goals included a need for more training and understanding of MUNIS and NeoGov, it is also true that she has since taken and passed the SHRM-CP exam (in May 2021) and participated in many hours of MUNIS and NeoGov trainings throughout 2020-2021. She has also attended webinars by SHRM, as well as MRA, CVMIC and a number of other trainings and self-education.

### III. ERD Officer Questions

1. *The Respondent asserted that the city administrator advised the Complainant not to interfere with the investigation after the city administrator, city attorney, mayor, and the Complainant discussed the internal discrimination complaint filed by a female police officer and decided to refer the matter to an outside attorney to handle the investigation and make recommendations. The Respondent further asserted that the city administrator already had concerns about the Complainant's knowledge of work and skills related to collaboration, meeting work commitments, and technology, as noted in a December 2020 evaluation, prior to any alleged oppositional activity. Please respond to the Respondent's denial that the Complainant's gender or statutorily protected oppositional activity motivated any alleged harassment or actions related to the terms/conditions of employment.*

Response: We refer to Sections I and II above. In summary, the City Administrator expressed no concerns about Ms. Schneider's performance or skills other than minimally in the December 2020 evaluation. Indeed, until she began to openly question his and the City's attention and response to the sexual misconduct situation involving the police department, he had nothing but positive things to say about her work and skills. After that, beginning in July 2021, he actively and admittedly engaged in a campaign to marginalize, disparage, and discredit her.

Response: See Sections I and II above and the attached Exhibits.

3. If you have witnesses, who have firsthand information relevant to your complaint and are willing to provide information on a voluntary basis, please provide a list with (a) name and contact information, such as home address, phone number, or email address, <u>and</u> (b) the specific information each witness can verify.

Response: Individuals who have been identified within this submission and who we believe will provide corroborating information include the following:

Darrell Hofland (former city administrator)
███████████

Mayor Ryan Sorenson
ryan.sorenson@sheboyganwi.gov
920-457-3317

Attorney Charles Adams
charles.adams@sheboyganwi.gov
920-459-3917

Nicole Geschke
HR Generalist
nicole.geschke@sheboyganwi.gov
920-459-3314

Vice President of the Common Council, Roberta Filicky-Peneski
roberta.filicky-peneski@sheboyganwi.gov
920-453-0602

Ms. Schneider does not have contact information for Assistant City Attorney Thomas Cameron or HR Generalist Jennifer Wray, both of whom have left City employment.

## IV.    Burden of Proof

A complainant's burden of proof is less at the probable cause stage than it would be at a hearing on the merits; at the probable cause stage, the complainant must present factual allegations and circumstances strong enough in themselves to warrant a prudent person to believe that discrimination occurred. *Herling v. Dealer's Office Equipment, Inc.*, LIRC 02/18/87 - ERD Case No. 8451573. To that

end, as this submission shows, Ms. Schneider has presented factual allegations that, if true, support findings of gender discrimination and retaliation. The respondent's position statement does nothing to dispose of the probability that discrimination and retaliation occurred here; instead, it merely acknowledged that the facts are in dispute and put more facts into dispute. Indeed, the brunt of the respondent's position statement – that Ms. Schneider was disgruntled that an outside investigator was brought in to review the sexual harassment complaint – is built on an untruth. The disparate nature of the parties' competing allegations requires an initial determination of probable cause so that these allegations can be tested at a hearing on the merits.

### V. Legal Standard & Conclusion

Ms. Schneider has set forth sufficient evidence to prove a *prima facie* case of discrimination and retaliation under the evidentiary analysis applied pursuant to the Wisconsin Fair Employment Act.

Summarily:

1. She is a female and the only female involved in the investigation of severe allegations of sexual misconduct and discrimination brought forward by female police officers against male police officers.
2. She has presented facts that support the conclusion that she was singled out by the City Administrator for hostile and discriminatory treatment;
3. She has presented facts that support the conclusion that she was otherwise treated with hostility in the terms and conditions of her employment after raising concerns about discrimination and sexual misconduct and the City's response to the complaint;
4. She has presented facts that support the conclusion that she advocated for harsher and broader discipline for the male officers involved in the mistreatment of female officers;
5. She has presented facts that show that immediately following her open questioning of the City Administrator's and the City's attention and response to the sexual misconduct situation involving the police department, the City Administrator actively and admittedly engaged in a campaign to marginalize, disparage, and discredit her.
6. She has presented facts that show that a number of the respondent's allegations in support of its position statement are patently untrue.

      The respondent's submission does nothing to rebut the strong inferences of discrimination and retaliation. Instead, its defense is merely a false narrative of factual contentions that are gross exaggerations, untruths, or otherwise tend to support rather than diffuse Ms. Schneider's allegations. She disputes the respondent's allegations and takes great exception to the descriptions that have been offered. At this stage of a discrimination complaint proceeding, the complainant's burden is to present factual allegations and circumstances strong enough in themselves to warrant a prudent person to believe that discrimination and/or retaliation occurred. Ms. Schneider – in both her Complaint and in this submission – has done at least that.

      Indeed, the dishonesty of many of the respondent's allegations provides sufficient proof, in itself, to sustain Ms. Schneider's claims. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 517 (1993). ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination"). Thus, showing the respondent's explanations to be false allows for a reasonable inference that it is "dissembling to cover up a discriminatory purpose." *Id.* "[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with *some* reason, based his decision on an impermissible consideration." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

      At very minimum, there should be no doubt that Ms. Schneider has met her burden at the probable cause stage of this proceeding. The disparate nature of the parties' competing allegations requires an initial determination of probable cause so that they can be tested through discovery and at a hearing on the merits.

      We hope that this letter offers clarity to your questions. Should you need additional information, please contact me. Thank you for your consideration and cooperation.

                            Sincerely Yours,

                              FOX & FOX, S.C.

                              Peter J. Fox

*ER Officer Rupneet Sidhu*
*Page 12*
*April 8, 2022*

Enclosures

cc:  Vicky Schneider
     Respondent