**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

TODD WOLF,

                Plaintiff

    v.                                       Case No. 23-CV-149-WED

CITY OF SHEBOYGAN, et al.,

                Defendants.

---

**PLAINTIFF TODD WOLF'S RESPONSE IN OPPOSITION TO ALL DEFENDANTS' MOTIONS TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

---

DeMaster Law LLC

*/s/ Jennifer DeMaster*
Jennifer DeMaster
Wis. Bar No. 1124201
attorney@jenniferdemaster.com

DeMaster Law LLC
361 Falls Rd # 610
Grafton, WI 53024
Phone: (414) 235-7488
Fax: (262) 536-0515

*Attorney for Plaintiff*

# TABLE OF CONTENTS

INTRODUCTION & BACKGROUND ............................................................................................. 1

LEGAL STANDARD FOR A 12(B)(6) MOTION ................................................................. 1

ARGUMENT AND AUTHORITIES ........................................................................................... 2

    I.    **The Defendants are incorrect that 12(b)(6) requires a plaintiff to plead the "final and correct" theory of legal liability and demands a plaintiff allege "all grounds" for his "information and belief" allegations.** ............................................. 2

    II.    **All three speech-related policies challenged by Mr. Wolf fail the legal standards established under *NTEU's* modified *Pickering* test.** ....................................... 3

        a.    Mr. Wolf has alleged injuries and standing sufficient to challenge the City's three speech-related policies. ........................................................................................ 4

        b.    The November Directives was an unconstitutional prior restraint on Mr. Wolf's First Amendment rights and the continued rights of all city employees and the public. ................................................................................................................... 5

            1.    The Directives were not narrowly tailored to address a legitimate government interest. ...................................................................................................................... 5

            2.    The City's "implied meaning" argument fails because the plain language of the November directives offered no reasonable alternatives, prohibited "all means of communication," and were not narrowly tailored to serve any legitimate interest. ................................... 6

            3.    The Amended Complaint alleges that Donohue jointly agreed with City officials to violate Mr. Wolf's rights in retaliation for Mr. Wolf's confidential letter expressing concerns about her DEIB group after the Council's two-hour session. ....................................... 6

        c.    The *Confidential Disclosures* policy is an unconstitutional prior restraint. ............................ 9

        *d.*    The *False Statements* policy and practices are unconstitutional. ........................................... 10

    III.    **The Amended Complaint alleges that the Defendants violated Mr. Wolf's Fourteenth Amendment Procedural Due Process rights.** ............................................... 12

        a.    The City Defendants and Mr. Wolf knew that Mr. Wolf had a property interest in his position and was entitled to due process. ............................................................. 13

        b.    The Amended Complaint alleges that the Defendants violated Mr. Wolfs Fourteenth Amendment occupational liberty rights without due process. ..................................... 14

1.    Mr. Wolf alleges that City Officials made false statements and assertions of fact in conjunction with his firing. ................................................................................................................15

2.    Mr. Wolf alleges the stigmatizing statements hurt his standing in the community and foreclosed his employment opportunities. ...............................................................................18

3.    Mr. Wolf alleges that the stigmatizing statements were publicly disseminated at public Council meetings, to the general public, and in newspaper articles. ...............................19

4.    Adams does not deserve qualified immunity for Mr. Wolf's occupational liberty claim. ..................................................................................................................................................19

c.    The Amended Complaint alleges that the Defendants are personally liable for the deprivation of Mr. Wolf's Fourteenth Amendment procedural due process rights. ....................................................................................................................................... 20

1.    Def. Hall's status as a private attorney does not immunize her from liability. .................................20

2.    Def. Hilty's status as a journalist does not immunize her from liability because she acted outside the scope of her employment and expressly agreed with Sorenson to fabricate evidence that led to the deprivations of Mr. Wolf's constitutional rights. ................................22

**IV.    The Amended Complaint sufficiently alleges state law claims for Defamation, Intentional Infliction of Emotional Distress, and Conversion. ................................ 26**

a.    Mr. Wolf alleges that Sorenson's statements about Mr. Wolf between November 2022 and February 2023 constituted unprivileged Defamation Per Se. ........................ 26

1.    Mr. Wolf alleges that Sorenson's defamatory statements about the sexual harassment investigation and DEIB meeting were made with actual malice. .............................................27

b.    The Amended Complaint pleads that Donohue intentionally caused Mr. Wolf severe emotional distress. ........................................................................................................... 28

c.    Mr. Wolf alleges that the Defendants conspired to convert Mr. Wolf's personal belongings and invaded his privacy in his office. ........................................................................... 29

**V.    Mr. Wolf's Civil Conspiracy and IIED claims are not barred by the Wisconsin Compensation Act. ........................................................................................................ 29**

**CONCLUSION ........................................................................................................................ 30**

## INTRODUCTION & BACKGROUND

On November 7, 2022, Plaintiff Todd Wolf, sent a confidential letter to the Common Council members to express concerns about harassment of city employee and to inform them that a non-registered "diversity, equity, inclusion, and belonging" collective (DEIB group) had made threats for city money and he was concerned about their influence at the city. Within hours, Mr. Wolf was placed under investigation and fired without any opportunity to gather his belongings or know the charges against him. Mr. Wolf alleges that the Defendants were personally involved in the violations of Constitutional rights and injuries, and therefore, respectfully requests this Court deny the Defendants' motions to dismiss in their entirety.

## LEGAL STANDARD FOR A 12(B)(6) MOTION

In ruling on a motion to dismiss under Rule 12(b)(6), the court must assume all facts alleged in the complaint to be true and draw all reasonable inferences in favor of the plaintiff. *Singer v. Pierce & Assocs., P.C.,* 383 F.3d 596, 597 (7th Cir. 2004). A 12(b)(6) motion to dismiss "is viewed with disfavor and is rarely granted." See e.g., *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). Dismissal is not appropriate if the complaint "state[s] a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal* , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Plausibility at the 12(b)(6) stage does not mean the court must decide which version of events to believe, but rather whether the events in question *could have occurred*. *Swanson v. Citibank, N.A*., 614 F.3d 400, 404 (7th Cir. 2010) (emphasis added). This does not require "detailed factual allegations." *Twombly*, at 555. A complaint does not have to "'allege all, or any, of the facts logically entailed by the claim,' and it certainly need not include evidence." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (quoting *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998)). A plaintiff alleging a civil rights

1

violation may do so quite generally as long as fair notice of the claim and its basis is provided suggesting the plaintiff has a "plausible" right to relief under any cognizable legal theory of liability. *Tamayo*, 526 F.3d at 1081, citing *Twombly*, 550 U.S. at 574.

Mr. Wolf has easily pled plausible facts that entitle him to relief, which thus "raise[s] [his] right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and creates more than an "inference" that Defendants are liable, despite the 210 pages filed by the City Defendants demanding the contrary. See *Iqbal*, 556 U.S. at 678. In fact, Mr. Wolf wins even on the City Defendants' characterization of the facts. Nevertheless, at this stage, the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT AND AUTHORITIES

I. **The Defendants are incorrect that 12(b)(6) requires a plaintiff to plead the "final and correct" theory of legal liability and demands a plaintiff allege "all grounds" for his "information and belief" allegations.**

The Defendants argue that Mr. Wolf failed to plead the correct theory of legal liability in his Amended Complaint because he did not state a separate "conspiracy" cause of action or allege an underlying tort or conduct. However, the Seventh Circuit and the Supreme Court have held that only factual bases, not legal theories, are required in a complaint. *Johnson v. City of Shelby, Miss.,* 574 U.S. 10, 12 (2014) (a plaintiff satisfies federal pleading standards so long as he gives the defendant fair notice of the factual basis of his claims); *Whitaker v. Milwaukee Cty., Wis.,* 772 F.3d 802, 808 (7th Cir. 2014) ("it is factual allegations, not legal theories, that must be pleaded in a complaint").

