# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

TODD WOLF,

        Plaintiff,

  v.                          Case No. 23-CV-149

CITY OF SHEBOYGAN, et al.,

        Defendants.

## DECISION AND ORDER

### 1. Background

Todd Wolf characterizes himself as "one of the most successful and well-liked businessmen and public servants that the City of Sheboygan has ever known …." (ECF No. 1, ¶ 1.) He was hired as Sheboygan's City Administrator on July 7, 2020 (ECF No. 36, ¶ 5), but within a year a group of city officials, a private attorney, and a local reporter allegedly began to conspire to remove him from office. This conspiracy was allegedly the result of Wolf's refusal to fund a "Diversity, Equity, Inclusion, and Belonging" program (ECF No. 36, ¶ 66), and eventually culminated in Wolf's termination as City Administrator on January 9, 2023.

On February 6, 2023, Wolf filed an expansive complaint spanning 63 pages and several hundred separately numbered paragraphs. (ECF No. 1.) Attached were roughly 200 pages of additional documents. (ECF Nos. 1-1 — 1-45.) Two months later Wolf filed an even longer amended complaint now spanning 68 pages, 467 numbered paragraphs, attaching 16 exhibits, alleging ten causes of action, and naming 14 defendants. (ECF No. 36.)

Wolf stipulated to dismiss Maya Hilty, a reporter with the Sheboygan Press, as a defendant. (ECF No. 58.) The remaining defendants—the City of Sheboygan, Sheboygan Mayor Ryan Sorenson, Sheboygan City Attorney Charles Adams, Alderpersons Barbara Felde, Roberta Filicky-Peneski, Amanda Salazar, Angela Ramey, Dean Dekker, Betty Ackley, Zach Rust, and Grazia Perrella, former Alderperson Mary Lynne Donohue (referred to collectively as the Sheboygan defendants), and Attorney Jill Hall—have moved to dismiss the complaint. (ECF Nos. 42, 46.) Those motions are now ready for resolution. All parties have consented to the full jurisdiction of this court. (ECF Nos. 4, 25, and 26.)

## 2. Applicable Law

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint on the grounds that it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

At the motion to dismiss stage the court is required to assume that every well-pleaded allegation in the complaint is true and to draw all reasonable inferences in favor of the plaintiff. *O'Brien v. Vill. of Lincolnshire*, 955 F.3d 616, 621 (7th Cir. 2020). The court may disregard only fantastic or delusional allegations. *Huber v. Beth*, No. 21-C-0969, 2023 U.S. Dist. LEXIS 16636, at *5 (E.D. Wis. Feb. 1, 2023). Aside from the complaint itself, the court can consider only "documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *O'Brien*, 955 F.3d at 621 (quoting *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013)).

The court does not weigh the veracity of the plaintiff's allegations or claims but merely their plausibility. *See Swanson v. Citibank, N.A.*, 614 F.3d 400, 402 (7th Cir. 2010) ("the court will ask itself could these things have happened, not did they happen"). Plausibility does not mean probability; "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 548.

"Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience

and common sense." *Iqbal*, 556 U.S. at 679. The plaintiff must "present a story that holds together," *Swanson*, 614 F.3d at 404, and goes beyond threadbare recitals of the elements of a claim or conclusory statements, *Iqbal*, 556 U.S. at 678.

The plaintiff may make allegations "on information and belief" "when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject." 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1224 (4th ed.); *Brown v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005) ("Where pleadings concern matters peculiarly within the knowledge of the defendants, conclusory pleading on 'information and belief' should be liberally viewed.'" (quoting *Tankersley v. Albright*, 514 F.2d 956, 964 n.16 (7th Cir. 1975)).

### 3. Wolf's Allegations

In March 2021 Mary Lynne Donohue, who at the time was a Sheboygan alderperson, requested that Wolf approve funding for certain Diversity, Equity, Inclusion, and Belonging groups. (ECF No. 36, ¶¶ 17, 66.) Wolf denied the request. (ECF No. 36, ¶ 68.) He also later rejected Donohue's request to hire a "DEI Consultant." (ECF No. 36, ¶ 79.)

Following these denials, Donohue and newly-elected Mayor Ryan Sorenson began to instruct employees to make complaints about Wolf so that they would have cause to remove him as City Administrator. (ECF No. 36, ¶¶ 84, 90.) Also around this

time Sheboygan adopted a "Confidential Information" policy, which provided that the City would have "cause" to fire any City employee—including the City Administrator—who discloses "confidential information" about city affairs. (ECF No. 36, ¶ 76 (citing ECF No. 36-1 at 1-2 (Sheboygan Mun. Code § 2-251)).)

On August 22, 2022, Sheboygan's Planning and Development Director, Chad Pelishek, learned that a citizen used a racial slur at a community meeting. In relating the report to the Director of Senior Services, Emily Rendall-Araujo, Pelishek repeated the slur when Rendall-Araujo asked what slur was used. (ECF No. 36, ¶¶ 90.) Shortly thereafter, Sorenson told Wolf that Rendall-Araujo was telling people that Pelishek had used a racial slur. Sorenson asked Wolf to talk to Rendall-Araujo about making these misleading statements. (ECF No. 36, ¶ 98.)

That incident snowballed into a renewed discussion of Wolf's refusal to fund Diversity, Equity, Inclusion, and Belonging groups in the City. At a subsequent meeting with Wolf and the leaders of the group attempting to gain funding for the Diversity, Equity, Inclusion, and Belonging efforts, Wolf again denied their funding request. (ECF No. 36, ¶¶ 110-12.) This led to a leader stating that the group would "oppose" Wolf (the amended complaint does not suggest how they would oppose him). (ECF No. 36, ¶ 113.)

Soon thereafter Hilty, with the cooperation of Rendall-Araujo, Sorenson, and a leader of the Diversity, Equity, Inclusion, and Belonging group, published a series of

articles discussing the racial slur incident and Wolf's refusal to fund Diversity, Equity, Inclusion, and Belonging efforts. (ECF No. 36, ¶¶ 101-18.) The purported intent of these articles was to generate a public outcry over Wolf and provide a basis for removing him as City Administrator. (ECF No. 36, ¶¶ 115, 117.)

On November 7, 2022, Wolf sent an email to the city alderpersons stating that "Rendall had set Pelishek up to make the 'racial slur,'" noting how the Diversity, Equity, Inclusion, and Belonging group asked for money, and stating that he was concerned that Hilty published her articles because Wolf had turned down the Diversity, Equity, Inclusion, and Belonging group's funding request. (ECF No. 36, ¶ 131.) At a Common Council meeting later that day the Council placed Wolf on paid administrative leave. (ECF No. 36, ¶¶ 137-41.) Later that evening, Wolf gave a statement to a radio station regarding "the Council's public investigation announcement into him." (ECF No. 36, ¶ 142.)

Soon thereafter Wolf was given "Leave Directives" that prohibited him, among other things, from speaking to any city employee or person conducting city business, speaking to media about city matters, and entering city facilities without permission. (ECF No. 36, ¶ 151.)

Donohue hired her friend, Attorney Hall, to investigate Wolf. (ECF No. 36, ¶¶ 167-68.) This investigation, about which Wolf has many complaints, led to Hall

concluding that the city had cause to fire Wolf. The council, however, decided to fire Wolf without cause. (ECF No. 36, ¶ 367.)

## 4. Analysis

### 4.1. Rule 8

Wolf's amended complaint is far from the sort of "short and plain statement of the claim" that Fed. R. Civ. P. 8(a)(2) demands. It is dense and at times argumentative, with many tangents, hyperbolic assertions, and sarcastic scare quotes. For a plaintiff, this approach to pleading saves him the trouble of having to identify and focus on the details that really matter. But when a plaintiff throws everything into a complaint, it creates unnecessary costs for the defendants and requires the court to devote a disproportionate amount of its scarce resources to one case. It can also counterproductively result in a court overlooking what may prove to be a crucial detail.

Nonetheless, "undue length alone ordinarily does not justify the dismissal of an otherwise valid complaint." *Stanard v. Nygren*, 658 F.3d 792, 797 (7th Cir. 2011); *see also Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998) ("Prolixity is a bane of the legal profession but a poor ground for rejecting potentially meritorious claims. Fat in a complaint can be ignored, confusion or ambiguity dealt with by means other than dismissal."). Provided the complaint is clear enough to alert the defendants as to the nature of the plaintiff's claims, length is not a reason to dismiss a complaint. *But see United States v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) ("Length may

make a complaint unintelligible, by scattering and concealing in a morass of irrelevancies the few allegations that matter.").

Wolf's complaint comes close to the line between those which are merely inefficient and prolix and those where the length obfuscates the essence of the claims. *Cf. Lockheed-Martin Corp.*, 328 F.3d at 379 (affirming dismissal of complaint of "400 paragraphs covering 155 pages, and followed by 99 attachments"). Some judges undoubtedly would demand a re-do. But, in the view of this court, the complaint is "windy but understandable. Surplusage can and should be ignored." *Lockheed-Martin Corp.*, 328 F.3d at 378. Although pleading by screed is a poor practice, courts are ill-equipped to correct all of a lawyer's bad habits. As Judge Easterbrook noted, "Instead of insisting that the parties perfect their pleadings, a judge should bypass the dross and get on with the case." *Id*. And so the court will.