Mr. Wolf did plead conspiracy liability for Hall, Hilty, and Donohue for the violations of Mr. Wolf's constitutional rights, but even if Mr. Wolf had NOT pled the underlying facts of conspiracy liability in his pleading, "the failure to identify a specific legal theory in a complaint does not proscribe its application." *Wightman*, at *13; *Whitaker v. Milwaukee Cty.*, 772 F.3d 802, 808 (7th Cir. 2014) ("when a

plaintiff does plead legal theories, it can later alter those theories…there is no burden on the plaintiff to justify [such alteration]"); *Bostwick v. Watertown Unified Sch. Dist.*, Case No. 13-C-1036, at *19 (E.D. Wis. Feb. 9, 2015) (a plaintiff "need not embrace one [theory of legal liability] over the other at this earlier stage of the proceedings") (internal citations omitted).  Mr. Wolf alleges sufficient facts that Donohue acted in a joint agreement with City officials to violate Mr. Wolf's Constitutional rights. *See infra* Parts II.b.3. & IV.b.

**II.    All three speech-related policies challenged by Mr. Wolf fail the legal standards established under *NTEU's* modified *Pickering* test.**

"Citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 573 U.S. 228, 231 (2014).  The Supreme Court first established the test to balance the interests of government as employer with employee related to speech in *Pickering v. Board of Education,* 391 U.S. 563 (1968).   Then, in 1995, the Court established a "modified *Pickering*" test to determine the constitutionality of policies that restrain *potential* employee speech with a *two-part* balancing test measuring the interests of (1) a vast group of employees and potential audiences in a broad range of present and future expression against the (2) government's interest that such restraints have a "necessary impact on actual operation" of the government as an employer. *United States v. Treasury Employees,* 513 U.S. 454, 468 (1995) ("NTEU"), citing *Pickering*, 391 U.S., at 571.

Under *NTEU*, the Court first looks to the interest that the government employer sees threatened by the potential speech.  *Crue v. Aiken*, 370 F. 3d 668, 679 (7th Cir 2004).  The City Defendants stated that *NTEU* is the appropriate test to determine the constitutionality of the November Directives, but then oddly referenced the so-called *O'Brien* factors in seeking dismissal of Mr. Wolf's challenges to the *Confidential Information* and *False Statements* policies. City Defs. Br. 22-26, ECF No. 47, citing *United States v. O'Brien,* 391 U.S. 367 (1968) (assessing constitutionality of a wartime law criminalizing the burning of military draft cards).  Mr. Wolf agrees that the *actual* test set forth in *NTEU* is the proper test to measure

3

the November Directives. City Defs. Br. 15. Here, none of the City Defendants' purported "interests" stand up to the *NTEU*'s requirements as set forth below, and therefore, this Court should deny the Defendants' Motion to Dismiss Mr. Wolf's First Amendment claims in its entirety.

  a. <u>Mr. Wolf has alleged injuries and standing sufficient to challenge the City's three speech-related policies.</u>

The City Defendants claim that Mr. Wolf failed to allege a "causal connection" between the November Directives and his injuries—noting that Mr. Wolf did not allege that he "needed" emergency services, nor did he allege he was prohibited from voting because of the Directives. City Defs. Br. 17. However, that argument is wholly without merit because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed, the injury suffered by an infringement on First Amendment rights *is the injury*—no matter how brief. See *id.*

The City Defendants also argue that Mr. Wolf does not have standing to challenge the *Confidential Information* and *False Statements* policies because he is "no longer employed" by the City of Sheboygan. But the injury that allegedly resulted from the application of the City's policies—Mr. Wolf's firing—already occurred. See *Savage v. Gee*, 665 F.3d 732, 740 (6th Cir. 2012) ("In order to have standing [in challenging a public employer's policies] a litigant alleging chill must still establish that a concrete harm—i.e., enforcement of a challenged statute—occurred or is imminent" (quotation omitted). Here, Mr. Wolf alleges that the City Defendants removed Mr. Wolf as City Administrator by enforcing the Confidential Information policy and the False Statements policy to his speech. *See* Am. Compl. Exs. 12, 14 & 15.

4

b. The November Directives was an unconstitutional prior restraint on Mr. Wolf's First Amendment rights and the continued rights of all city employees and the public.

1. *The Directives were not narrowly tailored to address a legitimate government interest.*

The City Defendants argue that their interests as employers in imposing the November Directives "far outweighed" the interests of city employees, private citizens, the public, and Mr. Wolf solely because Mr. Wolf wrote a confidential letter to the Common Council members about DEIB threats for money and the harassment of the City's Planning Director, Chad Pelishek (Am. Compl. ¶ 131). City Defs. Br. 13-14, ECF No. 47. The Defendants bear the burden of alleging a concrete potential "harm" that the government as employer seeks to avoid in imposing the prior restraint. *NTEU*, 513 U.S. at 475. To do this, the Defendants "must demonstrate that the recited harms are real, not merely conjectural, and that the [directives] will in fact alleviate these harms in a direct and material way." *Id.* quoting *Turner*, at 664. Further, Courts do not consider a plaintiff's "high-ranking" or policymaker status in analyzing the constitutionality of a prior restraint. *Wernsing v. Thompson*, 423 F.3d 732, 746-747 (7th Cir. 2005).

The City Defendants allege their interest was because of Mr. Wolf's confidential letter and potential criticisms as well as Mr. Wolf's "management expectations inherent in the City's role as an employer." City Defs. Br. 18. The City's purported "interests" are purely conjectural and were never expressed to Mr. Wolf, employees, or the public. See *Gustafson v. Jones*, 290 F.3d 895, 910 (7th Cir. 2002) ("First Amendment rights cannot be trampled based on hypothetical concerns that a governmental employer never expressed.") Despite these strong standards, the City Defendants' claim that these speculative interests "far outweigh" the interests of city employees, citizens, the public, and Mr. Wolf that were, and to some degree still are, implicated by the November Directives. *See* City Defs. Br. 20.

Next, Mr. Wolf does not claim that the City had "no authority" to place any narrowly tailored directives on him during his leave; but rather, that the November Directives were plainly and facially unconstitutional and did not meet any legitimate, let alone compelling, government interest. *McCullen v.*

5

*Coakley*, 134 S. Ct. 2518, 2534 (2014) ("the tailoring requirement prevents the government from too readily sacrific[ing] speech for efficiency") (internal quotations omitted). The City Defendants completely ignore the vast scope of their directives and its "total ban" on speech by essentially arguing that their interests in avoiding criticism outweigh employees and the public because they are a government employer, but these arguments fail.

>    2. *The City's "implied meaning" argument fails because the plain language of the November directives offered no reasonable alternatives, prohibited "all means of communication," and were not narrowly tailored to serve any legitimate interest.*

The City Defendants claim that Mr. Wolf's reading into an implied scope of the Directives is "absurd[]" and he should have known they only mean to ensure the "temporary removal of his authority to conduct business on behalf of the City of Sheboygan." City Defs. Br. 11, ECF No. 47. The City Defendants fabricate non-existent language into the Directives seeming to believe that neither Mr. Wolf nor this Court can read the plain language of the Directives. Am. Compl. Ex. 9, ECF. No. 36-9 (general ban on all speech). The Supreme Court has routinely rejected arguments by public officials that purport an "implied" good faith without facially delineated standards. See e. g. *Lakewood v. Plain Dealer Publ. Co.*, 486 U.S. 750, 770 (1988). Where the "plain language of the directives unconstitutionally restricts speech, [the Defendants'] good intentions cannot vitiate that constitutional defect." *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 748 (7th Cir. 1999). Most importantly, Mr. Wolf also alleges that "total ban" portion on speech between City employees and Mr. Wolf remains in effect today. Am. Compl. ¶ 251. Accordingly, the Defendants' argument fails.

>    3. *The Amended Complaint alleges that Donohue jointly agreed with City officials to violate Mr. Wolf's rights in retaliation for Mr. Wolf's confidential letter expressing concerns about her DEIB group after the Council's two-hour session.*

Donohue also argues that Mr. Wolf's allegations about her personal involvement in drafting and serving the November Directives is "rank speculation," but this argument fails because Mr. Wolf plausibly

alleged many grounds for his factual contentions. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Stavropoulos v. Patton*, Case No. 15-cv-811, at *3 (E.D. Wis. Nov. 4, 2015); citing *Iqbal*. at 678. Determining plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* Plausibility requires the plaintiff to give the court "enough details about the subject-matter of the case to present a story that holds together." *Id.* citing *Swanson v. Citibank*, *N.A*., 614 F.3d 400, 404 (7th Cir. 2010). At this stage, "[t]he court is not concerned with whether the events alleged *did* happen but rather with whether they *could* have happened." *Id*. at *4.