### 4.2. Rule 20

In broad terms, Wolf alleges that a conspiracy existed to remove him as City Administrator. Hall was allegedly a part of that conspiracy. The claims against Hall (Claims Five, Six, and Nine) also name certain of the Sheboygan defendants. Joinder under Rule 20(a)(2) is proper, is consistent with the objectives of the Rule, *see* 7 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1652 (3d ed.), and will foster fair and efficient resolution of Wolf's complex allegations, *see UWM Student Ass'n*

*v. Lovell*, 888 F.3d 854, 863 (7th Cir. 2018). Hall's motion to dismiss on Rule 20 grounds will be denied.

### 4.3. Hall as a State Actor

Hall contends that all claims against her should be dismissed because she is a private attorney at an outside law firm, and the amended complaint fails to charge her with actions that "cross the line from a private attorney acting on behalf of a municipal client to a state actor who would deprive Wolf of his constitutional rights." (ECF No. 43 at 11-12.) Claims Five and Six allege that Hall and others violated Wolf's rights under the Fourteenth Amendment. Liability under 42 U.S.C. § 1983 requires a showing that the defendant acted "[u]nder color of any statute, ordinance, regulation, custom, or usage, of any State." Generally, to show that a defendant acted "under color of law" a plaintiff must show state action by a state official. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982).

Hall is a private attorney hired by the city to investigate Wolf. A private attorney does not become a state actor merely because she represents a municipality. *See Raines v. Indianapolis Pub. Schs*, 52 F. App'x 828, 830 (7th Cir. 2002) (rejecting a claim that a private attorney was a state actor when her involvement was limited to writing a letter informing plaintiff that the school board had denied plaintiff's request for a continuance and a letter informing plaintiff that he had been fired).

However, "[a] private actor … can have acted under color of law if the plaintiff can establish that '(1) the private individual and a state official reached an understanding to deprive the plaintiff of her constitutional rights and (2) the private individual was a willful participant in joint activity with the state or its agents.'" *Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006) (quoting *Hanania v. Loren-Maltese*, 212 F.3d 353, 356 (7th Cir. 2000)); *see also Johnson v. Kenosha Unified Sch. Dist. Defendants*, No. 22-cv-0269-bhl, 2022 U.S. Dist. LEXIS 193883, at *9-*12 (E.D. Wis. Oct. 25, 2022).

Wolf alleges that Hall "agreed with Donohue and Sorenson in November 2022 to conduct a biased investigation to deliver a report to the Common Council that would convince any swing Council votes to fire [him] for 'cause.'" (ECF No. 36 at ¶ 210.) To achieve that outcome, Hall allegedly conspired with Donohue and Sorenson, omitted from her report evidence that was favorable to Wolf, and recommended that the Common Council fire Wolf "without cause" so that exculpatory evidence could not come out during a public hearing. (*See generally id.*, ¶¶ 209-32.)

These allegations are sufficient to support a claim that Hall engaged in a conspiracy with at least one government actor, rendering her actions under color of state law for purposes of § 1983. *Cf. Johnson v. Kenosha Unified Sch. Dist.*, No. 22-CV-269, 2022 WL 14637129, at *5 (E.D. Wis. Oct. 25, 2022) ("While the exception and not the rule [defendant's] role as attorney does not immunize her from liability, if the evidence

shows she did in fact conspire with [state actors] to violate [plaintiff's] rights."). Hall has not demonstrated that dismissal of the amended complaint is appropriate on this basis.

### 4.4. Donohue as a State Actor

The Sheboygan defendants argue that Donohue must be dismissed as a defendant to Claim One because she is a private actor and none of the exceptions which allow for § 1983 liability against private actors apply to her.

Accepting for present purposes that Donohue was no longer an alderperson at the time of the events that give rise to Claim One, the amended complaint nonetheless contains sufficient allegations to plausibly render her a state actor for purposes of § 1983. Wolf alleges that Donohue "directly participated [in the unconstitutional prior restraint on Wolf's First Amendment rights] by drafting the language and scope of the Leave Directives and sending that to Sorenson, Felde, and Salazar to serve Wolf." (ECF No. 36 at ¶ 309.) Claim One goes on to allege that, upon receiving Donohue's draft, Sorenson, Felde, and Salazar directed Adams to re-type Donohue's draft "into a letter to serve on Wolf during his constructive suspension." (ECF No. 36 at ¶ 310.) These allegations plausibly bring Donohue within the scope of § 1983.

And while Wolf supports these allegations with only the rote assertion that they are made "on information and belief," that is not a basis for dismissal. *See* Wright & Miller, Federal Practice and Procedure, at § 1224 nn. 9 & 10 (collecting cases); *Kenosha Unified Sch. Dist.*, 2022 WL 14637129, at *5 ("[Defendant] complains that [Plaintiff] lacks

specific evidence of a conspiracy…. But this is not fatal at this early stage in the litigation. Indeed, a lack of detailed proof is not unexpected given that conspiracies are by their very nature clandestine.") Of course, should it turn out that these allegations (or the scores of others likewise made "on information and belief") were not actually supported by a belief "formed after an inquiry reasonable under the circumstances," then Rule 11 may come into play. But for purposes of the present motion the court will not dismiss Donohue from Claim One.

### 4.5. Claim One – The Leave Directives as a Violation of the First Amendment

When the city placed Wolf on leave it informed him, "[Y]ou are not authorized to speak with any city employees or individuals conducting city business. This prohibition applies to all means of communication. You are not authorized to speak to the media about City matters." (ECF No. 36-9.) The directive further provided that "[f]ailure to abide these restrictions will be deemed insubordination and may subject you to discipline." (*Id.*) Wolf alleges that this directive violated his rights under the First Amendment.

Although "[a] government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment," "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004). Government employees retain the right "to speak on

matters of public concern, typically matters concerning government policies that are of interest to the public at large, a subject on which public employees are uniquely qualified to comment." *Id*. And employees can speak about matters unrelated to their employment unless the government has a good reason for restricting the communication. *Id.* (quoting *United States v. Treasury Employees,* 513 U.S. 454, 465, 475 (1995)).

The defendants argue that "[t]he restrictions set forth in the November [Leave Directives] are plainly not related to public matters …. [but] were related to the temporary removal of [Wolf's] authority to conduct business on behalf of the City of Sheboygan or speak to media about City matters." (ECF No. 47 at 17.) They contend that "the speech [that the directives regulated] clearly pertained to [Wolf's] duties as City Administrator in conducting City business and engaging with media outlets on City matters …. [T]hese categories of prior restraints related to work duties and did not involve protected speech." (ECF No. 47 at 18.)

The problem with the defendants' argument is that the directives contain none of the limitations the defendants articulate. The directives were comprehensive and plausibly proscribed a wide variety of conduct that would come within the protection of the First Amendment.

The Sheboygan defendants alternatively argue that the city's interests in restricting Wolf's protected speech outweighed any interest served by Wolf engaging in

the protected speech. (ECF No. 47 at 18.) But they fail to point to a "city interest" that was purportedly threatened by the speech which the Leave Directives restricted and, therefore, have failed to sustain their burden, *see Treasury Employees*, 513 U.S. at 468 (quoting *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 571 (1968)); *see also Crue v. Aiken*, 370 F.3d 668, 678-79 (7th Cir. 2004).

Nonetheless, for the reasons set forth in Section 4.6 below, the court must dismiss Wolf's overbreadth challenge to the Leave Directives as alleged in Claim One. (ECF No. 36, ¶ 298.) Although the defendants do not raise this argument, the court has an independent obligation to assess its jurisdiction. *See McCready v. White*, 417 F.3d 700, 702 (7th Cir. 2005). Because Wolf is no longer subject to the leave directive, he lacks standing to bring a facial challenge to it as overbroad. The motion to dismiss will be otherwise denied with respect to Claim One.

### 4.6. Claim Two – The Confidential Information Policy as a Violation of the First Amendment

Sheboygan enacted an ordinance, referred to as its Confidential Information policy, which states: "No city officer, employee, or agent shall, without proper legal authorization, disclose confidential information concerning the property, government or affairs of the city nor use such information to advance the financial or other private interest of the officer, employee, or agent or others." Sheboygan Mun. Code § 2-251.[1]

---

[1] The amended complaint and the parties' briefs refer to the Confidential Information policy as "§ 2-272" of the Sheboygan Municipal Code. A March 2023 version of the Confidential Information policy—which

In Claim Two of the amended complaint Wolf alleges that the policy violates the First Amendment, and he names the City of Sheboygan and City Attorney Adams as defendants. The defendants argue that, as a former city employee, and thus no longer affected by the policy, Wolf lacks standing to challenge the ordinance.

Wolf responds that the policy injured him when the city relied on it as one of the bases for firing him. (ECF No. 36, ¶¶ 229, 328.)

In order to assess Wolf's standing, it is necessary to first determine the nature of his claim. The heading to Claim Two in the amended complaint states, "VIOLATION OF THE FIRST AMENDMENT (OVERBREADTH) 'CONFIDENTIAL INFORMATION' POLICY." (ECF No. 36 at 44.) But in the paragraphs that follow Wolf twice refers to the ordinance as being both overbroad and vague. (ECF No. 36, ¶¶ 323, 325.)