Here, Mr. Wolf alleges sufficient factual grounds to allow a plausible inference based on his personal knowledge of how the individual City Defendants work together and the pattern of conduct whereby Donohue drafts legislation and directs the actions of City officials—despite no longer being an Alderwoman—that Adams, Sorenson, and Council members readily agree to. Specifically, Mr. Wolf alleged sufficient underlying factual grounds about Donohue's involvement that plausibly stated grounds for a story that "holds together" that Donohue made the final call to serve the Directives on Mr. Wolf on November 7, including:

> (1) Donohue has a long history of drafting language, resolutions, and advising Adams, Sorenson, and Council in a "de facto" role—all of whom listen to her and follow her orders and directions. (Am. Compl. ¶¶ 7, 19, 30 47, 48, 66-71, 73, 78-84, 90, 93, 100, 104, 107, 117, 119, 127, 128, 148, 159, 163, 167, 168, 169, 171, 176, 223, 226, 293; Ex. 8).

> (5) Mr. Wolf's November 7 confidential letter to the Council members expressing concerns about the October 5 DEIB meeting with her DEIB group representatives and her role in the "fabricated racism outcry" she helped orchestrate with Rendall and Sorenson to obtain DEIB funding was exposed in Mr. Wolf's letter. (Am. Compl. ¶¶131-35, 148-49).

> (6) Donohue was the only City Defendant that was not present at the November 7 Council meeting and closed session. (*Id*. ¶ 137).

> (7) The Defendant city officials (except Donohue) spent over two hours in closed session to determine the next steps for Mr. Wolf just prior to their public announcement placing Mr. Wolf on administrative leave just hours *after Mr. Wolf sent a Confidential letter to the Council members exposing Donohue's DEIB group's* financial threats. (*Id*. ¶¶ 131, 137).

7

(8) Not a single City Defendant present at the November 7 meeting gave Mr. Wolf any Directives during or following the meeting, nor did any City Defendant present tell Mr. Wolf that there "would" be leave Directives on him at the meeting (*Id.* ¶¶ 139-41).

(9) Adams personally escorted Mr. Wolf out of City Hall after the meeting and announcement and did not state that the Council nor Sorenson were drafting *any* Directives (*Id.* ¶¶ 139, 148-50).

(10) Two hours after Mr. Wolf had already arrived home, a police officer was forced to serve the sudden "directives" on him (*Id.* ¶ 150),

Based on the facts and grounds clearly laid out in the Amended Complaint, Mr. Wolf plausibly alleges that Donohue crafted the idea and drafted the language for the Council members and Sorenson to serve the Directives on Mr. Wolf after the Council meeting ended at 9:30 PM. Am. Compl. ¶ 151. Given that every individual City Defendant, except Donohue, had a two-hour closed session together and had no knowledge of any "Directives" on Mr. Wolf during the Council meeting or when Adams was escorting Mr. Wolf out of City Hall, Donohue is the only connected individual who had the capabilities, connections, long history, and *an interest* in demanding Mr. Wolf's silence about her DEIB group and efforts to orchestrate fabricated "racism" outcry for City resources. *Id.* ¶¶ 131, 151 & Ex. 8, ECF No. 36-8. Specifically since, if any of the Defendant city officials thought to draft the Directives language themselves, both they and Adams had ample time at the Council meeting with Mr. Wolf, during and following the two-hour closed session, to give the Directives to Mr. Wolf or inform him that they were preparing Directives—*none of which* they did when he was escorted out at 9:30 PM in the presence of the public and every Defendant city official (except Donohue).

Additionally, Mr. Wolf plausibly alleges that Donohue conspired with city official Defendants (Sorenson, Ackley, Salazar, Felde, etc.) to draft and serve the Directives on Mr. Wolf and City employees during his leave because she wanted to silence Mr. Wolf from exposing her DEIB group efforts and ensuring a sham investigation would destroy his credibility so that no one would ever take him seriously. Accordingly, Mr. Wolf's plausibly alleges Donohue's willful participation in a joint agreement with the

City official Defendants to violate Mr. Wolf's First Amendment rights by drafting the Directives language between 9:30 and 11:30 PM on November 7 that the City official Defendants served on Mr. Wolf.

  c. The *Confidential Disclosures* policy is an unconstitutional prior restraint.

  The City Defendants claim their interests in enforcing the amendments to the Ethics Code (Confidential Disclosures policy) are "to establish guidelines for ethical standards of conduct for all such officers, employees, and agents by setting forth those acts or actions that are incompatible with the best interests of the city and by directing disclosure by such officers, employees, and agents of private financial or other interest in matters affecting the city" but this argument fails because the government's interest must be real and concrete, not speculative.

  Notably, the City Defendants' purported interest in the policy is nearly identical to the underlying facts and government interest in *NTEU. NTEU*, 513 U.S. 454 (1995). In *NTEU,* the government *amended* the *Ethics Code* for employees by adding the challenged provision that barred employees from being paid for speaking engagements. *Id.* There, the government's purported interest was in reducing the appearance of impropriety to the public where employees are paid to speak about information learned from their public employment. *Id.* The Supreme Court held that the government's interest was not a "concrete injury" that the policy was narrowly tailored to address. *Id.,* citing *Turner,* at 664 (the government must allege the purported harms are real, not merely conjectural). Here, the City Defendants' have a nearly identical purported interest to the government in *NTEU* that was found illegitimate nearly thirty years ago. The Supreme Court held that the government had failed to argue a real and concrete specified injury the policy sought to address. *Id.* (the government must allege that the purported harms are real, not merely conjectural) (quotations omitted). Accordingly, the Defendants' argument fails.

  The City Defendants also claim that Mr. Wolf's "speculation" as to how the policy "could" be used makes his claim "ripe for dismissal." City Defs. Br. 22, ECF No. 47. However, this argument fails because

the City's "prior approval" mechanism gives the Common Council members unbridled authority to engage in viewpoint and content discrimination by assessing whether certain speech is "confidential information" about "city matters" before an employee can "disclose" it to *anyone*. Am. Compl. Ex. 1, ECF No. 36-1.

Nevertheless, the Supreme Court has held that "permit procedures [that] prevent "immediate speech" from responding to "immediate issues" are found to chill "a significant amount of spontaneous speech," in violation of the First Amendment. *Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 167–68; *Staub v. City of Baxley*, 355 U.S. 313, 321 (1958). This is especially true where the only definition offered for the scope of "confidential information" is veritably anything involving "city matters." Am. Compl. Ex. 1, Secs. 2-272 & 2-261 (no definitions for "confidential information concerning the property, government, or affairs of the city" as prohibited under 2-272). In general, the only cases that have upheld prior approval policies by government employers are those by *law enforcement* agencies based on the "paramilitary" stature of investigatory or prosecutorial internal processes and judgment required by law enforcement officers. See *Waters v. Churchill,* 511 U.S. 661, 677 (1994). Here, the City's policy extends to *all 450+* City employees including city planning workers, the Department of Public Works, and every other City of Sheboygan employee. Accordingly, the Defendants' arguments fail.

> d.  The *False Statements* policy and practices are unconstitutional.

The City Defendants claim the "compelling" interest they have in enacting and enforcing the F*alse Statements* policy is to ensure that no personnel decisions or certifications of officials are made on false information, specifically by "preventing the submission of false reports" regarding the certifications of public officials or the enforcement of the policy, and "potentially untrue and damaging" statements raised in complaints that effect the City's purported execution of the policies objectives. City Defs. Br. 27. The Seventh Circuit and the Supreme Court have held that interest is not legitimate, let alone compelling.

Policies chilling speech by making preconceived judgments on the potential content of the speech based on conjectured injuries have been regularly struck down under the First Amendment. See e.g. *Whitney v. California*, 274 U.S. 357, 376 (1927) ("[m]en feared witches and burnt women… [t]o justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced"); *Crue v. Aiken,* 370 F.3d 668 (7th Cir. 2004) (fearing personnel or recruiting injuries is not a concrete injury); *DeJohn v. Temple Univ*., 537 F.3d 301 at 316–18 (2008) (striking ban on "creating an intimidating, hostile, or offensive environment" as overbroad).