Vagueness and overbreadth relate to distinct constitutional principles. Overbreadth is a First Amendment principle. *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 476 (7th Cir. 2012) ("Under this overbreadth doctrine, 'a statute is facially invalid if it prohibits a substantial amount of protected speech.'" (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)). Vagueness is a due process principle under the Fifth or Fourteenth Amendments. *FCC v. Fox TV Stations,* 567 U.S. at 240, 132 S. Ct. 2307,

---

Wolf attached to his amended complaint—also has the policy as appearing in § 2-272. (ECF No. 36-1.) But on June 5, 2023, the policy was adopted by the Sheboygan Common Council as § 2-251. *See* Sheboygan Mun. Code § 2-251 (available at https://sheboygan.municipalcodeonline.com/book?type=ordinances#nam e=Sec_2251_Disclosure_Of_Confidential_Information). Thus, the court refers to the Confidential Information policy as appearing in § 2-251 of the Sheboygan Municipal Code.

2309, 183 L.Ed.2d 234, 238 (2012) ("The void for vagueness doctrine addresses at least two connected but discrete due process concerns: Regulated parties should know what is required of them so they may act accordingly; and precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."). Vagueness may be asserted alongside a First Amendment overbreadth claim, and "[w]hen speech is involved, rigorous adherence to those requirements [of the void for vagueness doctrine] is necessary to ensure that ambiguity does not chill protected speech." *Id*. "In the First Amendment context, the doctrines of vagueness and overbreadth overlap; both are premised on concerns about chilling constitutionally protected speech." *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 835 (7th Cir. 2014). Given this overlap, and the fact that the claims are often invoked together, courts have not always maintained the distinction with clarity. But the doctrines remain distinct.

Compounding matters is the fact that, in response to the motion to dismiss, Wolf argues that the Confidential Information policy is an unconstitutional prior restraint. This is yet another doctrine applicable to First Amendment claims that often overlaps with claims of overbreadth and vagueness. However, it is not a claim alleged in the amended complaint.

In any event, Wolf's prior restraint argument rests on a misreading of the ordinance. He contends that the policy "gives the Common Council members unbridled authority to engage in viewpoint and content discrimination by assessing whether

certain speech is 'confidential information' about 'city matters' before an employee can 'disclose' it to anyone." (ECF No. 51 at 13.) The ordinance, however, does not set forth any sort of prior approval mechanism. The Common Council is not vested with any authority to state that something is or is not confidential. Rather, "confidential information" is afforded its common and ordinary meaning.

And although a separate, related ordinance authorizes employees to seek an advisory opinion from an ethics board if they have questions about the propriety of any action (ECF No. 36-1 at 2, sec. 2-265), an advisory opinion is not required under the confidential information policy. Rather than imposing an obstacle to free speech, the ability to obtain an advisory opinion provides a safe harbor to employees: they need not self-censor or proceed at their peril but instead may receive prospective guidance from the city's ethics board. In this regard it appears that the role of the ethics board is not to grant "proper legal authorization" but rather to offer an opinion as to whether the employee already has proper legal authorization.

Notwithstanding these tangential arguments, the amended complaint is clear that Claim Two alleges only that the Confidential Information policy is unconstitutionally overbroad. This is, after all, written in bold and all capitals as the heading to Claim Two.

"Overbreadth claims are a distinct type of facial challenge." *Ezell v. City of Chi.*, 651 F.3d 684, 698 n.8 (7th Cir. 2011) (quoting *United States v. Stevens*, 559 U.S. 460, 472

(2010)). To have standing to bring an overbreadth challenge, a plaintiff must have more than a "notional or subjective fear" that the ordinance will chill his speech. *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012). The plaintiff must be able to point to a "specific present objective harm or a threat of specific future harm." *Id.* (quoting *Laird v. Tatum*, 408 U.S. 1, 14 (1972)). As a former employee who is no longer subject to the ordinance, Wolf faces no present objective harm or threat of specific future harm. Consequently, Wolf lacks standing to bring an overbreadth challenge to the confidential information policy.

Wolf's allegation that he was injured by the policy because his purported violation of it was a factor in his termination would ordinarily give him standing to pursue an "as applied" challenge to the ordinance. However, Wolf does not allege a plausible as applied challenge to the ordinance. He alleges that he was fired because "he violated the Policy by disclosing information about Pelishek and Rendall's 'slur incident' on August 22," but he does not allege (much less plausibly show) that this disclosure was protected by the First Amendment. He offers only speculative allegations that "[t]he Policy intentionally reaches endless forms of potential protected speech by present and future employees who may potentially try to disclose public corruption, wrongdoing, or unethical conduct of government officials through all modes of communication—including family conversations or speaking to the media on matters of public concern." (ECF No. 36, ¶ 320.)

Because Wolf lacks standing to bring Claim Two, the defendants' motion to dismiss Claim Two will be granted.

**4.7. Claims Three and Four – The False Statements Ordinance**

Sheboygan Municipal Code § 82-3 (the "False Statements ordinance") provides, "No persons shall make any false statement or report with regard to any test, certification or appointment made under any provisions of this chapter or in any manner commit or attempt to commit any fraud preventing the impartial execution of this chapter and policies." (ECF No. 36-2 at 1.) Sheboygan Municipal Code § 82-6 provides the penalties which correspond to a violation of the False Statement ordinance. Under § 82-6(a), City employees who violate the False Statements ordinance "shall be subject to disciplinary action which may include … termination of employment." (ECF No. 36-2 at 2.) Under § 82-6(b),

> An elected official, a department head, or any person who is not an employee of the city … shall be subject to a forfeiture of not less than $50.00 nor more than $250.00, together with the costs of prosecution, and in default payment thereof, to imprisonment in the county jail until such forfeiture and costs are paid, but not to exceed 30 days.

(*Id.*)

Wolf alleges that, notwithstanding the fact that he was terminated without cause, somehow this ordinance was also a basis for his termination. In the absence of an argument from the city on this seeming logical inconsistency, Wolf has adequately alleged standing to pursue a claim for damages. Moreover, unlike the Confidential

Information policy, which applies only to City employees, the False Statements ordinance applies to the public and thus its applicability did not end with Wolf's termination.

### 4.7.1. Claim Three – Overbreadth

In Claim Three, which is brought solely against the City of Sheboygan, Wolf alleges that the False Statements ordinance "and its enforcement mechanisms [under § 82-6] are facially unconstitutional because they impose fines and potential jail time on past employees and private citizens who make any statements about public corruption that the government determines is 'false' information." (ECF No. 36 at ¶ 340.)

"Facial invalidation for technical overbreadth is 'strong medicine,' and is inappropriately employed unless the statute 'substantially' criminalizes or suppresses otherwise protected speech vis-à-vis its 'plainly legitimate sweep.'" *Bell*, 697 F.3d at 455-56 (quoting *see New York v. Ferber*, 458 U.S. 747, 769, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982)).

At the heart of Wolf's contention that the ordinance is overbroad is his assertion that the ordinance gives "unnamed public officials unbridled discretion to subjectively determine the subjective 'truth' of speech content by countless public employees and private citizens about matters of public concern." (ECF No. 36 at ¶ 343.) He says that this allows officials to engage in viewpoint discrimination simply by declaring the disfavored speech false.

Although an official may be able to allege that certain conduct violates the ordinance, a mere allegation does not pose a First Amendment concern. The ordinance's silence as to how the truthfulness of a statement is determined means only that the standard procedures for enforcing a municipal ordinance, *see, e.g.*, Wis. Stat. ch. 800, or municipal employee discipline apply. It is not as if other statutes proscribing false statements are understood as empowering officials with unchecked discretion to determine whether a person is lying simply because they do not make explicit that a conviction requires a jury finding. *See, e.g.*, 18 U.S.C. § 1001; Wis. Stat. § 9420.3. It is understood that, in those situations, the procedures attendant a criminal prosecution apply.

In any event, the sufficiency of the procedures for determining the truth of any statement would not present a First Amendment problem; it would present a Due Process problem. But Wolf was never found to have violated this ordinance—again, Wolf alleges he was fired without cause—and so Due Process would not appear to come into play.

As for Wolf's assertion that the ordinance is unconstitutional because it authorizes the punishment of conduct protected by the First Amendment, his argument again appears to be based on a misunderstanding of the scope of the ordinance. The ordinance proscribes only false statements. And not all false statements, or even all false

statements regarding city government, but only a "false statement or report with regard to any test, certification or appointment made under any provisions of this chapter …."

Contrary to Wolf's argument, this ordinance does not fit the mold of a prior restraint. A speaker need not obtain permission before speaking, *see, e.g., Samuelson*, 526 F.3d at 1051, and there is no internal review process for determining whether a certain communication is permitted, *see, e.g., Conrad*, 420 U.S. at 554; *Alexander v. United States*, 509 U.S. 544, 550 (1993); *Clarke*, 574 F.3d at 382; *Green Valley Invs. v. Winnebago County*, 794 F.3d 864, 868 (7th Cir. 2015).