The Defendants purported interests become even less valid, let alone "compelling," when considering the False Statements policy's application to private citizens and those who "are not employed by the city." Am. Compl. Ex. 2, ECF No. 36-2, Sheb. Mun. Code Ord. 82-6(b) ("or any person who is not an employee of the city who is guilty…"). Policies are not, and cannot, be viewpoint neutral unless they include affirmative "protection. . . for viewpoint neutrality." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000); *Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1251 (11th Cir. 2004) (Viewpoint-based restrictions, whether in a public or nonpublic forum, are unconstitutional).The plain language of the policy and its application to statements about election certifications, bribery, political activities is unconstitutionally overbroad and allows unnamed officials with sole discretion to determine—with absolutely no enforcement standards—what is "true" or false.

The City Defendants claim that Mr. Wolf's interpretation of the potential scope of the False Statements policy imposing discipline on employees and fines on citizens are "illogical interpretation[s]" and "bizarre and implausible." City Defs. Br. 27. By that logic, the City Defendants' find the Seventh Circuit's reasoning in *Milwaukee Police Association v. Jones* was similarly "illogical" and "bizarre." In *Jones,* the Police Chief adopted a policy forbidding personnel from discussing potential complaints they had about other officers to allow the effective enforcement of internal matters and determine the veracity

of any complaints. 192 F.3d 742 (7th Cir. 1999). Like Mr. Wolf, the Seventh Circuit *inferred* from the breadth of that policy that an employee under those restrictions "might fear discipline" for reporting corruption or other misconduct, even to law enforcement. *Id.* at 748 (discussing oral arguments acknowledgments from defendant about what employees may "infer" from the policy).

A law is overbroad if it "penaliz[es] a substantial amount of speech that is constitutionally protected." *Forsyth Cty*., at 130. Laws that require the utterance *of a particular message* favored by the Government contravenes the rights embodied in the First Amendment. *Turner,* at 622 (emphasis added). The City Defendants wrongly presume that they can "shut off discourse solely to protect others from hearing it" by issuing threats of termination, stigmatization, or fines. *Cohen v. California*, 403 U.S. 15, 21 (1971). The False Statements policy applies to all speech about elected officials' potential qualifications, misconduct, political connections, or potential bribery efforts in any manner with no mechanisms to avoid arbitrary enforcement, and therefore the Defendants argument fails. Accordingly, the Defendants' argument fails.

## III. The Amended Complaint alleges that the Defendants violated Mr. Wolf's Fourteenth Amendment Procedural Due Process rights.

The Fourteenth Amendment to the United States Constitution guarantees citizens to be free from deprivations of their life, liberty, and property without due process of law. U. S. CONST. AMEND. XIV. "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, at 542 (1985). Mr. Wolf has plausibly alleged that the Defendants violated his Fourteenth Amendment procedural due process rights to property and liberty as set forth more fully below.

a. The City Defendants and Mr. Wolf knew that Mr. Wolf had a property interest in his position and was entitled to due process.

A plaintiff alleging a procedural due process property claim must allege "(1) that he had a constitutionally protected property interest; (2) that defendants deprived him of that interest; and (3) that the deprivation occurred in a way that violated due process." *Bostwick v. Watertown Unified Sch. Dist.*, Case No. 13-C-1036, at \*19 (E.D. Wis. Feb. 9, 2015); citing *Price v. Bd. Of Educ. Of City of Chi.*, 755 F.3d 605, 607 (7th Cir. 2014). None of the Defendants dispute Mr. Wolf's factual allegations that he was denied all procedural due process during and following his removal, so the only element in dispute is the first element—whether Mr. Wolf had a property interest in his position as Sheboygan's City Administrator based on the City Administrator Ordinance and his Agreement.

The Seventh Circuit has held that a property interest in employment is determined under state law and where "the terms of [the plaintiff's] employment" provide that the employee can be removed "only for cause." *Erbes v. Milwaukee Area Technical College District*, No. 06-C-667, at \*12-13 (E.D. Wis. Nov. 17, 2008) (internal citations omitted); *Forbes v. Milwaukee County*, Case No. 05-cv-591, at \*24 (E.D. Wis. Jan. 4, 2007); *Burrell v. City of Mattoon*, 378 F.3d 642, 647 (7th Cir. 2004). In Wisconsin, the Common Council for a city is endowed with the power under state law to create property interests in certain public positions by passing laws or policies that a specific government employee "may be removed ***only for*** inefficiency, neglect of duty, official misconduct, or malfeasance in office." WIS. STAT. 17.12(3m) (emphasis added). Here, the Amended Complaint alleges that Sheboygan's City Administrator Ordinance ("Ordinance") said Mr. Wolf can be removed "only for cause." Am. Compl. Ex. 3. Mr. Wolf also signed an Agreement, and there is no language at all in the Agreement that Mr. Wolf can be removed or terminated "without cause." *Id.*

"A government employer cannot avoid its procedural obligations….to conceal a for-cause dismissal and thereby deprive a career employee of the procedural protections to which he would

13

otherwise be entitled." *Lalvani v. Cook County, IL*, 269 F.3d 785 (7th Cir. 2001). The City Defendants clearly intended to, and did, terminate Mr. Wolf for cause, and merely labeled his removal as "without cause," lying about the language in the Agreement solely and specifically to deprive him of the procedural due process he was entitled to. For the same reasons, the City Defendant Alderpersons are not entitled to qualified immunity because the law is clearly established that officials cannot avoid due process in a constructive "for cause" termination by labeling it as "without cause."

Mr. Wolf's Agreement does not contain any provision that he can be removed "without cause" and the Defendant Alders publicly admitted that Mr. Wolf was fired because of the conclusions from Hall's investigations into his "conduct" and then admitted that they were only removing him "without cause" to save costs and protect employees. Am. Compl. ¶ 237 & Ex. 12; *see also* City Defs. Br. 42. Mr. Wolf alleges that Defendant Alder Felde even told citizens that Mr. Wolf was being fired because he "cannot defend the allegations against him" and, notably, according to Mr. Wolf, when Def. Felde was asked what firing "without cause" meant, Felde stated that she did not know the difference. Am. Compl. ¶ 236.

Finally, to remove all doubt, the Defendant Alders again in their Motion to Dismiss stated that Mr. Wolf was fired because of Hall's investigation conclusions about his conduct and violations of policies. City Defs. Br. 42. The Defendant Alders claim they are entitled to qualified immunity because Adams told them falsely that the Agreement gave them an option to remove him "without cause," which it clearly, and facially did not, so, unless the Defendant Alderpersons are alleging that they are unable to read words in the English language, their argument fails and the Defendants are not entitled to qualified immunity.

     b. <u>The Amended Complaint alleges that the Defendants violated Mr. Wolfs Fourteenth Amendment occupational liberty rights without due process.</u>

The Amended (and original) Complaint alleges the Defendant City officials publicly disseminated intentionally false statements about Mr. Wolf in conjunction with his removal as City Administrator and specifically denied him any constitutionally adequate administrative hearing opportunity prior to his

14

liberty deprivation. "A public employee's liberty interest is implicated when the employer defames the employee in the course of altering some right or status previously enjoyed by the employee." *Terry v. Woods*, 803 F. Supp. 1519, 1524 (E. D. Wis. 1992) (citations omitted). Mr. Wolf plausibly alleges that the Defendants personally participated in the intentional and malicious deprivation of his occupational liberty interests as set forth below.

       1. *Mr. Wolf alleges that City Officials made false statements and assertions of fact in conjunction with his firing.*

Dismissing allegations of defamation at the pleadings stage is only warranted "if the communication cannot reasonably be understood as defamatory." *Amoroso v. Schuh, et. al.*, 278 F.Supp.3d 1106, 1115 (2017), Case No. 15-cv-119 (Sept. 30, 2017 W. D. Wis) (citations omitted). According to Mr. Wolf, the statements by Dekker, Felde, Hall, and Sorenson contained false assertions and statements of fact—all of which, when taken in context, painted a picture that Mr. Wolf was dishonest, retaliated against female employees, and otherwise engaged in misconduct of a moral character.