But neither is the ordinance a content neutral limitation. *See, e.g., Conchatta Inc. v. Miller*, 458 F.3d 258, 267 (3d Cir. 2006) ("Where … a regulation burdens expression but is content-neutral, we apply the intermediate scrutiny standard enunciated by the Supreme Court in *United States v. O'Brien*…." (citing *Texas v. Johnson*, 491 U.S. 397, 407 (1989)). It is a content-based restriction in that it proscribes false speech. *See United States v. Alvarez*, 567 U.S. 709, 717 (2012). As such, the restriction is presumptively invalid. *Ashcroft v. ACLU*, 535 U.S. 564, 591 (2002). Although there are many instances where false statements are lawfully proscribed, they are not categorically outside the scope of the First Amendment. *Alvarez*, 567 U.S. at 718. Because the city's arguments in favor of dismissal depend on the incorrect premise that the ordinance is content neutral, the city has failed to demonstrate that dismissal of Claim Three is appropriate.

### 4.7.2. Claim Four – The False Statements Ordinance (Vagueness)

Claim Four, which Wolf brings against the City of Sheboygan, alleges that the False Statements ordinance is unconstitutionally vague and, therefore, in violation of the Fourteenth Amendment's Due Process clause. The amended complaint alleges that the ordinance's "lack of objective criteria, factors, or standards … force employees to guess whether their speech will be labeled as 'false' and [whether their speech will result in] grounds for discipline, termination, fines, or potential jail." (ECF No. 36 at ¶ 357.)

Wolf's claim rests on the mistaken understanding that a person may be subject to the proscribed sanctions based on an official's subjective assessment of the truth of a statement. But there is nothing vague about a prohibition against a false statement. A person of ordinary intelligence—in fact, a young child of ordinary intelligence—understands what a lie is. *Cf. Brown v. Chi. Bd. of Educ.*, 824 F.3d 713, 716-17 (7th Cir. 2016) (citing *Fox Television Stations*, 567 U.S. at 253); *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law"). The statute gives "fair notice of conduct that is forbidden or required." *Fox Television Stations*, 567 U.S. at 253 (citing *Connally*, 269 U.S. at 391; *see also Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972) ("Living under a rule of law entails various suppositions, one of which is

that [all persons] are entitled to be informed as to what the State commands or forbids." (internal citation and quotations omitted)). Therefore, the court will grant the motion to dismiss Claim Four.

### 4.8. Claim Five – Due Process

#### 4.8.1.  Property Interest

Claim Five of the amended complaint alleges that Wolf had a property interest in his continued employment as City Administrator and that the Sheboygan defendants, along with Hall, deprived him of that interest without due process of law. (ECF No. 36 at ¶¶ 359-77.)

In Wisconsin, public employees are either at-will or terminable only for cause. *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 904 (7th Cir. 2011) (quoting *Beischel v. Stone Bank Sch. Dist.*, 362 F.3d 430, 436 (7th Cir. 2004)). Only public employees who are not at-will employees are entitled to due process protections before being fired. *Id.* (citing *Beischel*, 362 F.3d at 436).

Ordinarily, a city official appointed by the common council in Wisconsin is an at-will employee and may be removed at the pleasure of the common council. Wis. Stat. § 17.12(1)(c)1.; (*see also* ECF Nos. 36 at ¶¶ 37, 40, 51; 51 at 16-17). The defendants assert that, consistent with this statute, Wolf's June 2020 employment agreement stated that he could be removed by the Common Council at any time.

However, a city may pass an ordinance making any official removable "only for inefficiency, neglect of duty, official misconduct, or malfeasance in office." Wis. Stat. § 17.12(3m). On April 7, 2021, the Common Council amended the General Ordinance controlling the City Administrator position, Sheboygan Mun. Ord. § 2-341, to provide, "The city administrator … may be removed only for cause by a four-fifths vote of the common council." Sheboygan Gen. Ord. 41-20-21. That ordinance remained in effect when Wolf was removed without cause.

This would seem like a fairly ordinary and simple dispute—was Wolf an at-will employee or not? If he wasn't, then the City violated his right to due process by firing him without cause. But Wolf's theory is more convoluted. He contends that the City actually intended to terminate him for cause but just did not give him the procedural protections that go with it. (ECF No. 51 at 16-17.) The distinction he seems to be trying to make, however, is immaterial to his claim. Wolf seems to be equating the Common Council's reasons for terminating him with the legal term of art "cause," and then arguing that, because he was fired for cause, he was entitled to due process.

Even if a public employer's reasons for terminating an at-will employee would add up to "cause," it does not mean that the employee is then entitled to due process. That would be inconsistent with the nature of at-will employment. While an employer may (and presumably generally will) have a reason to fire an at-will employee, at-will employment means that the employee is not entitled to challenge those reasons.

The only authority Wolf offers in support of his contention is a misleadingly edited quote. Wolf states, "A government employer cannot avoid its procedural obligations….to conceal a for-cause dismissal and thereby deprive a career employee of the procedural protections to which he would otherwise be entitled." (ECF No. 51, at 16-17 (quoting *Lalvani v. Cook Cty.*, 269 F.3d 785, 793 (7th Cir. 2001)).) What the court in that case actually said was, "[A] government employer cannot avoid its procedural obligations if it is picking specific individuals for lay-off or termination, nor can it use a RIF to conceal a for-cause dismissal and thereby deprive a career employee of the procedural protections to which he would otherwise be entitled." *Lalvani*, 269 F.3d at 793. Wolf's omissions removed context and changed the meaning. The court in *Lalvani* held that a government employer cannot bypass the procedural protections to which a non-at-will employee would be entitled simply by singling him out for termination as part of a reduction in force. The statement has no relevance to Wolf's claim.

Nonetheless, the defendants have failed to demonstrate that, in the face of uncertainty regarding the application of the ordinance, Wolf was an at-will employee. Wolf has plausibly alleged that he could be fired only for cause. Therefore, the motion to dismiss Claim Five on the basis that Wolf lacked a property interest in his job will be denied.

### 4.8.2. Qualified Immunity of Alderpersons

The eight Alderperson defendants argue that they are entitled to qualified immunity on Claim Five. "[G]overnment officials performing discretionary functions generally are granted qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). But because "[t]he facts essential to this defense typically emerge during discovery … the motion-to-dismiss stage is rarely 'the most suitable procedural setting to determine whether an official is qualifiedly immune.'" *Roldan v. Stroud*, 52 F.4th 335, 339 (7th Cir. 2022) (quoting *Hanson v. LeVan*, 967 F.3d 584, 589 (7th Cir. 2020)).

Wolf offers only the barest response to this argument. He argues simply that he was terminated for cause, but the defendants labeled it as being without cause to deprive him of the procedural protections to which he was entitled. (ECF No. 51 at 17.) Again, this argument appears to rest on a misunderstanding as to the basis for due process protections in public employment. A public employee is not entitled to due

process whenever there is cause to fire him. Only a non-at-will employee is entitled to proof of cause before he is terminated.

Having not otherwise responded to the substance of the Alderpersons' qualified immunity argument, Wolf has forfeited his opportunity to further respond. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). Nonetheless, it remains the movant's burden to show that the plaintiff's claim fails. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021). And so the court assesses this aspect of the defendants' motion to dismiss unaided by Wolf's arguments.

It is clear from the amended complaint that the Alderpersons are entitled to qualified immunity. Wolf explicitly alleges that City Attorney Adams and Mayor Sorenson informed the Common Council that Wolf could be fired without cause. (ECF No. 36, ¶ 233.) In light of the uncertainty as to whether the ordinance applied to Wolf, combined with the assurances from their legal counsel that Wolf could be fired without cause, Wolf has failed to plausibly allege that it was clearly established that he could be fired only for cause. The Alderpersons will be dismissed as defendants in Count Five.

### 4.8.3.  Mayor Sorenson and City Attorney Adams

Sorenson and Adams argue that they, too, should be dismissed from Claim Five. They argue that the only allegations against them in Claim Five are based on speculation and conjecture. But, as discussed above, provided the allegations were made consistent with Rule 11, they are sufficient at this stage. Sorenson and Adams do

not argue that, even if true, those allegations do not give rise to a due process claim against them.

Instead, Sorenson's and Adams's alternative argument is that, at a minimum, the amended complaint fails to allege an official capacity claim against them. They note that an official capacity claim against a city official is really a claim against the city. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). A city is liable only for its own conduct. *Monell*, 436 U.S. at 690-91 (citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997)). Thus, a city may be liable when there is: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019) (citation omitted).

Again, Wolf does not substantively respond to this aspect of the defendants' motion to dismiss. The complaint is devoid of allegations sufficient to state a Due Process claim against Sorenson and Adams in their official capacities. Therefore, the motion to dismiss will be granted with respect to Wolf's claim against Sorenson and Adams in their official capacities.

### 4.9. Claim Six – Occupational Liberty Interest

Wolf alleges in Claim Six of the amended complaint that defendants Sorenson, Adams, Donohue, and Hall deprived him of his occupational liberty interest in

29

violation of the Fourteenth Amendment's Due Process clause. "The concept of liberty protected by the due process clause has long included occupational liberty—the liberty to follow a trade, profession, or other calling." *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992) (citations and quotations omitted). "An occupational-liberty claim may arise when, after an adverse employment action, a public employer stigmatizes the employee by making public comments impugning his good name, honor, or reputation or imposes a stigma that forecloses other employment opportunities." *Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 573-74 (1972)).