In *Amoroso*, the Court emphasized the standards that Wisconsin state law has adopted that "context" of the alleged false factual assertion matters when considered as a whole. *Amoroso,* at 1113-4. In *Amoroso,* the defendant claimed that the plaintiff's interpretations of his words was "forced" and that "no recipient" would assume they referred to particular instances of misconduct by the plaintiff. *Id.* The Court rejected the defendant's arguments, noting that defamatory statements "within their full context" or taken in combination with one another is certainly actionable. *Id.*

This Court also faced a similar argument in *Stavropoulous v. Patton* where the defendants sought dismissal claiming the statements alleged by the plaintiffs were not "factual" assertions or implications of false facts. Case. No. 15-cv-811 (E.D. Wis. Nov. 4, 2015). This Court denied the defendants' Motion to Dismiss holding that the statements alleged by the plaintiffs referred to "assertions or facts that are objectively verifiable." *Stavropoulous,* at *5-6 (defendants' statements asserted or implied that the

plaintiffs had taken money, disappeared, failed to respond to customers, failed to provide merchandise that was paid for, and potentially committed law violations). In denying the Defendant's motion, this Court noted that statements or assertions of facts are found where the statement asserts information that can be readily proven, noting "either [plaintiffs] produced the bargained-for merchandise or they didn't…either [plaintiffs] remained in contact with the defendants or they didn't." *Id.*

The Defendants make similar arguments to those in *Stavropoulous* and *Amoroso* arguing that Mr. Wolf failed to allege that the statements by Hall on January 4, and by Dekker and Sorenson on January 9 and 10 (repeating Hall's conclusions) were not "false statements of fact" or "false assertions of fact," but the law is not as rigid as the Defendants want it to be. Even a statement in the form of an opinion may be considered a defamatory communication if it "implies the allegation of undisclosed defamatory facts as the basis for the opinion." *Torgerson v. Journal/Sentinel, Inc*., 210 Wis. 2d 524, 534 (1997), citing Restatement (Second) of Torts §566. Specifically, Mr. Wolf alleged the following statements or assertions of undisclosed facts that, in context, justified and explained Mr. Wolf's firing as guilty of misconduct, retaliation, making false statements about the DEIB group, and committing law, ethics, and policy violations:

> (1) November 7, 2022 - Felde at public Council meeting announcing Hall's investigation: "I am making a motion to place Administrator [Todd] Wolf on paid administrative leave effective immediately, for the purpose of investigating allegations and concerns regarding his conduct with direction to authorize the city attorney to hire outside counsel to conduct the investigation." (Am. Compl. ¶ 138).

> (2) January 9, 2023 - Dekker's statement at the public Council meeting firing Mr. Wolf: "That investigation has concluded. …[A]fter hearing [Hall's investigation] synopsis, have come to the conclusion that this is in the best interests of our employees…one employee doesn't stand over the rest of our employees. To put our employees through something like this is not right. So that is why I support [firing Mr. Wolf without a hearing]." (Am. Compl. ¶ 237).

> (3) Hall's preliminary report given to the Common Council on January 4, 2023 (and typed for finalization on February 6, 2023):

> > a. Mr. Wolf lied about the DEIB meeting. (Am. Compl. Ex. 12).

16

b. Pelishek did not confirm Mr. Wolf's story that Rendall asked him to repeat a racial slur or about the DEIB meeting. (Am. Compl. Exs. 12 & 15).

c. Mr. Wolf disclosed confidential information about Pelishek using racial slur to Hilty when he was ordered not to. (*Id.*)

d. Mr. Wolf retaliated against and harassed Rendall for engaging in protected reporting of Pelishek's "racism" (which she did not do). (*Id.*)

(4) January 9, 2023 – Sorenson's interview and assertions to the Sheboygan Press that were published the day after the vote to fire Mr. Wolf on January 10, 2023:

a. Mr. Wolf interfered in Hall's investigation by leaking details of the investigation. (*Id.* ¶ 244, Ex. 14).

b. Hall's investigation found Mr. Wolf lied and kept "doubling down on" his lies that Mr. Wolf knew were not true and that Mr. Wolf's statements [about the DEIB group and Rendall asking Pelishek to repeat a slur] "could be proven false with other documentation." (*Id.* ¶¶ 245-46).

c. Mr. Wolf was fired, in part, because he was retaliating against employees and "people should feel safe to come to work…[and not] have to be fearful of retaliation." (*Id.* ¶ 247).

(5) False Statements from January 10, 2023 – Sorenson emails to (at least) two citizens:

a. "This decision was made by the city council after the completion of [Hall's] extensive investigation. The investigation raised significant concerns, including policy violations, ethic violations, and potential law violations, all of which lead to legal liability for the city. We will make sure you get a copy of [Hall's investigation] report once it is made public." (*Id.* ¶ 241, Ex. 13).

All of these statements, when taken as a whole, include false assertions and statements of easily identifiable factual information. And, once again, to remove all doubt, even in his quoted public statements to the Sheboygan Press, Sorenson said that Mr. Wolf's statements about the DEIB group could "be proven false with other documentation." Am. Compl. ¶ 246, Ex. 14. Next, Mr. Wolf plausibly alleges that the statements and assertions of fact were false. Specifically, Mr. Wolf alleges:

(1) He told the truth about the DEIB October 5 meeting, and Pelishek, an eyewitness, confirmed that to Hall. (Am. Compl. ¶¶110-14, 118).

(2) Rendall did not report "racism," and Mr. Wolf had no knowledge that she had ever filed any "complaint" or report about him for her "reporting" Pelishek's racial slur that she asked him to repeat. (Am. Compl. ¶¶93, 97-98, Exs. 5 & 7).

(3) Mr. Wolf was not the source of the leak disclosing confidential information about Pelishek to Hilty, and Mr. Wolf was never ordered not to comment to Hilty. (*Id.* ¶ 101).

Accordingly, Mr. Wolf has plausibly alleged that the Defendants made false statements and assertions of fact about him specifically in conjunction with his removal as City Administrator.

> 2. *Mr. Wolf alleges the stigmatizing statements hurt his standing in the community and foreclosed his employment opportunities.*

The Defendants claim that Mr. Wolf failed to allege that he lost "multiple" job opportunities, but this misstates the legal standard. A plaintiff pleads "a tangible loss of employment opportunities in his chosen field" if he alleges that the false statements called into question his "good name, reputation, honor or integrity." *Abcarian v. McDonald*, 617 F.3d 931, 941 (7th Cir. 2010); quoting *Townsend v. Vallas*, 256 F.3d 661, 669-70 (7th Cir. 2001) (where the government fires a public employee, and publicly states the circumstances of his discharge, calling into question "the employee's good name, reputation, honor or integrity," the employee been "deprived of a liberty interest in pursuing the occupation of his choice").

This includes allegations, charges, or statements implying the plaintiff "was dishonest" in this official position or alleging any statements that "imply unsavory character traits." *State ex Rel. DeLuca v. Common Council*, 72 Wis. 2d 672, 679 (Wis. 1976); *Hadley v. County of Du Page*, 715 F.2d 1238, 1245 (7th Cir. 1984) (internal citations omitted); *Ratliff v. City of Milwaukee*, 795 F.2d 612, 625-26 (7th Cir. 1986) (concluding that charges of untruthfulness and neglect of duty impose sufficient stigma implicating a liberty interest that made it virtually impossible for the public employee to find employment in his chosen field). The City Defendants' Brief admits that the statements referencing Hall's investigation conclusions implicated Mr. Wolf's liberty interests based on Adams' claiming, wrongly, that a *Woznicki*

notice was a name-clearing opportunity for Mr. Wolf. City Def. Br. 46. Nevertheless, the Amended Complaint pleads that the public statements were such that called into question Mr. Wolf's honesty, integrity, and moral character. See *Abcarian,* at 941.

> 3. *Mr. Wolf alleges that the stigmatizing statements were publicly disseminated at public Council meetings, to the general public, and in newspaper articles.*

The City Defendants and Hall argue that Mr. Wolf did not allege facts that city officials "publicly disseminated" false statements about him in conjunction with his firing, but that clearly misrepresents the factual allegations in the Amended Complaint. Am. Compl. ¶ 237 & Ex. 14. Here, Mr. Wolf clearly alleges in both his original and Amended Complaints that the false statements were publicly disseminated in a manner that would, *and did,* reach the community at large and potential employers. *See supra* Parts III.b.1 & III.b.2. Finally, although Mr. Wolf sufficiently alleges public dissemination, this Court can take judicial notice of the Sheboygan Press article detailing the contents of Hall's "final report." *See* Kelli Arseneau, *An investigation found former Sheboygan city administrator's conduct may have violated city policies, he is suing, claiming he was targeted,* (Sheboygan Press, April 10, 2023), https://tinyurl.com/375xhueu.