"To succeed on an occupational liberty claim, an employee must prove that: '(1) he was stigmatized by the employer's actions; (2) the stigmatizing information was publicly disclosed; and (3) he suffered a tangible loss of other employment opportunities as a result of the public disclosure.'" *Dunn v. Schmitz*, 70 F.4th 379, 383 (7th Cir. 2023) (quoting *Dupuy v. Samuels*, 397 F.3d 493, 509 (7th Cir. 2005)).

With respect to the first element, the plaintiff must "show that a public official made defamatory statements about him." *Strasburger v. Bd. of Educ., Hardin Cnty. Cmty. Unit Sch. Dist. No. 1*, 143 F.3d 351, 356 (7th Cir. 1998). To qualify as "defamatory," the "statements must be false assertions of fact"; "[t]rue but stigmatizing statements that preclude further government employment" do not suffice, "[n]or do statements of opinion, even stigmatizing ones, if they do not imply false facts." *Id.*

For the second, "public disclosure" element, "the defendant [must] actually disseminate the stigmatizing comments in a way that would reach potential future employers or the community at large." *Palka*, 623 F.3d at 454 (citing *Ratliff v. City of Milwaukee*, 795 F.2d 612, 627 (7th Cir. 1996)).

As for the third element, the false statements must "ha[ve] the effect of blacklisting the [plaintiff] from employment in comparable jobs." *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001). "[T]he [plaintiff's] good name, reputation, honor or integrity must be called into question in a manner that makes it virtually impossible for the employee to find new employment in his chosen field." *Id.* (citations omitted).

### 4.9.1. Alleged Loss of Employment

Sorenson, Adams, Donohue, and Hall contend that the occupational liberty claim should be dismissed because the amended complaint fails to sufficiently allege the third element: "a tangible loss of other employment opportunities as a result of the public disclosure." (ECF Nos. 43 at 16; 47 at 41-42.)

Wolf alleges that, "[a]s a direct result of the Defendants [sic] statements, public releases, and combined acts …, [Wolf's] Fourteenth Amendment liberty rights were violated, and he has lost multiple employment opportunities in his chosen field [of public service]." (ECF No. 36 at ¶ 393.) Specifically, he "has been told by municipal recruiters that … the public releases by Defendants in November 2022 and January 2023 will make it impossible for him to find municipal or public employment in any

capacity" (*Id.*, ¶¶ 280), and that he "cannot resurrect his former reputation and status ... because Defendants … falsely stated he was a liar and dangerous to employees" (*Id.*, ¶ 282). Further, he "was expressly rejected from one employment opportunity … after Sorenson's public statements to Hilty on January 10." (*Id.*, ¶ 278.)

Accepting these allegations as true, as the court must at this stage, they suffice to satisfy the third element of an occupational liberty claim. *See Ratliff*, 795 F.2d at 625-26; *Townsend*, 256 F.3d at 670.

### 4.9.2. Hall

Hall alternatively argues that she should be dismissed from Claim Six because she "is not even alleged to have had any role in the information disclosed regarding Wolf during or following Wolf's termination." (ECF No. 43 at 14.) Wolf responds that he "clearly alleges in both his original and Amended Complaints that the false statements were publicly disseminated in a manner that would, and did, reach the community at large and potential employers." (ECF No. 51 at 22.) The use of the passive voice in this assertion is significant; he omits any allegation as to *who* disseminated those false statements and thus fails to respond to Hall's argument.

To state a claim against Hall, Wolf must allege that Hall disseminated the defamatory information. Disclosure to city officials, even if she knew that those officials might subsequently disseminate the information, is not enough. *Cf. Johnson v. Martin*, 943 F.2d 15, 17 (7th Cir. 1991) ("The plain fact is that the mere existence of damaging

information in Johnson's personnel file cannot give rise to a due process challenge.") Hall offered her summary to the Common Council in closed session (ECF No. 36-12) and disseminated her report only to city officials with the heading "ATTORNEY-CLIENT PRIVILEGED COMMUNICATION" (ECF No. 36-15). As such, Wolf's occupational liberty claim against Hall cannot succeed. *See McMath v. Gary*, 976 F.2d 1026, 1033 (7th Cir. 1992) ("Absent proof that the defendants disseminated the stigmatizing information beyond the appropriate chain of command within the City of Gary, McMath cannot succeed."). Hall's motion to dismiss Claim Six against her will be granted.

### 4.9.3. Sorenson

Sorenson alternatively argues that Claim Six must be dismissed against him because the statements attributed to him were not defamatory.

Wolf alleges in the amended complaint:

- "Sorenson and Adams disclosed and authorized the public release of statements that Mr. Wolf was dishonest, dangerous and retaliatory to employees, and violated 'laws' pursuant to the city's unconstitutional False Statements policy and practices." (ECF No. 36, ¶ 383.)

- "Sorenson labeled Mr. Wolf 'dishonest' on several occasions, including before Hall ever began her 'investigation,' to make sure that he was stigmatized as 'dishonest' and then accused of 'violating laws' in conjunction with his firing." (ECF No. 36, ¶ 384.)

- "Sorenson … emailing private citizens that Mr. Wolf violated the law, lied about the DEIB leaders, and then publicly

> stating for Sheboygan Press January 10 article that Mr. Wolf was dangerous to employees, retaliated against them, was a habitual liar, and that Mr. Wolf was 'warned' about his dishonesty— all of which Sorenson knew was categorically false." (ECF No. 36, ¶ 385.)

There are reasons to doubt whether statements made in emails to two private citizens are broad enough to satisfy the public disclosure element. *See, e.g.*, *Ratliff*, 795 F.2d at 626-27. But at this stage the court does not parse individual claims. *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015). For present purposes, it is sufficient to note that the quotes attributed to Sorenson in a January 10, 2023 (ECF No. 36-14) news report include statements that could plausibly be defamatory if untrue. Because the court cannot, at this stage, assess the truthfulness of those statements, Sorenson's motion to dismiss him from Claim Six will be denied.

### 4.9.4. Adams

Wolf alleges that Adams is liable in his official and individual capacities for violating Wolf's occupational liberty right because Adams "authoriz[ed] the public release of Hall's February 6 'investigation' report one month after … Wolf had been publicly fired without [providing him with procedures for challenging the report's release]." (ECF No. 36 at ¶ 387.) The amended complaint further alleges that Adams acted "maliciously and with reckless disregard for Wolf's liberty rights" by "immediately authoriz[ing] the full public release of Hall's final report two days after a

public announcement was posted that Wolf was a finalist for another City Manager position." (*Id.*, ¶ 388.)

Adams argues that Wolf cannot sustain a claim against him because he told Wolf of his intention to release Hall's report and with his legal options for challenging the report's release. Although Adams provided the court with his letter, neither the letter nor the fact that Adams gave Hall an opportunity to object to the release of the report is referenced in the amended complaint. Therefore, the court cannot consider this information in resolving the motion to dismiss. *See Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998) ("While 'documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are *central* to his claim,' …, this is a narrow exception aimed at cases interpreting, for example, a contract. It is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment[.]" (internal citation omitted; emphasis in original) (quoting *Wright*, 29 F.3d at 1248)).

Disregarding Adams's letter, the amended complaint's allegations plausibly state an occupational liberty claim against Adams for his role in authorizing the release of the Hall report.

The court must also reject Adams's alternative argument that, because he authorized the release of the report pursuant to an open records request, he is entitled to qualified immunity. Again, the amended complaint does not allege that Adams was

acting pursuant to an open records request. The court must accept what the amended complaint alleges—that Adams released the report with the intention of harming Wolf's public service employment prospects. (ECF No. 36 at ¶ 388.) Therefore, Adams's motion to dismiss Claim Six against him will be denied.

### 4.9.5. Donohue

Donohue argues that, even if she qualified as a public actor for purposes of the occupational liberty claim, the amended complaint does not allege that she publicly disclosed any defamatory statements about Wolf.

Wolf failed to respond to this aspect of the defendants' motion to dismiss. Unaided by Wolf's response, the court has not identified any allegation in the amended complaint that Donohue publicly disclosed any plausibly defamatory information in violation of Wolf's right to occupational liberty. Therefore, Donohue will be dismissed as a defendant as to Claim Six.

### 4.11. Claim Seven – Defamation Per Se

Claim Seven alleges common law defamation against Mayor Sorenson. To state a claim for defamation under Wisconsin law, a plaintiff must allege:

> (1) a false statement; (2) communicated by speech, conduct or in writing to a person other than the person defamed; and, (3) the communication is unprivileged and tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her.

Case 2:23-cv-00149-WED   Filed 09/05/23   Page 36 of 55   Document 62

*Colborn v. Netflix Inc.*, 541 F. Supp. 3d 888, 899 (E.D. Wis. 2021) (citing *In re Storms v. Action Wis. Inc.*, 309 Wis. 2d 704, 721-22, 750 N.W.2d 739, 748 (2008)). Because Wolf was a public figure, he must also allege that Sorenson made the defamatory statements with actual malice. *Id.* (citing *In re Storms*, 309 Wis. 2d at 721-22, 750 N.W.2d at 748). "Actual malice means that the allegedly defamatory statement was made with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.* (citing *In re Storms*, 309 Wis. 2d at 722-23, 750 N.W.2d at 748).