> 4. *Adams does not deserve qualified immunity for Mr. Wolf's occupational liberty claim.*

Adams claims that he is entitled to qualified immunity because he believed that providing Mr. Wolf a *Woznicki* notice constituted a "name clearing" opportunity on February 8, but Mr. Wolf alleges the stigmatizing comments were publicly disseminated on January 9 and 10—to which Council denied him a hearing opportunity based in part on Adams' advising. Adams does not deserve qualified immunity because he is plainly incompetent, and he knowingly and intentionally violated clearly established laws. Qualified immunity protects all but the "plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

19

The laws is clearly established that the due process afforded to an employee whose liberty interests are implicated must be *granted by the employer engaged in the deprivation*, must be administrative in nature, must not consist of biased procedures, and must include notice of the charges, a presentation of the employer's evidence, and an opportunity to clear the plaintiff's name and question witnesses. A constitutionally adequate name-clearing hearing opportunity requires the employer to specifically notify and "provide the employee with a public forum to clear his name ***before the governing body that discharged him***." *Rosenstein v. City of Dallas*, 876 F.2d 392, 396-397 (5th Cir. 1989) (emphasis added).

Indeed, the main purpose of a name-clearing hearing is to afford the plaintiff a public opportunity to protect his reputation by the governing board. See *Patterson v. City of Utica*, 370 F.3d 322, 335 (2d Cir.2004) (holding the purpose of a name-clearing hearing is to "afford the plaintiff an opportunity to 'hear *and answer first-hand any stigmatizing charges*, clearing his name of any false statements made about him, and curing the injury to his reputation'"); *Codd v. Velger*, 429 U.S. 624, 627 (1977) (the purpose is specifically to publicly and directly address the false statements). Mr. Wolf also alleges no facts that Adams was granted the Council's administrative authority as the final decision maker to permit or deny him a hearing opportunity, and therefore, Adams is not entitled to qualified immunity.

     c.   The Amended Complaint alleges that the Defendants are personally liable for the deprivation of Mr. Wolf's Fourteenth Amendment procedural due process rights.

     *1. Def. Hall's status as a private attorney does not immunize her from liability.*

Defendant Jill Hall argues that she is immunized from liability because (1) she is a private attorney that cannot be subject to liability under § 1983, and (2) Mr. Wolf failed to allege her willful participation with public officials to deprive Mr. Wolf of his Fourteenth Amendment procedural due process rights. However, Hall's arguments fail because Mr. Wolf explicitly alleges that Hall jointly agreed with government officials to conduct a sham investigation, make false statements and assertions of fact about

20

Mr. Wolf's conduct, and encourage the Council to deny Mr. Wolf any hearing opportunity despite knowing that Mr. Wolf was entitled to one based on the public allegations of his conduct.

Private persons who are "willful participant[s] in [a] joint activity with the State" are acting under color of state law for purposes of a § 1983 claim. *Adickes*, 398 U.S. at 152. A plaintiff must only allege "the parties, the general purpose, and the approximate date of the conspiracy" to escape dismissal at this stage. *Bohannan v. City of Milwaukee*, 998 F. Supp. 2d 736, 749 (E. D. Wis. 2014); citing *Walker v. Thompson*, 288 F.3d 1005, 1007–08 (7th Cir. 2002).

As recently as October of 2022 in *Kenosha,* the Eastern District of Wisconsin denied a private attorney's motion to dismiss a claim under 42 U.S.C. § 1983 where the plaintiff alleged the attorney was hired to investigate and testify before the public deciding body, that the defendant attorney knew or should have known there was bias in the proceedings, and that she "coached" public officials on their options to remove the plaintiff from her position. *Kenosha*, Case No. 22-cv-0269-bhl (E. D. Wis. Oct. 25, 2022). This Court, in October 2022, denied the attorney's motion to dismiss even where the *Kenosha* plaintiff was given a hearing, albeit a biased one. *Id.* Here, Mr. Wolf alleges far more factual grounds than even the plaintiff in Kenosha that plausibly infers Hall's willful participation in the deprivation of Mr. Wolf's liberty and property rights:

> (1) Hall knew or should have known that the Council publicly announced allegations of misconduct about Mr. Wolf on November 7, 2022, that she was hired to "investigate" and that Sorenson publicly stated on November 8 that he believed Mr. Wolf "lied" about Donohue's DEIB group. (Am. Compl. ¶¶ 138, 242).

> (2) Hall admitted she has known Donohue well for over thirty years. (*Id.* ¶ 19).

> (3) Hall concealed several employee eyewitness statements that Rendall asked Pelishek to repeat the racial slur and that Pelishek was set up to repeat the racial slur he expressed concerns over. (*Id.* ¶ 212, 252, 255-56).

> (4) Hall separated employee witnesses from those who "supported" Mr. Wolf verses those who supported Sorenson and then conceal, disregarded, and falsified the testimonies of Mr. Wolf's so-called "supporters" while considering only evidence provided by Sorenson, Rendall, or Adams. (*Id.* ¶ 221).

21

(5) Hall denied Mr. Wolf's attorney to be present during her interview of him in December 2022, knew that he still did not know the actual charges against him when the interview started, and then spent five hours interviewing him to try to determine whether she could find any cause to convince the Council to fire him. (*Id.*).

(6) Hall told the Council on January 4 that a hearing for Mr. Wolf would be costly and harmful to the employees. (*Id.* Ex. 12).

(7) On January 4, Hall provided a reported to the Common Council (that was finalized in written form on February 6) that Mr. Wolf, among other false statements), (1) retaliated against Rendall for engaging in protected activity by reporting Pelishek's alleged racism, (2) was the source of the confidential disclosure leaks about Pelishek for Hilty's "slur" articles in October that led to a "public outcry," (3) lied about the October 5 DEIB leader meeting, and (4) was potentially guilty of law violations. (*Id.* Exs. 12 & 15).

(8) After Mr. Wolf's December 2022 interview with Hall, neither Mr. Wolf nor his attorney every received another communication from Hall again, and Hall did not provide any preliminary or final report to Mr. Wolf or his attorney before "finalizing it" for the City Defendants to release. (*Id.* ¶244).

(9) One month after Mr. Wolf was publicly fired and denied any hearing opportunity by the Council based solely on Hall's January 4 investigation conclusions, Hall sent her "final report" to the City (without ever providing any report to Mr. Wolf)—which the City immediately disclosed to the public. (*Id.* Ex. 15); City Defs. Br. 43, 46.

Mr. Wolf plausibly alleges that Hall agreed with Sorenson and Adams (based on her long friendship with Donohue) to help convince the Council to deny a hearing opportunity for Mr. Wolf, tell the Council there was cause to fire him, falsify, and conceal exonerating witness testimonies, and divide employee witnesses between those who "support" Mr. Wolf to disregard the testimonies of Mr. Wolf's "supporters," while concealing and falsifying witness testimonies, and then delivered a conclusion based on false statements that Mr. Wolf was guilty and there was "cause" to fire him, but a hearing would be "costly" and harmful for employees.

> 2. *Def. Hilty's status as a journalist does not immunize her from liability because she acted outside the scope of her employment and expressly agreed with Sorenson to fabricate evidence that led to the deprivations of Mr. Wolf's constitutional rights.*

Hilty seeks dismissal from this action because (1) Mr. Wolf did not plead an underlying tort for his civil conspiracy claim or a separate § 1983 claim against her, and (2) she cannot be acting under "color of

law" because she is a journalist. However, "conspiracy or meeting of the minds [between a private individual and public official] works to cloak the private individual with the authority of law" where a plaintiff alleges a joint agreement to violate another's constitutional rights. *Kenosha*, at *5 (E. D. Wis. Oct. 25, 2022). To plead civil conspiracy under § 1983, a plaintiff must allege facts that permit a reasonable inference "(1) an express or implied agreement among [private and public] defendants to deprive a plaintiff[] of his…constitutional rights, and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Wheeler v. Piazza*, 364 F. Supp. 870, 880 (N.D. Ill. 2019), quoting *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988). There is no law carving out an exemption for journalists.