Sorenson's allegedly defamatory statements, which Hilty quoted in her January 10 article, were: "[Wolf] made some decisions that put the city in a very difficult situation, and actions have consequences. People should feel safe to come to work. People shouldn't have to be fearful of retaliation. People should have to come to work in a professional manner." (ECF No. 36-14 at 3.)

Sorenson argues that he is immune from liability because his statements were conditionally privileged. (ECF No. 47 at 58.) However, Sorenson argues his statements were conditionally privileged only as an alternative to his argument that his statements were absolutely privileged.[2]

---

[2] The conditional privilege defense is a bit of a non-sequitur in this context of a defamation claim by a public figure. The privilege means only that the plaintiff must prove that the statement was made with actual malice. That standard already applies because Wolf was admittedly a public figure. *Cf. Humann v. City of Edmonds*, No. C13-101 MJP, 2014 U.S. Dist. LEXIS 115806, at *20-21 (W.D. Wash. Aug. 19, 2014) ("a qualified privilege would merely institute the actual malice standard which Plaintiff already admits applies by virtue of her status as a public figure").

Wolf responds that Sorenson forfeited any conditional privilege because he knew his statements were false. (ECF No. 51 at 30-31.) But Wolf did not respond to Sorenson's argument that his statements were absolutely privileged and thus has forfeited any such argument. *See Bonte*, 624 F.3d at 466.

Nearly 60 years ago the Wisconsin Supreme Court stated:

> In determining the scope of the privilege to be accorded public officials while acting in an executive or administrative capacity competing values exist: (1) Of insuring that government officials not to be deterred from performing their public duties in fear of being held individually liable for what they may say or publish, and (2) of protecting private citizens from having their private or professional reputations damaged by defamatory matter uttered or published by public officials. Giving due weight to these competing values, we feel that with respect to all but executive officers in the higher echelons of government the according of conditional privilege rather than absolute privilege is preferable.

*Ranous v. Hughes*, 30 Wis. 2d 452, 466-67, 141 N.W.2d 251, 258 (1966).

It does not appear that any court has addressed the question of whether, under Wisconsin law, a mayor is an "executive officer[] in the higher echelons of government" entitled to an absolute privilege against claims for defamation for his official statements. However, courts around the country have found that absolute privilege extends to mayors. *See, e.g.*, *Lindner v. Mollan*, 544 Pa. 487, 496, 677 A.2d 1194, 1198 (1996); *Geick v. Kay*, 236 Ill. App. 3d 868, 876, 177 Ill. Dec. 340, 346, 603 N.E.2d 121, 127 (1992); *Harris v. City of Wabasha*, No. 05-CV-645(JMR/FLN), 2007 U.S. Dist. LEXIS§ 10431 (D. Minn. Feb. 14, 2007). In the absence of any argument from Wolf, the court finds that, if the Wisconsin Supreme Court were presented with the question, it likely would find that a

mayor is entitled to an absolute privilege against claims of defamation for statements made in his official capacity. Sorenson made the allegedly defamatory statements in his capacity as mayor, and therefore his motion to dismiss Claim Seven will be granted.

### 4.12.    Claim Eight – Civil Conspiracy

Claim Eight of the amended complaint asserts a state law civil conspiracy claim against Sorenson and Donohue. But in Wisconsin "there is no such thing as a civil action for conspiracy." *Onderdonk v. Lamb*, 79 Wis. 2d 241, 246, 255 N.W.2d 507, 509 (1977). Civil conspiracy is not so much a claim but a theory of liability. "In contrast to criminal law, where the 'gist' of conspiracy is the agreement, the 'gist' of a civil conspiracy action is the damages." *Brew City Redevelopment Grp., LLC v. Ferchill Grp.*, 2006 WI 128, ¶20 n.5, 297 Wis. 2d 606, 724 N.W.2d 879. It "involves 'a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful.'" *N. Highland Inc. v. Jefferson Mach. & Tool Inc.*, 2017 WI 75, ¶25, 377 Wis. 2d 496, 898 N.W.2d 741 (quoting *City of Milwaukee v. NL Indus., Inc.*, 2005 WI App 7, ¶25, 278 Wis. 2d 313, 691 N.W.2d 888).

"[I]t is not the conspiracy, as such, that constitutes the cause of action, but the overt acts that result from it." *Onderdonk*, 79 Wis. 2d at 247, 255 N.W.2d at 510 (quoting *Weise v. Reisner*, 318 F. Supp. 580, 583 (E.D. Wis. 1970)). "To state a cause of action for civil conspiracy, the complaint must allege: (1) The formation and operation of the

conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting from such act or acts." *Onderdonk*, 79 Wis. 2d at 247, 255 N.W.2d at 510; *see also N. Highland*, 2017 WI 75, ¶25. The wrongful act need not be criminal; it need only "violate some recognized legal norm." *Medline Indus. v. Diversey, Inc.*, 563 F. Supp. 3d 894, 920 (E.D. Wis. 2021) (quoting *Gene Frederickson Trucking & Excavating, Inc. v. Wagner*, 2019 WI App 26, 387 Wis. 2d 685, 928 N.W.2d 805 (unpublished)).

Sorenson and Donohue contend that the amended complaint fails to plausibly allege the second element—the existence of an underlying "wrongful act" taken in furtherance of the conspiracy.

It is unclear what aspect of his response, if any, Wolf intends to address his civil conspiracy allegations against Sorenson and Donohue. He frequently refers to various alleged conspiracies in his response, but his arguments generally do not align with or refer to Claim Eight. In response to the defendants' motions to dismiss, Wolf refers to an alleged conspiracy under § 1983. (*See, e.g.*, ECF No. 51 at 26.) But he abandoned that claim in his amended complaint, and in any event he discussed a § 1983 conspiracy in his response only as a theory for holding Hall, Hilty, and Donohue liable for constitutional torts (ECF No. 51 at 5, 24-26).

Wolf asserts that he "plausibly alleges that Donohue conspired with city official Defendants (Sorenson, Ackley, Salazar, Felde, etc.) to draft and serve the Directives on Mr. Wolf and City employees during his leave because she wanted to silence Mr. Wolf

from exposing her DEIB group efforts and ensuring a sham investigation would destroy his credibility so that no one would ever take him seriously." (ECF No. 51 at 11.) But he offers that argument not in the context of defending his civil conspiracy claim but in the context of arguing that Donohue was a state actor after she was no longer an Alderperson.

Wolf states that he "alleges that [Adams and Sorenson] conspired to convert [his] personal belongings and invaded his privacy in his office." (ECF No. 51 at 32.) But that argument would seem to align with Claim Ten, which alleges conversion only against Adams and thus not in the context of an alleged conspiracy.

Finally, Wolf argues that his civil conspiracy claim is not barred by Wisconsin's worker's compensation law. (ECF No. 51 at 32-33.) This is the only instance in which he explicitly refers to his civil conspiracy claim, but it is in response to a distinct alternative argument raised by the defendants.

The only portion of Wolf's response that could be characterized as responding to the defendants' argument regarding the sufficiency of Claim Eight is Wolf's contention that Donohue conspired with Sorenson (and others not named as defendants in Claim Eight) to draft and serve the leave directives. (ECF No. 51 at 11.) However, that theory does not align with the allegations contained in the complaint with respect to Claim Eight. (ECF No. 36, ¶¶ 420-24.)

It is not the court's role to try to piece together disparate contentions and attempt to weave them into a coherent argument for the plaintiff. *See, e.g., Dewey v. Bechthold*, 387 F. Supp. 3d 919, 924 (E.D. Wis. 2019); *Bank of Am., N.A. v. Veluchamy*, Civil Action No. 15 CV 882, 2015 U.S. Dist. LEXIS 115013, at *33 n.7 (N.D. Ill. Aug. 27, 2015) (quoting *Gross v. Town of Cicero*, 619 F.3d 697, 702 (7th Cir. 2010)); *DeLaTorre v. Minn. Life*, No. 04 CV 3591, 2005 U.S. Dist. LEXIS 20938, at *12 (N.D. Ill. Sep. 16, 2005). Rather, as this court has already noted, it is well settled that, when a party fails to properly respond, he forfeits his argument. *Dewey*, 387 F. Supp. 3d at 922 (citing cases). Having said that, the court is obligated to independently assess the sufficiency of the allegations in the amended complaint and determine whether the defendants have sustained their burden to show that the plaintiff has failed to state a claim. *Marcure*, 992 F.3d at 631.

The gist of Wolf's Claim Eight is that Donohue and Sorenson fabricated evidence of Wolf's misconduct as part of a scheme to defame and destroy his character and to ultimately force the Common Council to remove him and give Sorenson the power to distribute funds to support the DEIB group. (ECF No. 36, ¶ 418-29.) Although Wolf alleges that Sorenson's and Donohue's ultimate goal—funding a DEIB group—was unlawful, he does not suggest how it injured him. His alleged injury arose from the steps Sorenson and Donohue supposedly took to remove him from office.

An agreement to defame someone (*see* ECF No. 36, ¶ 422) which resulted in damage to that person is plausibly within the scope of a civil conspiracy claim.