Hilty cites *Skinner v. Dwyer,* where a *pro se* prisoner plaintiff filed a lawsuit against a media outlet (Daily Gazette) and the District Attorney's office involved in his prosecution and conviction. *Skinner v. Dwyer, et. al.,* Case No. 6:91-cv-00238-CGC-GJD (N. D. N. Y. May 15, 1992). The *Skinner* Court rightly dismissed the Daily Gazette holding that the media was not liable under § 1983 for publishing *criminal complaints or police investigation records* that were defined under state law as public records. *Id.* Here, Mr. Wolf was not criminally investigated nor was he charged with a crime under state law. Mr. Wolf plausibly alleges that Hilty agreed to publish confidential information about Pelishek making a "racial slur" from Sorenson and Rendall, and then published a false implication of fact that Mr. Wolf was the source of disclosing that "confidential" information during Hall's investigation so that Sorenson and Hall could convince the Council there was "cause" to remove Mr. Wolf under the Confidential Disclosures policy. Specifically, Mr. Wolf alleges:

> (1)     Published multiple articles about the Sheboygan DEIB and related political activist outfits and regularly quoted Donohue's DEIB leaders, including those who were present at the October 5 lunch. (Am. Compl. ¶18).

> (2)     Hilty contacted Mr. Wolf directly for a comment on September 12 specifically for an interview on "Pelishek making a racial slur"; and Mr. wolf told her that she could interview both he and Sorenson together on September 20. (*Id.* Ex. 11).

(3)    Despite this information from Mr. Wolf, on September 16, Hilty met secretly with Sorenson outside of city hall when Mr. Wolf was out of the office. (*Id.* ¶ 103).

(4)    Hilty showed drafts of her "racial slur" article to Rendall—who is not mentioned anywhere in the article by name.  (*Id.* Ex. 5).

(5)    Five days after Mr. Wolf rejected the DEIB meeting request, Hilty published her slur article, and Sorenson immediately told the public to email Council with "public outcry" calling for Mr. Wolf to be removed for cause.  (*Id.* Ex. 4).

(6)    Hilty's October articles laid out how Mr. Wolf was neglectful and potentially guilty of malfeasance. (*Id.* ¶127).

(7)    Immediately following the publication of Hilty's third October article about Mr. Wolf listing DEI failures and concerns, Donohue emailed the Common Council to, once again, ask for funding to hire her DEIB group to allocate city resources as consultants. (*Id.* ¶ 128)..

(8)    Hilty contacted Mr. Wolf on his private cell phone directly to comment during his leave after she received a communication from Mr. Wolf 's attorney to direct all communications to her.  (*Id.* ¶ 183).

(9)    In November 2022, when Mr. Wolf was on leave, Hilty asked Mr. Wolf to comment on information that she knew Mr. Wolf believed was confidential information.  (*Id.* ¶ 184).

(10)   After Mr. Wolf declined to comment on confidential information for Hilty's December 2022 article, Hilty published an article on December 16 stating that *Mr. Wolf* disclosed to her that Pelishek made a racial slur—implying falsely that Mr. Wolf leaked the information to her.  (*Id.* ¶¶ 186-87).

(11)   Sorenson immediately emailed Hilty's December 16 article to Hall during the investigation. (*Id.* Ex. 10).

(12)   Hall's investigation report says that Pelishek disclosed confidential information in violation of city policies. (*Id.* Exs. 12 & 15).

Mr. Wolf has alleged sufficient factual grounds to create a plausible inference that Hilty agreed with Sorenson to publish false information *in her December 2022 article* solely for Sorenson to use as "cause" to remove him for Hall's investigation.  Hilty claims that her showing drafts of her "slur" article to Rendall and Donohue was simply a "newspaper reporter confirming the accuracy of a quote in an article," even though neither Rendall nor Donohue are named in the October 10 slur article.  Hilty Br. 10; Am. Compl. Ex. 4.  Notably, Hilty's argument about her showing drafts supports Mr. Wolf's allegations that she published false information that Mr. Wolf was the source of the "slur" articles about Pelishek;

24

specifically, since Rendall and Donohue are not mentioned anywhere in her article, and Mr. Wolf alleges that he did not use names in his interview with her. *Id.*

Finally, Hilty argues that allowing Mr. Wolf's claims against her to succeed would be a "declaration" that nearly "all news outlets are state actors" where public employees are fired and receive coverage in the news media, but this characterization is not accurate, and Hilty offered no cases, because none exist, where a private citizen (regardless of their media-affiliation) *with similar underlying factual grounds alleged by Mr. Wolf* was dismissed solely because they are a "journalist." Mr. Wolf does not seek to create any standards of private actor liability *that have not already been established* under decades of Constitutional jurisprudence, and at this stage, Mr. Wolf must only plausibly allege sufficient facts to state a claim—which he has.

On the contrary, far more concerning is the new legal standard this Court would set in carving out a specific delineation for "journalists" who go *beyond the scope* of their employer's mandates and conspire to aid the government in constitutional deprivations—specifically in light of the sufficiency of Mr. Wolf's factual allegations. Such an exemption solely for "journalists" would render anyone with a media-affiliation above the United States Constitution. Indeed, where a single journalist decided that, instead of speaking "truth to power," she will act as a propaganda arm to oppress and help the government infringe on constitutional rights of their political opponents, that goes against the very fabric of our democracy—as well as against the fabric of journalistic standards of integrity that entitles the media to greater protections under the First Amendment.

Hilty essentially asks this Court to carve out a new exemption allowing journalists *who go beyond the scope* of their duties and intentionally *engage in constitutional deprivations with the government* to be effectively immunized from such liability—while simultaneously noting that journalists are not government actors. Such a precedent would lead to unchecked media-government partnerships, biased

reporting that favors the government, and, most importantly, unchecked constitutional deprivations and reputational injuries against those the government targets as political opponents—which Mr. Wolf alleges here. The facts alleged here go far beyond a "newspaper reporter" doing her job as an "unbiased" journalist, but rather as a young, recent college graduate that agreed to join public officials in fabricating false evidence so they would have "cause" to fire him and report his "violations" and dangers to employees for leaking confidential information about them. Additionally, according to Mr. Wolf, even the opinions espoused by Hilty in her *October articles* about Mr. Wolf failing to address racism and being "more concerned" about employees who "reported" racism aided Sorenson and public officials in later stating that Mr. Wolf was dangerous and retaliatory against employees.

IV. **The Amended Complaint sufficiently alleges state law claims for Defamation, Intentional Infliction of Emotional Distress, and Conversion.**

a. <u>Mr. Wolf alleges that Sorenson's statements about Mr. Wolf between November 2022 and February 2023 constituted unprivileged Defamation Per Se.</u>

Under Wisconsin common law, a claim for defamatory communication must sufficiently allege that the defendant made "(1) a false statement, (2) communicated by speech, conduct, or in writing to a person other than the person defamed, and (3) the communication is unprivileged and is defamatory." *Terry v. Journal Broadcast Corp.*, 2013 WI App 130, ¶ 14, 351 Wis. 2d 479, 840 N.W.2d 255 (internal citations omitted). Mr. Wolf has already addressed Sorenson's false statements regarding the DEIB, Pelishek, Rendall's "retaliation," the "slur," having improper ties to city officials as false assertions of fact made intentionally and maliciously. *See supra* Part III.b.1. This section only addresses the statements by Sorenson about Mr. Wolf covering up sexual harassment in the Sheboygan Police Department and whether Sorenson abused any conditional privilege he may have had by defaming Mr. Wolf.

Mr. Wolf alleges that Sorenson told multiple third persons, including the Wisconsin Watch, between November 2022 and February 2023 that Mr. Wolf stopped the internal investigation into alleged sexual harassment at the Sheboygan Police Department (SPD), implied and stated that Mr. Wolf was the

one responsible for sexual harassment in the police department, and that Mr. Wolf as covering up sexual harassment in the police department. Am. Compl. ¶¶ 260-271. Sorenson's statements are clearly false statements of fact because they can be easily and quickly proven true or false. Mr. Wolf alleges that he ensured the investigation was fully completed without interference, had no authority over the Fire and Police Departments (Sorenson does) but merely helped Sorensen by hiring outside counsel to investigate, involving Sorenson, ensuring an investigation into the 2021 complaint was conducted and completed fully, which it was, without any interference—all of which Sorenson knew and was involved with. *Id.* ¶¶58 - 62.