However, as discussed above, Sorenson is absolutely immune for any statements Wolf attributes to him as being allegedly defamatory. And Wolf does not even allege that Donohue personally defamed him.

Wolf cannot pursue indirectly through a conspiracy claim what he cannot pursue directly through a defamation claim. Because defamation is the only wrongful conduct Wolf alleges to support his conspiracy claim, and Sorenson is absolutely immune from Wolf's defamation claim, Wolf's conspiracy claim against Sorenson cannot proceed.

The defendants do not address the questions posed by this conclusion. Given that a conspiracy must involve at least two people, does a conspiracy exist when one of the two alleged conspirators is absolutely immune for the underlying conduct? Can the law of conspiracy be used to hold Donohue liable for Sorenson's statements even though Sorenson's statements were absolutely privileged? Because Donohue fails to answer any of these questions, she has failed to show that Wolf's conspiracy claim against her fails.

Finally, Donohue argues that Wisconsin's Worker's Compensation Act (WCA) provides Wolf with the exclusive remedy for his conspiracy claim, which is, at its heart, a defamation claim. "[T]he WCA's definition of 'accident or disease causing injury' includes injuries caused by intentional acts, and thus courts are in agreement that both defamation and Section 134.01 claims are the types injuries for which the WCA may provide the exclusive remedy." *Patel v. Med. Coll. of Wis., Inc.*, No. 20-CV-1679-SCD, 2021

U.S. Dist. LEXIS 264179, at *5-6 (E.D. Wis. Feb. 8, 2021) (citing cases). Wolf does not dispute that the WCA can apply to an employee's defamation claim. Instead, he argues that the WCA does not apply because his injuries, at least in part, were incurred when he was on leave and thus prohibited from working. (ECF No. 51 at 33.) Donohue replies that Wolf clearly alleges that the conduct that led to his injuries began long before he was ever placed on leave. (ECF No. 56 at 31.)

After thoroughly reviewing the caselaw regarding defamation vis-à-vis the WCA, the court in *Patel* stated: "The Wisconsin courts thus appear to take an almost categorical approach to such claims: 'pre-termination defamation' is covered by the WCA while post-termination defamation is not." *Patel*, 2021 U.S. Dist. LEXIS 264179, at *11 (citation omitted). The court noted that at least one court recognized a potential exception to this dichotomy when the employee, although still technically employed, is on leave at the time of the alleged injury. *Patel*, 2021 U.S. Dist. LEXIS 264179, at *11 (discussing *Bostwick v. Watertown Unified Sch. Dist.*, No. 13-C-1036, 2013 U.S. Dist. LEXIS 170827, at *9 (E.D. Wis. Dec. 4, 2013)).

Ultimately, whether the employee was "performing service growing out of and incidental to his or her employment," Wis. Stat. § 102.03(d), at the time of the alleged injury requires the court to "look to the 'time, place, and circumstances,' under which the injury occurred." *Patel*, 2021 U.S. Dist. LEXIS 264179, at *8 (quoting *Love v. Med. Coll. of Wis.*, 371 F. Supp. 3d 489, 495 (E.D. Wis. 2016)). The record before the court on a

motion to dismiss is insufficient for the court to resolve this question. Consequently, the defendants' motion to dismiss will be granted as to Sorenson. For the reasons stated above, Sorenson is absolutely immune from suit for what amounts to a defamation claim. However, the motion is denied as to Donohue. She has not shown that Wolf's claim against her fails as a matter of law.

**4.13. Claim Nine – Intentional Infliction of Emotional Distress**

Claim Nine of the amended complaint asserts a claim of intentional infliction of emotional distress against Sorenson, Donohue, and Hall. To state a claim for intentional infliction of emotional distress the plaintiff must plausibly allege that: "(1) the defendant intended to cause emotional distress by his or her conduct; (2) that the conduct was extreme and outrageous; (3) that the 'conduct was a cause-in-fact of the plaintiff's emotional distress; and (4) that the plaintiff suffered an extreme disabling response to the defendant's conduct.'" *See Terry v. J. Broad. Corp.*, 2013 WI App 130, ¶ 42, 351 Wis. 2d 479, 515, 840 N.W.2d 255, 271-72 (quoting *Rabideau v. City of Racine*, 2001 WI 57, ¶ 33, 243 Wis. 2d 486, 501, 627 N.W.2d 795, 802-03).

It is not enough that a defendant intentionally engaged in conduct that caused emotional distress; the defendant must have engaged in the conduct for the purpose of causing emotional distress. *Rabideau*, 2001 WI 57, ¶36. Moreover, it is not enough that a plaintiff suffered some distress, upset, or depression as a result. *See Kopp v. Sch. Dist. of Crivitz*, 2017 WI App 80, ¶ 53, 378 Wis. 2d 740, 905 N.W.2d 843, 2017 Wisc. App. LEXIS

771 (unpublished). "Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is part of the price of living among people. The law intervenes only where the distress is so severe that no reasonable man could be expected to endure it." *Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 652 n.23, 517 N.W.2d 432, 442 (1994) (quoting Restatement (Second) of Torts, sec. 46, comment j.).

The defendants argue that Wolf fails to plausibly allege the second element of an intentional infliction of emotional distress claim because the conduct alleged is not extreme and outrageous. (ECF No. 47 at 66.) In order for conduct to be extreme and outrageous, "[t]he average member of the community must regard the defendant's conduct in relation to the plaintiff, as being a complete denial of the plaintiff's dignity as a person." *Alsteen v. Gehl*, 21 Wis. 2d 349, 359-60, 124 N.W.2d 312, 318 (1963).

Again, Wolf's response (or lack thereof) fails to address the defendants' arguments. Despite alleging Claim Nine against Donohue, Sorenson, and Hall (ECF No. 36 at 62), Wolf refers to only Donohue in the relevant portion of his response to the motion to dismiss. (ECF No. 51 at 31-32 (discussing Claim Nine under the heading "The Amended Complaint pleads that Donohue intentionally caused Mr. Wolf severe emotional distress").) By omitting any discussion of his claim against Sorenson and Hall, Wolf could be fairly understood as abandoning Claim Nine with respect to them. *Cf. Bolt v. Loy*, 227 F.3d 854, 855 (7th Cir. 2000).

But the court is reluctant to construe the omission as intentional rather than simply another example of carelessness on the part of Wolf. As to all defendants in Claim Nine, Wolf's arguments do not always align with the allegations in the complaint and are facially lacking. For example, in an effort to support the sufficiency of Claim Nine against Donohue, Wolf offers a long string citation that appears to reflect simply every instance where Donohue is referenced in the amended complaint. It is unclear what Wolf intends by the citation.

Wolf's response to the defendants' motion regarding Claim Nine continues:

Mr. Wolf alleges the following underlying factual grounds sufficient to create a plausible inference:

(1) Donhue [sic] used Hilty's "October" slur articles and public outrage to request from Council public resources for her DEIB group that Mr. Wolf had previously rejected as non-compliant with ARPA funds.

(2) Diane Welsh, another Madison-based attorney that works with Donohue at Planned Parenthood—sent a "cease and desist" letter to the City against Mr. Wolf during Hall's investigation solely on Mr. Wolf's confidential letter to the common Council on December 7, 2022 for Donohue's DEIB leaders despite Mr. Wolf being on leave and never disclosing his letter, its existence, nor its contents to anyone in the public; and despite his letter being privileged.

(3) Donohue's friend, Lauren Hofland, who is publicly affiliated with the progressive democratic [sic] party, attended the Republican event that Mr. Wolf was threatened from speaking at and immediately posted and reported Mr. Wolf's attendance and speech at the event.

(4) Diane Welsh sent Mr. Wolf and Mr. Wolf 's attorney a "cease and desist" letter threatening Mr. Wolf's attorney from representing him in his judicial proceeding specifically and solely based on Mr. Wolf filing his original Complaint naming Donohue and referencing her DEIB group.

(5) That Mr. Wolf suffered severe and debilitating emotional and physical injuries that harmed himself, his family, and caused severe lasting effects, including former colleagues and associates that are afraid of being threatened with (frivolous) legal action just for supporting or defending Mr. Wolf.

(ECF No. 51 at 31-32 (citations omitted).)

Although Wolf asserts that these five paragraphs are "sufficient to create a plausible inference," he does not identify what inference he is talking about. Only paragraph one addresses Donohue's alleged actions, and therefore that is the only paragraph relevant to whether Wolf has stated an intentional infliction of emotional distress claim against Donohue. Yet it does not come remotely close to plausibly alleging that Donohue engaged in conduct that is "extreme and outrageous."

Nonetheless, the court finds itself obligated under *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021), to look past West's deficient response and to independently assess the allegations in the amended complaint. As to Donohue, aside from conclusions and speculation as to her motives, the amended complaint alleges that Donohue

told Sorenson what to tell female employees so that Mr. Wolf could be fired as harassing and retaliatory, told Sorenson to publicize stigmatizing information about Mr. Wolf to the public, sent Lauren Hofland to harass and "spy" on Mr. Wolf at the Republican event, and directed her attorney friends, including Diane Welsh, to send letters to Mr. Wolf's attorney threatening Mr. Wolf from pleading relevant facts in this current judicial proceeding.