> 1. *Mr. Wolf alleges that Sorenson's defamatory statements about the sexual harassment investigation and DEIB meeting were made with actual malice.*

Wisconsin adopts the general standards of "actual malice" finding it exists where a statement is made with "knowledge that it is false or with reckless disregard of whether such statement is false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Mr. Wolf alleges that Sorenson had explicit knowledge that the police sexual harassment investigation was fully completed, that Sorenson was informed of the SPD investigation's completion and knew that its completion allowed the City to resolve the complainant's claims in 2021. Am. Compl. ¶¶58-61.

Next, even if Sorenson was entitled to a conditional privilege, he abused that privilege and has forfeited it. Under Wisconsin law, a defendant entitled to a conditional privilege relinquishes that defense where a plaintiff alleges the speaker had actual knowledge that the statement was false, or with reckless disregard to the truth or falsity of a statement. *Zinda v. Louisiana Pacific Corp.*, 149 Wis. 2d 913, 924-25, 440 N.W.2d 548 (1989) ("conditional privilege is not absolute and may be forfeited if the privilege is abused"); *Emiabata v. Marten Transport, Ltd.*, 574 F. Supp. 2d 912, 919 (W.D. Wis. 2007) (denying defendant's motion where plaintiff alleged that defendant abused any privilege by knowingly making false statements). For the same reasons, Mr. Wolf has plausibly and sufficiently alleged that Sorenson is not

entitled to immunity under Wis. Stat. 893.80(4) because his statements were made intentionally, willfully, and maliciously. See *Lodl v. Progressive Northern Insurance Co*., 2002 WI 71 ¶ 24.

      b.   <u>The Amended Complaint pleads that Donohue intentionally caused Mr. Wolf severe emotional distress.</u>

Where a person treats another as an object to be deliberately manipulated, humiliated, and scorned, [s]he ought to be compelled to compensate that person for any disabling emotional response caused by [her] conduct." *Id.* The Wisconsin Supreme Court states that "conduct is extreme and outrageous if '[t]he average member of the community [would] regard the defendant's conduct in relation to the plaintiff . . . as being a complete denial of the plaintiff's dignity as a person.'" *Michael v. Mega Concrete Constr*., 20-cv-658-jdp, at *17 (W.D. Wis. Jan. 27, 2022). In Wisconsin, to state a claim for intentional infliction of emotional distress, a plaintiff must allege "(1) that the defendant's conduct was intentioned to cause emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct was a cause-in-fact of the plaintiff's emotional distress; and (4) that the plaintiff suffered an extreme disabling emotional response to the defendant's conduct." *Rabideau v. City of Racine*, 627 N.W.2d 795, 803 (Wis. 2001), citing *Alsteen*, at 318.

Here, Mr. Wolf plausibly alleges that Donohue spent nearly two years intending to cause him extreme emotional and physical distress to destroy his standing and credibility, effectuate his removal, and assassinate his character throughout the community (and the state), because she considered him a political threat after he turned down her requests. *See supra* Part II.b.3. Am. Compl. ¶¶ 17, 19, 30 47, 48, 66-71, 73, 78-84, 90, 93, 100, 104, 107, 117, 119, 127, 128, 148, 159, 163, 167, 168, 169, 171, 176, 223, 226, 293. Specifically, Mr. Wolf alleges the following underlying factual grounds sufficient to create a plausible inference:

      (1) Donhue used Hilty's "October" slur articles and public outrage to request from Council public resources for her DEIB group that Mr. Wolf had previously rejected as non-compliant with ARPA funds. *(Id.* Ex. 8).

(2) Diane Welsh, another Madison-based attorney that works with Donohue at Planned Parenthood—sent a "cease and desist" letter to the City against Mr. Wolf during Hall's investigation solely on Mr. Wolf's *confidential letter* to the common Council on December 7, 2022 for Donohue's DEIB leaders despite Mr. Wolf being on leave and never disclosing his letter, its existence, nor its contents to anyone in the public; and despite his letter being privileged. (*Id.* Ex. 16).

(3) Donohue's friend, Lauren Hofland, who is publicly affiliated with the progressive democratic party, attended the Republican event that Mr. Wolf was threatened from speaking at and immediately posted and reported Mr. Wolf's attendance and speech at the event. (*Id.* ¶163).

(4) Diane Welsh sent Mr. Wolf and *Mr. Wolf's attorney* a "cease and desist" letter threatening Mr. Wolf's attorney from representing him in his judicial proceeding specifically and solely based on Mr. Wolf filing his original Complaint naming Donohue and referencing her DEIB group. (*Id.* ¶ 293, Ex. 16).

(5) That Mr. Wolf suffered severe and debilitating emotional and physical injuries that harmed himself, his family, and caused severe lasting effects, including former colleagues and associates that are afraid of being threatened with (frivolous) legal action just for supporting or defending Mr. Wolf. Am. Compl. 38-41.

Accordingly, Donohue's argument fails.

      c.  <u>Mr. Wolf alleges that the Defendants conspired to convert Mr. Wolf's personal belongings and invaded his privacy in his office.</u>

The City Defendants use additional facts and imply Mr. Wolf's dishonesty by instigating a factual dispute based on "evidence" authenticated by the City's legal counsel that this brief will not indulge. The City Defendants' factual disputes and affirmative defenses at the 12(b)(6) stage are not proper, and even if they were, Mr. Wolf has plausibly alleged (both in his original and Amended Complaints) that Adams and Sorenson conspired to convert Mr. Wolf's personal property in his office—an office that Mr. Wolf was prohibited from entering at all points during his leave and several months after his firing on January 9. Am. Compl. ¶¶180, 208, 284, 290-92.

**V.    Mr. Wolf's Civil Conspiracy and IIED claims are not barred by the Wisconsin Compensation Act.**

Mr. Wolf's Civil Conspiracy and state law claims are not barred by the Wisconsin Compensation Act ("WCA") because the crux of his alleged injuries resulting from the intentional conduct of the ***City***

*official Defendants* did not occur until his administrative leave and mainly following his firing—when Mr. Wolf was expressly prohibited from engaging in work growing out or incident to his employment. Am. Compl. 38-41. Wis. Stat. § 102.03(1)(c)1; *Weiss v. City of Milwaukee*, 559 N.W.2d 588, 592 (Wis. 1997) (the language "growing out of and incidental to employment" is used interchangeably with the phrase "course of employment").

Notably, the City Defendants briefs admits that Mr. Wolf was prohibited from engaging in *any* work-related activity during his "administrative leave"—thus acknowledging that no injuries Mr. Wolf suffered during his leave rose from his employment-related activities. City Defs. Br. 14, ECF No. 47 at 20 (stating Mr. Wolf "had no daily responsibilities during the [leave] period"). Here, the underlying tortious conduct for the actions by Sorenson, Adams and Donohue related to his § 1983 claims and his civil conversion claims are wholly outside the scope of the WCA's exclusivity provision and Mr. Wolf's most serious and alleged injuries did not occur until November 2022—when he was placed on administrative leave and prohibited from engaging in any work-related duties. *Id*. Accordingly, the Defendants' arguments seeking dismissal under the WCA fail.

## CONCLUSION

For the reasons set forth above, the Plaintiff Todd Wolf respectfully requests this Court deny the Defendants' motions to dismiss under Rule 12(b)(6) in their entirety (Defs. Mots. Dismiss ECF Nos. 40 – 43, 46 – 47).

Dated: May 30, 2023

Respectfully Submitted,

DeMaster Law LLC

*/s/ Jennifer DeMaster*
Jennifer DeMaster
Wis. Bar No. 1124201

attorney@jenniferdemaster.com

DeMaster Law LLC
361 Falls Rd # 610
Grafton, WI 53024
Phone: (414) 235-7488
Fax: (262) 536-0515

*Attorney for Plaintiff*