(ECF No. 36, ¶ 432.)

48

In each instance, Donohue's actions allegedly led another person to do something that Wolf seems to believe would constitute extreme and outrageous conduct. The court finds no support for the notion that the actions of an independent third-party can provide a basis for a direct claim of intentional infliction of emotional distress. In any event, none of the alleged actions rises to the level of extreme and outrageous conduct. Wolf does not even allege that Sorenson ever instructed any female employee to lie; he alleges merely that Sorenson advised them of what sort of conduct would be actionable.

Outside of perhaps a few exceptions for private information, which are not alleged here, publication of stigmatizing information could not constitute extreme and outrageous conduct if it were true. *Cf. Terry*, 2013 WI App 130, ¶42 (finding claim for intentional infliction of emotional distress insufficient and stating, "Again, the lynchpin of Terry's claim—falsity—is missing."). And Wolf does not allege that the published information was untrue. Notwithstanding the use of the nefarious "harass" and "spy," observing someone at an event is not extreme and outrageous. And, finally, having an attorney warn an adversary of plausible legal repercussions from an action is not extreme or outrageous even if the recipient deems the notice threatening.

The amended complaint alleges that Sorenson "engaged in extreme and outrageous conduct by lying to female employees that Mr. Wolf was toxic and retaliating against them so they would file complaints against Mr. Wolf …" (ECF No. 36, ¶ 435) and stated to a reporter "in November 2022 that Mr. Wolf was responsible for

sexual harassment in the police department …" (ECF No. 36, ¶ 436). A statement to an employee that the employee's supervisor "was toxic and retaliating against them" is not the sort of statement that plausibly rises to the level of extreme and outrageous. The tort of intentional infliction of emotional distress does not provide a cause of action for every instance of hurt feelings. *See Alsteen*, 21 Wis. 2d at 360 ("[T]he requirement of extreme and outrageous conduct as a condition of recovery will avoid litigation 'in the field of bad manners, where relatively minor annoyances had better be dealt with by instruments of social control other than the law.'" (quoting Magruder, *Mental and Emotional Disturbance in the Law of Torts*, 49 Harv. L. Rev 1033, 1035)). To bring such statements within the ambit of a claim for intentional infliction of emotional distress would turn routine workplace personality conflicts into torts. The law does not mandate adherence to every mother's adage to say nothing unless you can say something nice.

Similarly, to suggest that the City Administrator was ultimately responsible for sexual harassment in the police department is far from an extreme and outrageous assertion. Sorenson did not even suggest that Wolf participated in the harassment. Rather, the implication appears to be that, regardless of whether he had formal authority over the police department, as the city's chief administrator the buck stopped with Wolf.

As to Hall, the amended complaint alleges that Hall intentionally inflicted emotional distress

> by using her internal "investigation" to conduct a five-hour
> "interrogation" of Mr. Wolf without his attorney present, refusing to ever
> once tell Mr. Wolf exactly what she was investigating, knowing Mr. Wolf
> had no knowledge of the "charges" she was investigating, and then
> intentionally concealing and falsifying employee witness evidence in her
> "oral synopsis" and "final report" so that the city officials could
> "immediately" publish that Mr. Wolf was harassing and retaliating against
> Rendall, a habitual liar, and guilty of multiple policy and ethical violations
> as City Administrator—all based on knowing and intentional false
> information.

(ECF No. 36 at 64.)

The manner in which Hall conducted her investigation is not plausibly extreme and outrageous. To the contrary, Hall's actions seem quite ordinary and routine given the circumstances. *Cf. Kopp*, 2017 WI App 80, ¶ 52 ("As an example, even accepting the Plaintiffs' characterization of their interviews as 'threatening' and 'intimidating,' and their assertion that they were not permitted to discuss the circumstances of their punishment with other school staff members, no reasonable member of the community—as a matter of law—would view these events as 'extreme and outrageous' conduct warranting judicial remedy.") As for Wolf's allegation that Hall lied in reporting the findings of her investigation, this at least constitutes improper conduct. But merely alleging that a person lied does not support the inference that the lie was extreme and outrageous.

Because the amended complaint does not allege that Sorenson, Donohue, or Hall engaged in any conduct that was plausibly extreme and outrageous, the defendants' motion to dismiss Claim Nine will be granted.

**4.14. Claim Ten – Conversion**

Claim Ten of the amended complaint asserts a common law conversion claim against Adams, alleging that Adams converted Wolf's personal belongings in his City Hall office by refusing him access to his office after the Common Council voted to place him on administrative leave, refusing subsequent requests to allow him or his attorney access to his office while he was on leave, and refusing him access to his office after he was fired on January 9, 2023. (ECF No. 36 at ¶ 443.) As a result, Wolf alleges that he has been "deprived of a priceless artwork from his father …, valuable decorations and other items of personal value, … and very sensitive documents involving personal, family, and financial information." (*Id.*, ¶ 442.)

"The elements of conversion are: "(1) intentional control or taking of property belonging to another, (2) without the owner's consent, (3) resulting in serious interference with the rights of the owner to possess the property." *H.A. Friend & Co. v. Pro. Stationery, Inc.*, 2006 WI App 141, ¶ 11, 294 Wis. 2d 754, 763, 720 N.W.2d 96, 100 (Wis. Ct. App. 2006) (citing *Bruner v. Heritage Cos.*, 225 Wis. 2d 728, 736, 593 N.W.2d 814, 818 (Wis. Ct. App. 1999)).

In conjunction with their motion to dismiss, the Sheboygan defendants have provided the court with emails demonstrating their attempts to have Wolf retrieve his personal belongings. (ECF No. 48-9.) As matters outside the pleadings, those emails are not properly before the court (although they may raise a question as to the good faith basis for Wolf's conversion claim) and are therefore disregarded. *See Levenstein*, 164 F.3d at 347 (quoting *Wright*, 29 F.3d at 1248).

Adams also points to the letter he provided Wolf with the Leave Directives as proof that Wolf's conversion claim must fail. Because Wolf attached that letter to his amended complaint, it is part of the pleadings and properly before the court on a motion to dismiss. That letter informed Wolf, "If you would like to retrieve any of your belongings, please contact Attorney Adams to coordinate that." (ECF No. 36-9.) This sentence tends to undermine Wolf's claim, but it does not necessarily negate it. It is plausible that, despite offering to return Wolf's property, Adams later refused to do so.

Wolf's response is simply that he "has plausibly alleged (both in his original and Amended Complaints) that Adams and Sorenson conspired to convert Mr. Wolf's personal property in his office—an office that Mr. Wolf was prohibited from entering at all points during his leave and several months after his firing on January 9." (ECF No. 51 at 32.) Wolf's response is of little help to the court. Aside from offering a mere conclusion, Wolf incorrectly asserts that he alleges that Adams and Sorenson conspired

to convert his property. Wolf's conversion claim is against Adams alone. (ECF No. 36 at 65.)

Nonetheless, the amended complaint adequately alleges that Adams denied Wolf access to his office from November 7, 2022, to April 2023 and, as a result, deprived him of his property during that period. (ECF No. 36, ¶ 208.) And because Wolf plausibly alleges that Adams did so "maliciously, willfully, and intentionally" (ECF No. 36 at ¶ 448), Adams is not entitled to discretionary immunity under Wis. Stat. § 893.80(4) at this stage. Accordingly, the court must deny Adams's motion to dismiss Claim Ten.

## 5. Motion to File a Sur-Reply

Wolf seeks leave to file a sur-reply "to address new arguments that were not raised in the Defendants' motions and factual inaccuracies about the Plaintiff's Responsive Brief." (ECF No. 60 at 1.)

The defendants did not raise any material new arguments in reply. And there is no need for a plaintiff to correct alleged factual inaccuracies. The court is not making any sort of factual determination with respect to a motion to dismiss.

Insofar as Wolf seeks to file a sur-reply so he can respond to the arguments that he neglected to address in his response, that is not an inappropriate basis for a sur-reply. The time to respond to the defendants' arguments was in his response; he doesn't get a new opportunity to do so simply because the defendants pointed out his failure in their reply. Therefore, Wolf's motion to file a sur-reply will be denied.

6.  **Conclusion**

**IT IS THEREFORE ORDERED** that Hall's motion to dismiss the amended complaint (ECF No. 42) is granted with respect to Claim Six and Claim Nine. The motion is denied in all other respects.

**IT IS FURTHER ORDERED** that the Sheboygan defendants' motion to dismiss the amended complaint (ECF No. 46) is granted with respect to Claim Two, Claim Four, Claim Seven, and Claim Nine. These claims are dismissed in their entirety. The motion is granted in part as to Claim One as to Wolf's claim that the Leave Directives were unconstitutionally overbroad. The motion is granted as to Claim Five as to the Alderperson defendants. Claim Five is further dismissed as to Sorenson and Adams in their official capacities. The motion is granted as to Claim Six with respect to Donohue. The motion is granted as to Claim Eight with respect to Sorenson.

**IT IS FURTHER ORDERED** that Wolf's motion to file a sur-reply (ECF No. 60) is denied.

Dated at Milwaukee, Wisconsin this 5th day of September, 2023.

*William E. Duffin*

WILLIAM E. DUFFIN

U.S. Magistrate Judge